United States Courts
Southern District of Texas
FILED

*December 08, 2020*

David J. Bradley, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Ernest Adimora-Nweke | § | CASE NO. |
| *Plaintiff* | § | 4:20-CV-4149 |
| v. | § | |
| *Hannah O. Yarbrough-Smith, et al* | | |
| *Defendants* | | |

PLAINTIFF'S 4th AMENDMENT TO ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Ernest Adimora-Nweke, Plaintiff, and files this 4th Amendment to Original

Petition pursuant to Fed. R. Civ. Pro. Rule 15(a)(1) complaining of Defendants, Hannah O.

Yarbrough-Smith ("HYS") *et al*, and shall show as follows based on personal knowledge,

information, and/or belief:

## PARTIES

Plaintiff, Ernest Adimora-Nweke is an individual who resides in The State of Texas.

On information and/or belief,

(1) Defendant, Hannah O. Yarbrough-Smith ("HYS"), is an individual who resides in the State

of Texas.  Address for the sake of service of process shall be ascertained and provided to

the clerk in due course.

(2) Defendant, Jarrod Walker, is an individual who resides in the State of Texas.  Address for

the sake of service of process shall be ascertained and provided to the clerk in due course.

(3) Defendant, Damiola Akinfolarin is an individual who resides in the State of Texas. At the

time of events complained of against him, he was a security manager at M5250

Apartments, or employed at M5250 Apartments. His last known home address for the sake

of service of process is 13099 Westheimer Rd. Apt 2905. Houston, TX 77077.

(4) Defendant, Officer J.J. Barbar (#16385) is a HPD officer or was such during the time of

1

events complained of against him/her; and is an individual who resides in the State of Texas.  Ms. Barbar may be served process at her place of employment – Houston Police Department 1200 Travis St. Houston, TX 77002.

(5) Defendant, Officer Blenton (#131978) is a HPD officer or was such during the time of events complained of against him/her; and is an individual who resides in the State of Texas.  Ms. Blenton may be served process at her place of employment - Houston Police Department 1200 Travis St. Houston, TX 77002.

(6) Defendant, Officer J.D. Tallant (#155586) is a HPD officer or was such during the time of events complained of against him/her; and an individual who resides in the State of Texas.  Mr./Mrs. Tallant may be served process at his/her place of employment - Houston Police Department 1200 Travis St. Houston, TX 77002.

(7) Defendant, Officer M. Meyer (#155268) is a HPD officer or was such during the time of events complained of against him; and is an individual who resides in the State of Texas.  Mr. Meyer may be served process at his place of employment - Houston Police Department 1200 Travis St. Houston, TX 77002.

(8) Defendant, Officer M. A. Reyes (#132896) is a HPD officer or was such during the time of events complained of against her; and is an individual who resides in the State of Texas.  Mr. Reyes may be served process at his place of employment - Houston Police Department 1200 Travis St. Houston, TX 77002.

(9) Defendant, Houston Police Department ("HPD"), a government entity, may be served process via its Chief of Police, Hubert A. Acevedo, at 1200 Travis St. Houston, TX 77002.

(10)     Assistant District Attorney ("ADA") Nelson, is a resident of the State of Texas.  At the time of events complained of against him/her, he/she was an assistant district attorney

within the Harris County District Attorney's office.  ADA Nelson may be served process at his/her place of employment – which shall be confirmed in due course.

(11)     ADA Denholmn, is a resident of the State of Texas.  At the time of events complained of against him/her, he/she was an assistant district attorney within the Harris County District Attorney's office.  ADA Denholmn may be served process at his/her place of employment – which shall be confirmed in due course.

(12)     Harris County District Attorney's Office, a local government entity, may be served process via Harris County District Attorney, Kim Ogg, at 1201 Franklin St., Ste 600, Houston, TX 77002.

(13)     CWS Galleria, 5250 L.P. (d/b/a "M5250") is the owner and/or operator of M5250 Apartments located at 5250 Brownway St., Houston, TX.  In Houston Appraisal District property tax records, CWS Galleria, 5250 L.P. ETAL is listed as the owner of the parcel of 5250 Brownway St, with a mailing address is listed as 14 Corporate Plaza, Dr. Ste. 210, Newport Beach, CA, 92660-7928.  CWS Galleria 5250, L.P., is listed as an entity formed in the State of Delaware, with a Texas Mailing Address of 9606 North Mopac Expwy, Suite 500.  Austin, TX 78759, and registered agent, Shanna Berrien, at registered address of 9606 North Mopac Expwy, Suite 500.  Austin, TX 78759.  CWS Galleria, 5250 L.P. and/or M5250 may be served process via Shanna Berrien at her registered address.

(14)     Defendants John Does 1, 2, 3, & 4, are individuals who are yet to be identified in this suit.

(15)     Defendant, Deputy Chad Schoenvogel (#533), is a resident of the State of Texas and a Harris County Constable Precinct 5 police officer.  He may be served process at 17423 Katy Freeway, Houston, TX 77094.

(16)    Defendant, Deputy Carmelo Aponte (#547) is a resident of the State of Texas and a Harris County Constable Precinct 5 police officer.  He may be served process at 17423 Katy Freeway, Houston, TX 77094.

(17)    Defendant, Officer D.R. Daniel, III is a HPD officer or was such during the time of events complained of against him; and is an individual who resides in the State of Texas. Mr. Daniel may be served process at his place of employment - Houston Police Department 1200 Travis St. Houston, TX 77002.

(18)    Defendant, Harris County, Texas ("Harris County") is a duly recognized local government entity in the State of Texas. During all relevant times, Harris County is the parent entity or employer of the applicable entities and/or individual persons or officers involved in causing Plaintiff(s) harm.  Amongst others, Harris County is directly or indirectly responsible for enacting policies, procedures, customs, practices, and training of the subdivisions or sub-entities and staff for the involved in causing Plaintiff(s) harm; and is directly or indirectly responsible for, amongst others, failure or inadequate (a) screening during hiring process, (b) supervision or management, (c) training, (d) provision of necessary or essential health care to inmates, and/or (e) oversight of its staff and magistrates, and/or for the sub-entities and/or subdivisions involved; all which subjected or caused Plaintiff(s) civil rights deprivations, and were a substantial factor in Plaintiff(s) resulting harm.  Harris County may be served process via Harris County Judge, Lina Hidalgo, 1001 Preston, Suite 911, Houston, TX 77002.

(19)    Defendant Officer Z. Wang (#13150 or #8111) is a HPD officer or was such during the time of events complained of against him; and is an individual who resides in the State of Texas.  He may be served process at his place of employment – 7277 Regency Square,

4

Houston, TX 77036.

(20)    Defendant Officer J. Teran (#164259) is a HPD officer or was such during the time of events complained of against him; and is an individual who resides in the State of Texas. He may be served process at his place of employment - Houston Police Department 1200 Travis St. Houston, TX 77002.

(21)    Defendants, John Does 5, 6, 7, 8, & 9 are all state actors or employees of HPD during the time of the events complained of against them; and reside in the State of Texas, and Harris County.  Their proper identities and employers are yet to be ascertained.

(22)    Defendant, Steven C. McGraw is the applicable and responsible Director of Texas Department of Public Safety, a Texas State Agency. He may be served process at 5805 N. Lamar Blvd. Austin, TX 78752-4431.  He is sued in his official capacity.

JURISDICTION & VENUE

This Court has jurisdiction over Defendants, and is proper venue for this case because (a) Defendants are residents of Harris County and the State of Texas; (b) the events or incidents that are the basis of Plaintiff(s) claims occurred in Harris County and throughout Texas, and the U.S. District Court, Southern District of Texas, Houston Division is located within Harris County, Plaintiff's place of residence; and (c) Plaintiff(s) have claims that arise under the U.S. Constitution and Federal Laws of the United States per 28 U.S.C. Section § 1331 *et al*.  Damage amounts are also within this Court's jurisdiction.

JURY DEMAND

Plaintiff hereby requests a jury trial.

OVERVIEW

There is an extensive history behind this case during which HYS, various non-

governmental actors, and various governmental actors acting under color of law, have continuously conspired to, acted to, or attempted to deprive or subject Plaintiff to the deprivation of his U.S. Constitutionally protected civil rights, and cause Plaintiff severe mental and emotional harm, injury to his person, his business, his property, his reputation, his income and income opportunities; as well as his family.  Such has been ongoing since 2015, and has intensified exponentially each year thereafter.

The harmful actions of HYS and/or various governmental and/or non-governmental actors, acting alone or as co-conspirators, to/that injure Plaintiff, his rights, property, business, and family, are customarily ignored, acquiesced to, aided, supported, directed, aided, and/or encouraged the authorities.

Plaintiff has been informed various times, that Plaintiff **is** the target.  The below are a few incidents.

<u>MATERIAL FACTS</u>

Plaintiff met HYS in June 2014, and never saw her again until September 2015.

Plaintiff is an attorney.  Plaintiff is also a party to a major civil right and *qui tam* case against a major state agency, Harris County Hospital District, and a good number of physicians and executive physicians. The case is still currently litigated in Federal court.  Plaintiff was involved in the civil rights case since July 2015.  It involves conspiracies to deprive Plaintiff and his clients of their equal protection and due process rights for reasons including their race, age, alienage, and more; killing/murder of one of the clients; and various conspiracies actionable under 42 U.S.C. §1985 and §1986. There are lots of powerful entities and individuals who are Defendants in the suit.  Plaintiff worked on this case day and night.  It has consumed Plaintiff's time and resources.

In early September 2015, Plaintiff caught the Harris County Sheriff – Ron Hickman – at that time, appear in Plaintiff's apartment complex at that time, and was snooping in **only** Plaintiff's vehicle with a flashlight.  Days later, while Plaintiff was at his parent's home, all of Plaintiff's work equipment and materials regarding the case, disappeared.  The tortfeasor did not take Plaintiff's money in the vehicle.  Just Plaintiff's work equipment and all evidence regarding the case. Plaintiff conducted unsuccessful inquiries with Defendant's counsel. Within about 48 hours after the theft, HYS randomly called Plaintiff to meet up again, and has ever since tried and even forcefully kept herself and HPD in Plaintiff's life.

In 2016, after the Defendants moved the case to Federal Court, Plaintiff filed the whistleblower action, a major Federal and State whistleblower claim.  Once Plaintiff filed the whistleblower action, the wrongful activities of HPD, HYS, and more intensified.  On one rainy day, after the whistleblower action was filed, after HYS informed Plaintiff of her involvement in illegal activities and Plaintiff instructed her that she **must** stop such if she wanted to be associated with Plaintiff – to which she assured and agreed that she would, HYS was a guest at Plaintiff's apartment. Plaintiff had roommates that were away at the time.  The parties consumed alcohol. HYS wanted and was about to get in her vehicle and drive home extremely drunk.  Plaintiff instructed against it, and took her keys out of the ignition.  Plaintiff went inside with the keys and left the door open for HYS, and eventually fell asleep.

Plaintiff was awoken by a female HPD officer and about 5 – 7 other HPD officers in his room, about 8 others in the apartment, about 5 others outside, and over 10 police vehicles outside. Supposedly, they all came because HYS called them alleging that Plaintiff had HYS's keys, and locked her out of the apartment.  Such was clearly not the truth. Plaintiff tried to understand what was going on from HYS – who remained outside, but the officers would not allow Plaintiff to

communicate with her.  As Plaintiff was putting his clothes on, they searched Plaintiff's room and apartment.  A barely awake Plaintiff, shocked and surprised at the police intrusion into his home and room, and shocked and surprised at the allegations, immediately gave them the keys – that were on the couch – and told everyone to leave.  As they left, they would not allow Plaintiff to speak to HYS to understand what was going on/what had occurred.  HYS called Plaintiff the following day and told Plaintiff that the female HPD officers were trying to get her to press charges against Plaintiff, but she refused.  ***Interestingly***, after the HPD incident with all the officers in Plaintiff apartment and room, Plaintiff's apartment was constantly entered without authorization, and Plaintiff's property, including case related materials, would end up missing.

Plaintiff and HYS maintained contact with each other throughout 2016. Plaintiff would constantly advise HYS to (a) get a graduate degree, (b) get a legitimate job, and (c) stop her illegal activities.

Throughout 2016, after the HPD intrusion into Plaintiff's apartment, and definitely after the Ron Hickman incident, crazy things would happen to Plaintiff to harm Plaintiff from being able to represent himself and his clients in the civil rights and *qui tam* claims, injure Plaintiff in his person, reputation, and property. For example, Plaintiff's vehicle would be vandalized to hinder, deter or impede Plaintiff from being able to attend court appearances in the matter. Plaintiff's bank accounts would be accessed without authority or consent from Plaintiff.

On one occasion in 2016, HYS came to Plaintiff's apartment and informed Plaintiff that some of her illegal activities' clientele, which she alleged to include physicians, would discuss Plaintiff's case in front of her.  The case is a major and ground-breaking case.

After Plaintiff moved to a different apartment in 2017, HYS would sometimes come to Plaintiff's place unauthorized to spy on Plaintiff.  In situation in which Plaintiff would ask her to

leave, she would refuse, and cause a scene with Plaintiff's neighbors. She would state that she has deep connections and influence within HPD, Harris County District Attorney's Office, and within legitimate and illegitimate/illegal industries. She would claim that she was going use her authority to get Plaintiff evicted from his home, Plaintiff would lose his professional license, Plaintiff would lose he civil rights and *qui tam* case, and that Plaintiff would have to go back to Africa. On one occasion – which seemed like a planned action with her HPD cohorts – she came to Plaintiff's apartment, Plaintiff eventually asked her to leave and she refused. She called the police and within about 5 minutes there were about 15 – 20 officers and approximately 10 HPD vehicles again in Plaintiff's apartment, with about 10 HPD officers searching through Plaintiff's apartment without authority. Plaintiff stood outside as the officers were inside and HYS picked up her things. When they all left, some of Plaintiff's personal property ***interestingly*** also disappeared with them.

The civil rights component of the civil rights and *qui tam* cases went on appeal in Federal Court in the spring of 2017. During the appeal, Plaintiff would get ***bombarded*** with random calls and texts from individuals that HYS later claimed to be her cohorts/co-conspirators. Plaintiff would also get threats to his person, threats of harm to his family members who work in the medical field – including threats of harm to Plaintiff's mother who consulted Plaintiff on the civil rights case, and threats of harm because of the civil rights and *qui tam* case. Some of these texts would be racially charged – e.g., with the word "nigger," go back to Nigeria, and more.

Once in late 2017, around or after the incident described below in FACTS FOR INCIDENT 1, she texted Plaintiff a photograph of some of the officers that came into Plaintiffs apartment, and also one of the officers that arrived per the FACTS FOR INCIDENT 1, to show her connections and influence within HPD. Yet, she still continued to come to Plaintiff apartment, cause nuisance, and refuse when asked to leave; or roam around Plaintiff's neighborhood.

Per the landlord, Plaintiff ultimately had to move out of that apartment and back to his parent's home by the end of Dec 2017, due to HYS and her HPD cohort's constant wrongful actions and/or harassment of Plaintiff and other tenants on the premises.

Before or around the period of the events in the FACTS FOR INCIDENT 2 & 3 below, HYS disclosed to Plaintiff of a night that she and one of her later disclosed vice cohorts, who usually meets with her at M5250, went to a social venue, Clutch bar, in Houston's Washington Avenue; after the club business hours.  At the venue it was only her, the cohort, and many HPD officers.

During the events alleged in FACTS FOR INCIDENT 2 & 3 below, HPD even came after Plaintiff's mother.  They waited under evidence of her defense was destroyed from HPD records – e.g. surveillance footage that evidences her innocence of an alleged crime, an officer called her many times two consecutive early mornings to harass her about the months long ago accident.  On the first call, he informed her that he knew who she was, where she lived, and that she was a nurse by profession.  On the following morning call, he told her to check herself in jail immediately, and then charged her with a crime that she did not commit. The case was dragged out, and Plaintiff and his mother were constantly harassed, intimidated, and under threat to life, health, and safety.

HYS showed her and/or her cohort/co-conspirators' involvement with Plaintiff's mother's matter when she texted Plaintiff of an internally accessible database of the proceedings.

Overall, whenever Plaintiff would report to the authorities about HYS and her cohort/co-conspirator's harmful actions, nothing is done.  Not even an investigation.  Yet, Plaintiff is constantly subject to harm from HPD and the authorities, due to the wrongful actions or false allegations from HYS and/or her co-conspirators.

Some of the case evidence taken from Plaintiff's vehicle in first week September 2015,

*magically* appeared in a conspicuous location in Plaintiff's home in 2019, on the same day as stolen in 2015.

<u>FACTS FOR INCIDENT 1</u>

On or about August 14, 2017, Defendants HYS and Jarrod Walker ("Walker") at various times agreed and acted in furtherance of said agreements to kidnap or falsely imprison Plaintiff, have him assaulted and battered by contracted hit-men, and to steal his personal property including his telephone, the keys to his home, and more.  Their actions in furtherance of said conspiracy included the following:

HYS and Walker planned and hired contract hit-men to execute a hit-job on Plaintiff.  HYS and Walker came to Plaintiff's apartment, and HYS deceptively called Plaintiff to come outside and come with her to drop off Walker and home, and then go to lunch with her.  When Plaintiff arrived outside at her vehicle – parked in the public park and school parking lot, Walker was in the driver's seat.  HYS stated that she was going to drop Walker at his home before her and Plaintiff head off to lunch; but first, Walker's friends were to first arrive at the parked location so that she and Walker can purchase some marijuana.

Within less than five minutes, a vehicle arrived at the parking lot.  Plaintiff overheard the communication between Walker, HYS, and the driver of the vehicle that arrived ("Terrance"), during which Terrance stated that the parking lot was too open, and that they needed to go to another secluded location.

HYS drove Plaintiff and Walker, with Plaintiff in the back-passenger side of the vehicle and Walker in the front passenger side of the vehicle, to a secluded area about 15 minutes away from his apartment.  The hit-men, including the Terrance character, went to the secluded location in a separate vehicle.

There, while Plaintiff was in the back seat of HYS' vehicle, HYS in the front driver seat, and Walker in the front passenger seat, HYS and Walker invited the hit-man into the back-driver seat of the vehicle.  Plaintiff was ignorant of all of their intentions.

Terrance approached HYS' vehicle and entered the vehicle from the back left/driver-side. Plaintiff saw HYS give a handful of cash to Walker, and saw Walker give the cash to the Terrance guy who was in the back-driver's section seat at this time.

The Terrance hit-man guy thereafter began to physically and brutally/severely hit Plaintiff on the head, face, shoulder, and ribs, with both of his fists, while simultaneously trying to take Plaintiff's phone and keys.

The second hit man exited their vehicle upon, stood outside the back-passenger door thereby blocking Plaintiff's means to exit the vehicle. HYS and Walker wound down the back-passenger window next to Plaintiff for said secondary assailant/hit-man.  The second hit-man then began to also physically and brutally/severely hit Plaintiff on the head and face through the window, while standing outside the door and restricting Plaintiff's movement.

Plaintiff was restricted to an enclosed the back-passenger seat of the vehicle, while defending his life and property, as HYS and Walker watched from the front seat, and assisted by granting the hit-men access, paying them, and aiding the hitmen who attempted to steal Plaintiff's property – i.e., phone.

After about two to three minutes of sheer brutal battery on a constrained Plaintiff, with Plaintiff struggling to simultaneously defend himself against two hit-men assailants – one form each side of him – and also simultaneously retain his phone and keys which the assailant inside also tried to forcefully take from Plaintiff, Plaintiff in fear of death mustered enough energy to open the door while being battered, kick it forcefully enough to get enough space to run out of the

vehicle, and ran away from the vehicle.

After running about 20 yards in the parking lot yet away from the vehicle, Plaintiff was realized that (1) he was not shot in the back, and (2) his keys were in the car's back seat. Plaintiff turned around and then saw the hit men run away from the car to their vehicle and drove off.

HYS' vehicle with Walker inside was still parked at the spot of the hit-job, with the back driver-side door open, and HYS and Walker in the front seat.

Plaintiff called out to them that his, i.e., Plaintiff's keys were in the back seat of the vehicle, and Plaintiff needed to collect his keys.

After Plaintiff called out and informed HYS and Walker of his keys, HYS started and accelerated the vehicle, the force shut the back driver-side door, and HYS and Walker drove off with Plaintiff's keys.  As they let the parking lot and turned on the street, Plaintiff continued to call out to them to leave his keys.  They continued their flight in the vehicle.

Plaintiff used his telephone and called the police.  When the HPD police arrived about 30 to 45 minutes later, they saw Plaintiff and did not want to stop.  Plaintiff had to go to the middle of the street in a deserted area to stop them from leaving Plaintiff stranded there.  Plaintiff informed HPD of all that occurred, and informed them that HYS and Walker had his key bunch which included his house, room, and apartment keys.  They HPD police officers rather felt amused by Plaintiff's injured condition and deserted situation, and refused to render assistance saying that there was nothing they could do for Plaintiff.  Plaintiff was shocked and demanded that they at least call HYS and ask her to bring back Plaintiff's keys.  They called HYS, who – per the officer that called her – claimed that she did not have Plaintiff's keys.  The officers then sought to leave Plaintiff stranded on the location of the incident, by side of the freeway/highway.  They claimed they could not give Plaintiff a ride home.  After multiple efforts from Plaintiff, including how non-

sensical it seems not to at least give Plaintiff a ride home under the circumstances, and that they could not just leave Plaintiff injured and stranded on the side of the highway, the officers reluctantly agreed to give Plaintiff a ride back to his apartment.

The officers dropped Plaintiff back at his apartment.  About 4 hours later that evening, Plaintiff received a call from an individual who had his keys.  She claimed that an old lady was passing by her apartment and handed them to her through her apartment fence.  She – i.e. the girl – then looked through the documents on the flash drive, and saw Plaintiff's information, and contacted Plaintiff.

HYS later told Plaintiff that she was surprised that Plaintiff ever got the keys back because her and Walker never though Plaintiff would ever get the keys back.  According to her, she and Walker drove somewhere far away with the keys, and stopped, and Walker threw the keys in a deserted bushy area.

Ever since, HYS, Walker, and their various other cohorts, have used the keys, or copies of the keys, which they made to access Plaintiff's apartment and home/parent's home.  The intrusions to Plaintiff's apartment and home/parents' home continuously occurred since the kidnapping and robbery incident with HYS and Walker until after Plaintiff moved out of the apartment in the case of the apartment intrusions, and until Plaintiff convinced his parents to change the locks on the doors to the home around July or early September 2018.  Plaintiff requested the change of locks due to the multiple continuous and unconsented intrusions into the family's home with the keys, the continued resulting theft/conversion, continued resulting destruction of Plaintiff's property, continued resulting invasion of Plaintiff and his family's privacy, and more continuous harm on Plaintiff, his rights, business/firm, property, reputation, income, and income opportunities, as well as on Plaintiff's family.

Some of Plaintiff's property subsequently stolen from his apartment and family's home since August 2017 until home includes Plaintiff's work materials, Plaintiff's ipod that contained law review/legal lectures and music, and Plaintiff's privileged work-related documents.

Plaintiff also later came to find out from HYS that the HPD officers, were friends of HYS. About a month after the incident, Walker got hired as a Probation Officer II for Texas Department of Corrections.  Plaintiff also later came to find out from HYS that the name of the hit-man driver of the second vehicle, who entered her vehicle, was named Terrance, and that he was a friend of Walker.

Plaintiff made various subsequent efforts to press charges in regards to the matter.  HPD was not responsive to Plaintiff.

<u>CAUSES OF ACTIONS FOR INCIDENT 1:</u>

<u>False Imprisonment</u>

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

HYS and Walker, acting along with their hit-men cohorts, intended to and did cause the willful and wrongful detention or confinement of Plaintiff on August 14, 2017.  HYS and Walker also requested, directed, or caused the willful detention or confinement of Plaintiff on August 14, 2017.  At all relevant times, Plaintiff never consented to the detention or confinement.  At all relevant times, neither HYS, Walker, nor any of their two hit-men, including the Terrance character, had any authority of law for the detention or confinement of Plaintiff.  Their actions were intended to detain or confine Plaintiff, they were conscious of Plaintiff's detention or confinement, and they were aware that Plaintiff did not consent to such detention or confinement, nor was their detention or confinement of Plaintiff privileged.

Plaintiff incurred and endured injuries actually or proximately caused by the HYS, Walker, and the hitmen's malicious, willful, and intentional detention or confinement of Plaintiff. The injuries include mental anguish, pain and suffering, emotional harm, reputational injury, property damage, and financial injuries including loss of income and loss of income opportunities. Plaintiff prays for all damages allowed including exemplary/punitive damages.

Conversion

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

At various times, including on and after August 14, 2017, HYS and Walker intentionally or knowingly deprived Plaintiff of his right to use and possess his personal property – including the keys to his apartment and family home, and Plaintiff's properties inside his apartment and his family home. They intentionally or knowingly interfered with Plaintiff's right to said personal properties without consent and lawful justification. Plaintiff had ownership or right to possession of said personal properties. They intentionally or knowingly took said properties without Plaintiff's consent and without just authority. They intentionally or knowingly dispossessed Plaintiff, the lawful possessor of said personal properties, of said personal properties. They intentionally or knowingly used or appropriated the use of said personal properties without authority from Plaintiff to use or appropriate the properties, and in a manner indicating a claim of right in opposition to the rights of Plaintiffs and his family. They intentionally or knowingly disposed of Plaintiff's personal properties in an unauthorized manner with intent to transfer a proprietary interest it said properties. They intentionally or knowingly refused to surrender the properties upon demand from Plaintiff. Their actions were a legal cause of Plaintiff's various loss of said properties and rights to said properties. Plaintiff sustained damages as an actual or

proximate result. Plaintiff's damages include mental anguish, pain and suffering, emotional harm, reputational injury, property damage, and financial injuries including loss of income and loss of income opportunities.   Plaintiff prays for all damages allowed by law and equity including exemplary/punitive damages.

Assault

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

HYS and Walker, acting along with their hit-men cohorts, intentionally attempted to inflict injury on Plaintiff, had the apparent ability to cause injury on Plaintiff, and did create a reasonable apprehension of bodily harm or offensive contact on Plaintiff.  Plaintiff sustained damages as an actual or proximate result. Plaintiff's damages include mental anguish, bodily injury, emotional harm, pain and suffering, reputational injury, property damage, and financial injuries including loss of income and loss of income opportunities.  Plaintiff prays for all damages allowed by law and equity including exemplary/punitive damages.

Battery

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

HYS and Walker, acting along with their hit-men cohorts, intended to and did cause the intentional touching of, or application of force to Plaintiff's body; in a harmful and offensive manner, and without Plaintiff's consent.  Plaintiff sustained damages as a proximate result. Plaintiff's damages include mental anguish, bodily injury, pain and suffering, emotional harm, reputational injury, property damage, and financial injuries including loss of income and loss of income opportunities.   Plaintiff prays for all damages allowed by law and equity including

exemplary/punitive damages.

Conspiracy to Commit False Imprisonment

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

HYS, Walker, and their two hit-men, including the Terrance character, at various times entered into various agreement to intentionally, willfully and wrongfully detain or confine Plaintiff, without Plaintiff's consent, and without lawful authority Plaintiff on August 14, 2017. HYS, Walker, and their two hit-men, including the Terrance character, acted in furtherance of their various agreements agreement to intentionally, willfully and wrongfully detain or confine Plaintiff, without Plaintiff's consent, and without lawful authority Plaintiff on August 14, 2017.  Their actions include, amongst others, the restriction of Plaintiff in the back of HYS's vehicle while Plaintiff was surrounded by the hit-men to his left and right-side while being battered, and unable to exit the vehicle.  Their actions were done with intention to detain or confine Plaintiff, they were conscious of Plaintiff's detention or confinement, and they were aware that Plaintiff did not consent to such detention or confinement, nor was their detention or confinement of Plaintiff privileged.

Plaintiff sustained damages as a proximate result. Plaintiff's damages include mental anguish, personal injury, reputational injury, bodily injury, pain and suffering, emotional harm, and financial injuries including loss of income and loss of income opportunities.  HYS, Walker, and their two hit-men are jointly and severally liable for Plaintiff's damages.  Plaintiff prays for all damages including exemplary/punitive damages.

Conspiracy to Commit Conversion

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

At various times, including on and after August 14, 2017, HYS and Walker intentionally or knowingly entered into various agreement to intentionally or knowingly deprive Plaintiff of his right to use and possess his personal property – including the keys to his apartment and family home, and Plaintiff's properties inside his apartment and his family home.  They intentionally or knowingly interfered with Plaintiff's right to said personal properties without consent and lawful justification.  Plaintiff had ownership or right to possession of said personal properties.  They intentionally or knowingly took said properties without Plaintiff's consent and without just authority.  They intentionally or knowingly dispossessed Plaintiff, the lawful possessor of said personal properties, of said personal properties.   They intentionally or knowingly used or appropriated the use of said personal properties without authority from Plaintiff to use or appropriate the properties, and in a manner indicating a claim of right in opposition to the rights of Plaintiffs and his family. They intentionally or knowingly disposed of Plaintiff's personal properties in an unauthorized manner with intent to transfer a proprietary interest it said properties. Some of their actions in furtherance of their conspiracy include using the keys to continuously access Plaintiff's apartment and home themselves or cause or direct others to do so; and wrongfully take and/or access Plaintiff's personal property within his apartment and his parent's home without Plaintiff's consent, or cause or direct others to do so.  They intentionally or knowingly refused to surrender the properties upon demand from Plaintiff.  Their actions were a legal cause of Plaintiff's various loss of said properties and rights to said properties. Plaintiff sustained damages as an actual or proximate result. Plaintiff's damages include mental anguish, bodily injury, pain and suffering, emotional harm, reputational injury, property damage, and financial injuries including loss of

income and loss of income opportunities. HYS, Walker, and their two hit-men are jointly and severally liable for Plaintiff's damages. Plaintiff prays for all damages allowed by law and equity including exemplary/punitive damages.

<u>Conspiracy to commit battery</u>

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

HYS, Walker, and their two hit-men, including the Terrance character, at various times intentionally and/or knowingly entered into various agreement to, and did cause the intentional touching of, or application of force to Plaintiff's body; in a harmful and offensive manner, and without Plaintiff's consent.  Some of their wrongful intentional action included deceptively transporting Plaintiff to a secluded area of town, hiring the hit-men, paying the hit-men, and assisted the hit-men to restrict Plaintiff in the back of HYS's vehicle while the hit-men severely, intentionally, and knowingly apply force on Plaintiff's body including Plaintiff's head, fact, shoulders, and ribs.  Plaintiff sustained damages as an actual or proximate result. Plaintiff's damages include mental anguish, bodily injury, emotional harm, pain and suffering, reputational injury, property damage, and financial injuries including loss of income and loss of income opportunities. HYS, Walker, and their two hit-men are jointly and severally liable for Plaintiff's damages. Plaintiff prays for all damages allowed by law and equity including exemplary/punitive damages.

<u>FACTS FOR INCIDENT 2</u>

The whole time Plaintiff had known HYS, Plaintiff constantly tried to persuade HYS to act right/civil, finish school or go to graduate school, and get a legitimate job/career.  HYS always indicated that she would do so but never did.  HYS has various adult male friends that include

persons within the legal and business profession, and countless others.  She also has close friends or ties within HPD, the District Attorney's Office, and other local government entities.

On or about Thanksgiving 2017, HYS stated to Plaintiff that she wanted to sell electronic products online, and that it was highly profitable.  She claimed she started on craigslist, and was buying and selling cell phones locally and internationally, but was running into issues with meeting demand and import-export laws in various countries.  Plaintiff sough to help her establish a legitimate income.  Plaintiff advised her on business strategies, including sourcing scalable platforms for any online sale of any consumer product. HYS researched Amazon.com, Instagram, and other online platforms and decided that such was best for the business.  Around the last two weeks of December 2017, she approached Plaintiff disclosing that the business venture was highly profitable, and she wanted Plaintiff's involvement under which Plaintiff would advise her on business strategies, and provide legal consultation and advisory services on the business and its operations. HYS would handle the operations activities.  HYS assured Plaintiff that nobody else was involved in the business with her, or was to be involved in the business without Plaintiff's knowledge and consent.

After weeks of discussion, on or about December 27, 2017, Plaintiff and HYS entered into a business or partnership agreement in regards to the online sale of products.  Plaintiff made it clear to HYS from the origin that the venture was strictly a business relationship and not a personal relationship, and that HYS was not to involve herself in any illegitimate venture or business activity as such would affect the business.  The parties agreed that Plaintiff was to invest $1000 in exchange for ownership of 50% of all profits periodically paid into an account designated by Plaintiff upon HYS' receipt of net sales proceeds, and provide the business and legal consultation and advisory services.  HYS was to provide accounting to Plaintiff.

Plaintiff then began to further advise HYS on issues including (a) the need to form and operate via an LLC, (b) that she needed to set up a separate bank account for the company, (c) company logo design and marketing strategies, (d) intellectual property rights and the need for licensing and distribution agreements with manufacturers ranging from U.S. to Chinese of products are to be sold, (e) the need to ensure that the business name she selected, i.e. Embark Inc., was not already registered and being used by another company within the industry, and (f) intellectual property rights and protection in regards to the company logo.

Based on the evidence, it seems that Plaintiff was being defrauded.  The evidence supports that HYS and her cohorts, including a Rudolph Michael Scholler, rather schemed to defraud Plaintiff out of $1000 and professional services, and never intend to pay Plaintiff his share of the profits.

Plaintiff performed on his part of the agreement obligations, including paying HYS the $1000 hard money investment.  HYS formed the LLC entity on her name only.  HYS set up a bank account for the business, and informed Plaintiff that he needed to come with her to put his name on the account.  Plaintiff informed HYS that she only needed to wire funds to Plaintiff's designated account.  Such never occurred.  Plaintiff never saw or received any accounting of proceeds from HYS.  HYS never received any payment of profits.

Rather, HYS continuously demanded and received performance from Plaintiff, and would inform or show Plaintiff of the business' existence and her progress. Sometimes, she would even assure Plaintiff of his involvement in the business in order to gain the benefit of Plaintiff's obligations. Sometimes, she would deceptively call Plaintiff to her apartment – as she managed the operations from her apartment without a separate office – indicating that she needed to discuss the business strategies, discuss progress in executing the advice Plaintiff provided her in regards

to the business, and to show Plaintiff the business progress. When Plaintiff would get to her apartment, she would want to discuss personal matters. Plaintiff would constantly make it clear to her that Plaintiff is only interested in the business, and his profits/returns, and not interested in any personal relationship.

Sometimes, HYS would deceptively call Plaintiff to drive around with her to deliver product at the post office for shipment to consumers. Meanwhile, Plaintiff's home and room would be intruded upon and Plaintiff's properties stolen or destroyed while Plaintiff would be away from home with her. Sometimes, the unauthorized access to Plaintiff's home and property would occur while Plaintiff was working or at social/networking activities. This continued throughout 2018. Around July or early Sept. 2018, Plaintiff had his family changed the locks on the doors of the/their home.

Throughout 2018, when Plaintiff asked HYS about payment of profits or accounting, HYS would claim, amongst others, that (a) there was never an agreement, and/or (b) that she owes Plaintiff nothing, and/or (c) that she already paid Plaintiff his share of the proceeds, and/or (d) that she was busy with alleged UofH graduate school obligations. Whenever, Plaintiff got fed-up with her and not want to go and visit HYS or deal with her deceptions, especially as Plaintiff was yet to receive any returns from the investment, she would bombard Plaintiff with calls alleging that Plaintiff was not performing his obligations under the agreement, and threaten that Plaintiff would not receive any proceeds. Hence Plaintiff would comply. However, again, when asked about payment of profits or accounting, HYS would give the usual response.

Around fall of 2018, Plaintiff understood the scope of products sold online was expanded to include sales of hair products, make-up, and other beauty accessories. Plaintiff continued to comply with his performance obligations, yet still received no payments nor accounting.

Around fall and winter of 2018, HYS would drive or call Plaintiff at her apartment to discuss the business or other business ventures – e.g. real estate investment properties that she sought Plaintiff's business and legal assistance in the summer and fall of 2018.  When HYS drove Plaintiff to her apartment, a financially illiquid Plaintiff would be stuck at HYS's apartment and she would refuse to let Plaintiff leave.  She would want Plaintiff to spend the night there. Plaintiff would constantly wake up with his phone or keys – which included his newly changed house keys – missing from his pocket where he left them, or displaced somewhere in the apartment. Sometimes, Plaintiff's flash drive with Plaintiff's work materials and evidence, including spoliated/edited/manipulated evidence relating to FACTS FOR INCIDENT 3, 4 & 5 below in this pleading, would be missing, and would later appear at some impossible location in the apartment after it had been accessed.  Sometimes, Plaintiff would finally arrive home to notice that someone had accessed his home and personal times in his home while he was at HYS's apartment. Sometimes, other flash drives at Plaintiff's home would be taken, destroyed, and returned to Plaintiff's home in their destroyed condition, while Plaintiff would be stuck at HYS's apartment working with her on the business, working on the real estate venture – e.g. going to view investment properties, helping her prepare investment proposals for her alleged investors, and advising on term of and drafting real estate purchase and sale agreement.  These include flash drives that contain back-ups of the spoliated/edited/manipulated evidence regarding FACTS FOR INCIDENT 3, 4 & 5 below in this pleading.  While at HYS's apartment Plaintiff would need internet access for research and work matters.  Before use of HYS's wifi, HYS assured Plaintiff that her wifi was secure and private, and gave Plaintiff access to her guest wifi account.

Around early December 2018, while Plaintiff one of Plaintiff's friends/associates whom Plaintiff met in April 2018 called and introduced Plaintiff to a lucrative once in a million-year

opportunity.  Plaintiff signed a formal retained agreement around mid-December 2018 to represent miners, sellers, and global distributors of diamonds and gold.

Plaintiff would work with these international clients on their matters while at home and also while at HYS's apartment waiting for payment on the online sales business, or waiting to close and get compensation the real estate ventures with her.  Plaintiff's work included legal and market research and advisory on products, industry targets, and potential clients/buyers, marketing and pricing of product, legal research and drafting of sale and purchase agreement of the commodities, fielding and negotiating terms of sale and delivery of the commodities with buyers, and representing Plaintiff's clients as their global counsel and mandate.

Once HYS became aware that Plaintiff represented diamonds and gold clients, she forcefully insisted on Plaintiff being at her apartment at all times.  Plaintiff never disclosed to her the client's names nor allowed her privy to any of the proprietary material.  Such made HYS extremely jealous of Plaintiff and aggressive towards Plaintiff, and would always want Plaintiff at her apartment.  She would use the expected payout on the online business as a means to request that Plaintiff is present at her apartment when the funds clear in her account.  However, again, even after Plaintiff would comply and fulfill his professional end of the agreement, the funds would never clear.

Again, while there, Plaintiff constantly awoke to his flash drive that contained Plaintiff's personal and work information – including proprietary information on the diamond and gold clients and transactions – would somehow disappear, and later be found in the apartment in an unauthorized location, or no longer functioning.  Plaintiff also subsequently noticed that Plaintiff would awake to his phone in another location in the apartment where Plaintiff did not leave the phone, and that the phone would be connected to the HYS's wifi without Plaintiff's

25

institute/authorization of the wifi connection.

HYS would also randomly disappear for hours from the apartment while Plaintiff was focused working on the diamond and gold client's transactions.  When Plaintiff would finally get home, Plaintiff would notice that the intrusions into his home, and the unauthorized access to and destruction of his personal and firm property while away, became more frequent.  Almost every time Plaintiff came come, someone had been in Plaintiff's room.  Plaintiff's old flash drives would disappear and/or be returned non-functioning.  Plaintiff's files, including documents in regards to these claims and other case matters including the civil rights and *qui tam* cases, would disappear; to be returned days, weeks, or even months later in 2019.  Plaintiff's passport, birth certificate, and personal documents would disappear, and be returned weeks or months later in 2019.[1]  Plaintiff told HYS that someone(s) was breaking into her apartment to access Plaintiff's property while he is asleep, and then accesses Plaintiff's home and his property there.  HYS would claim or feign ignorance.

Prior to Plaintiff's business relationship with the precious commodities clients, whenever HYS would want to disappear, Plaintiff would have to go home.  Post the precious commodities

---

[1]   Plaintiff's home and personal property were also continuously invaded throughout 2019.  Amongst others, Plaintiff's account passwords would be taken, and Plaintiff's electronic files, iCloud back-ups, *e*Filing account, emails, and more would be accessed, even after Plaintiff would (a) change his password, or (b) secure his passwords on a flash drive. Evidence Plaintiff stored in his iCloud account, phone, or flash drive, would be deleted or altered/manipulated to harm Plaintiff.  During some of the invasions, the person would even leave evidence that they were there.  Plaintiff would report to the police, and the HPD officers would refuse to take the evidence or do anything.

Around March 2019, after Plaintiff cut all personal contact with HYS, Plaintiff the invasions continued.  Plaintiff even caught one of HYS's vice cohorts/co-conspirators who is also infatuated with her, Eric Keller, in Plaintiff's neighborhood and in his home.  This 43-year-old cohort/co-conspirator of HYS has ties with HPD officers and local government authorities, is well known at the Washington Avenue Clutch Bar, is a very racist, devious, and extremely criminal minded character.

HYS has also stated to having people that live in Plaintiff's neighborhood "on payroll." Plaintiff caught one of HYS's cohorts/co-conspirators that live in Plaintiff's neighborhood, on Plaintiff's property – garage roof – one night in 2020. The guy one night, while driving around the neighborhood drunk, actually admitted to being on Plaintiff's property to Plaintiff.  Plaintiff again informed the authorities the night the guy admitted it to Plaintiff.

The invasions to Plaintiff's home/family home still continue in 2020.

clients, it then became critical that Plaintiff stayed and worked from her apartment.

While Plaintiff was at HYS's apartment waiting on this constantly elusive payout, and after Plaintiff secured the diamonds and gold clients, HYS would constantly disappear for hours, and return to discuss about having a personal relationship with Plaintiff.  Plaintiff would clearly maintain that he does not want a personal relationship with her; that he only was there to ensure that he actually sees a payout occur; and that what she disappears to do is her business.

One day around the last week of December 2018, Plaintiff received text messages from a third-party who alleged to be one of HYS personal relationship persons.  The person indicated that HYS did have Plaintiff's share of the proceeds from the online business, and was never going to pay Plaintiff his share of the proceeds.  At the time of the text message from the third party, Plaintiff understood from HYS that there was a payout of over $600K that was to occur from the business operations.  Plaintiff never received any payment.  Rather, HYS would claim that she wanted a personal relationship with Plaintiff, to which Plaintiff refused and would state that he – i.e. Plaintiff – simply just wanted his expected profits from the business.  Due to issues Plaintiff has endured at the hands of or involving HYS, Plaintiff was/is not interested in any personal relationship with HYS.  Plaintiff just wanted/wants his 50% of profits paid periodically into the designated account Plaintiff long ago provided HYS.  The business was set-up, streamlined and automated, product distributors secured, everything established, and funds simply flowing periodically… just that HYS was defrauding Plaintiff of his interest, or unjustly converting his interests in the proceeds without consent.

In January 8, 2019, HYS reassured Plaintiff that she was going to pay Plaintiff 50% of the profits from the business including the hair and accessories business.  Plaintiff, thinking of a means to have HYS honestly and mentally committed to actually performing on the obligation versus

committing either another clear fraud or another breach of contract, had HYS text the general terms of the agreement to Plaintiff.  Plaintiff responded with approval.

Around the time of the January 8 2019 text messages, or within about two weeks afterwards, Plaintiff understood from HYS that there was a profit payout of over $960K that was to occur for two weeks' worth of sales. As usual, HYS would deceptively call Plaintiff away from his home or to her apartment, or deceptively pick up and take Plaintiff to her apartment and deceptively keep Plaintiff.  She would indicate that the payout is to clear the following morning or afternoon, and that Plaintiff needed to be present so that she can give Plaintiff his share of the funds; otherwise, Plaintiff would not receive any of his share of the business.  HYS never paid anything to Plaintiff.  She only provided (1) excuses on the payment being stuck in her account, her bank account frozen, the payment was returned by her bank, and more; or the usual excuses of (a) there was never an agreement between the parties, and/or (b) that she owes Plaintiff nothing, and/or (c) that she already paid Plaintiff his share of the proceeds, and/or (d) that she was busy with alleged UofH graduate school obligations.

Around Feb. 2019, Plaintiff refused to meet with HYS at her apartment. She called Plaintiff, asked Plaintiff of the account number for the deposit, claimed that the $960K funds cleared, and sent Plaintiff an alleged screenshot confirmation of her authorization of the funds to be wired to Plaintiff's account. She then wanted Plaintiff to come to her apartment. Plaintiff was not interested.

Plaintiff never received the alleged $960K payment or any other amounts. Rather, amongst others, HYS taunted Plaintiff in regards to not being present with her at the bank to receive his funds in person, or alleged as usual that, (a) there was never an agreement between the parties, and/or (b) that she owes Plaintiff nothing, and/or (c) that she already paid Plaintiff his share of the

proceeds.

CAUSES OF ACTIONS FOR INCIDENT 2:

Breach of Contract

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

There were offers, acceptances, and a meeting of the minds between HYS and Plaintiff in regards to the online business venture on December 27, 2017, and/or January 8, 2019, and/or February 6, 2019.  Both parties consented to the terms of the agreements, including that the business venture was only between HYS and Plaintiff, and that nobody else would be involved in the business without Plaintiff's knowledge and consent.  There was execution and delivery of the agreement with the intent that the agreement become mutual and binding on both parties.  E.g., Exhibit 1, 2, and 3.

Plaintiff performed or tendered performance on the agreement, including by the hard money investment and the legal and business consulting/advisory services, and providing payment account information.

HYS refused to perform on her obligations under the agreement, including payments of 50% of Plaintiff's profits in the business.  Such was a material breach of the agreement by HYS.

Plaintiff sustained damages as a result of HYS's breach(es), and prays for all damages allowed.

Fraud

Plaintiff herein incorporates all applicable facts and allegations in all sections above and

below.

HYS made material representations that was false in regards to the online business and/or the terms of the online business agreement with Plaintiff. Amongst others misrepresentations HYS made to Plaintiff, at the time HYS entered into the agreements with Plaintiff on December 27, 2017, and/or January 8, 2019, and/or February 2019, she did not intent to pay Plaintiff 50% of profits of the business. At the time she entered into the business agreements including on December 27, 2017, January 8, 2019, and February 2019, she also did not intend to provide Plaintiff with any accounting for profits on the business venture or investment. At the time she entered into the agreement, she was also not acting alone in regards to the online business venture, nor did she intend on fulfilling her end of the bargain. She had ulterior motives, including ulterior business motives with others.

HYS knew that her representation to Plaintiff in regards to, amongst others, the business operations and/or payment of 50% of profits from the business and/or provision of accounting to Plaintiff and/or exclusively dealing with Plaintiff in regards to the online business, was false at the time it was made, or made the misrepresentations recklessly as a positive assertion without any knowledge of its truth.

HYS's representations were intended to induce the plaintiff to act upon her representations by paying her the hard money investment and providing his end of the bargain – e.g., legal and business serves including advisory and consulting services.

Plaintiff actually and justifiably relied on HYS's representations, which caused Plaintiff injury.

Plaintiff prays for all damages allowed by law and equity including exemplary/punitive damages.

## Conspiracy to Commit Fraud

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

HYS and John Doe 1 (Rudolph aka "Rudy" Michael Schlosser[2]) and/or John Doe 2 and more, all HYS's cohorts/co-conspirators, had an objective to be accomplished – to defraud Plaintiff out of amongst others, (a) his $1000 hard money investment, (b) his legal and business consulting and advisory services, and/or (c) Plaintiff's 50% ownership of the profits in the business. HYS, John Doe 1, and/or John Doe 2 had a meeting of the minds on either or all said objectives or on their course of action to execute such objectives.

HYS acted for the benefit of the co-conspirators' agreement/conspiracy to defraud Plaintiff of (a) his $1000 hard money investment, (b) his legal and business consulting and advisory services, and/or (c) Plaintiff's 50% ownership of the profits in the business.  HYS did so by, amongst others, misrepresenting to Plaintiff that she was not dealing with anyone else in the business venture, and was not going to deal with anyone else without Plaintiff's knowledge and consent. HYS also did so by collecting the $1000 from Plaintiff after the agreement was established and Plaintiff performed on the agreement.  HYS also did so by requesting and/or accepting further performance from Plaintiff in regards to the agreement, all without providing accounting to Plaintiff or providing Plaintiff with his due payments from the business.

Plaintiff incurred damages as a proximate result.  HYS and John Doe 1, and/or John Doe 2, *et al*, are jointly and severally liable for Plaintiff's damages. Plaintiff prays for all damages

---

[2] A multiple-times bankrupt, vindictive, and fraudulent 56-year-old man out of Jonesboro, GA, also infatuated with HYS. He poses as a religious/spiritual mentor to students and young people, yet commits fraud, theft including identity theft, compels prostitution, and more; all according to HYS.  He and HYS had/have a scheme in which he has access to HYS's files, accounts, documents, emails, and more. Her communications, including vice communications, get routed to him, and he responds on her behalf acting as her.

allowed by law and equity including exemplary/punitive damages.

<u>FACTS FOR INCIDENT 3</u>

On the night of 06/16/2018, as Plaintiff and HYS were returning to HYS's apartment at M5250 from a night out, HYS while on her telephone stated that she had to go and make some "shmoney," i.e. illegal money.  This did not make Plaintiff happy.  Plaintiff sought to get his phone, wallet, and keys from HYS's purse, which Plaintiff had in his possession since the Uber ride home, and go home.  Plaintiff told HYS to just pay his share of the money into the account periodically.  HYS attempted to be dramatic, and demanded Plaintiff bring her purse to her.  Plaintiff took his property out of the purse, and told her to come and get her purse.  She refused and wanted Plaintiff to bring it to her.  Plaintiff attempted to throw the purse towards the M5250 building but away from where HYS was standing.  The purse landed by the in the fence of the building adjacent to M5250.  HYS stormed off into the building.  Plaintiff went looking for the purse, found it, and went looking for HYS in the building.

Plaintiff walked inside the building lobby/concierge area.  It was empty.  Nobody was there.  The entry elevator access door was open.  Plaintiff went upstairs to look for HYS.  Plaintiff went upstairs to look for HYS in her unit and give her the purse.  She was nowhere to be found in the unit.  Plaintiff then left her purse and unit keys in her kitchen island, and went downstairs to look for HYS.

Plaintiff found HYS, a short Hispanic guy wearing a backpack, and the concierge staff – Damiola, at the concierge desk.  Plaintiff informed HYS that her purse and all her materials were in her unit, and she should come and inspect to assure that everything was there.  Plaintiff did not want any drama or false allegations.

Plaintiff, HYS, Damiola, and the short Hispanic guy with his backpack, all went up to

HYS's unit at M5250.  The short guy with his backpack, and Damiola, stood outside the unit while Plaintiff and HYS went into the unit.  The door was kept open for Damiola and the other guy to see what was going on.

HYS inspected her back and things, and confirmed to Damiola and Plaintiff that everything was there.  Damiola asked HYS if she wanted Plaintiff to leave.  She responded that she did so.  That was no problem with Plaintiff.  Plaintiff looked at HYS, Damiola, and the short guy, laughed and condescendingly shook his head at all of them, fully knowing what was about to happen; after all, (a) HYS already disclosed to Plaintiff that she needed to go and make some "shmoney," (b) neither she nor Damiola nor the third guy were in the lobby a few minutes ago, and (c) now the random guy with a backpack and Damiola were standing outside the door of her apartment.  Most of all, HYS already had some side personal relationship with Damiola, that Plaintiff knew about.

Plaintiff left the building and headed home on his own volition.  Damiola said nothing to Plaintiff as Plaintiff left.  Damiola did not walk Plaintiff to the elevator nor out the door.  Damiola and the guy in the backpack, simply stayed back at HYS unit with HYS.

About 35 minutes later, about 5 mins away from Plaintiff's home, HYS called Plaintiff's phone, asking Plaintiff to return.  Plaintiff stated that he was not interested.  HYS begged Plaintiff to return.  Plaintiff eventually stated that if he returns, he does not want any drama or anything involving police.  HYS assured Plaintiff that no such thing would occur.

Plaintiff told HYS to inform Damiola that Plaintiff was allowed in the building.  Plaintiff also had HYS text Plaintiff that it was ok for Plaintiff to return.  HYS did so.  Plaintiff had HYS confirm that she would be awake when Plaintiff returns to her apartment, so that Plaintiff is not stranded outside.  HYS confirmed that she would be there and would be awake.  Plaintiff asked HYS, "what if I get there an nobody is in the lobby to let me through to the elevator area?"  HYS

responded that Plaintiff should just come through the front lobby, and if nobody is there, just come up the same way Plaintiff did before.

When Plaintiff arrived at M5250 about 40 mins later, neither Damiola or anyone were in the concierge lobby area again.  The glass door to the elevator lobby area was open.  Plaintiff went through the door, up the elevator, and up to HYS's unit.  Plaintiff knocked and HYS's dog barked. After a few minutes of knocking, the dog became silent and nobody answered the door.  Plaintiff sat down on the ground outside the door, and eventually fell asleep.

Around 4:30am, Plaintiff awoke to handcuff being placed on his right wrist by Officer Blanton, and said Officer Blanton saying, "we got him," into her microphone.  Officer Blanton then proceeded immediately to put the other handcuff on Plaintiff's left wrist.   A discombobulated/barely awake Plaintiff, looked up and saw to female police officers – Officer Blanton and Officer Barbar – and asked them what was going on.  Officer Blanton finished handcuffing Plaintiff, stood Plaintiff up, and claimed, amongst others, that they received a call of criminal trespassing.  Plaintiff told the officers that he – i.e. Plaintiff – was a guest of the person in the unit in front of them.  Plaintiff told the officers to knock and confirm the information.  They refused, searched Plaintiff's pockets, and finished their arrest Plaintiff in the hallway outside the HYS's unit.

As Officer Blenton searched Plaintiff, Plaintiff asked her if he was being arrested.  She responded immediately that Plaintiff was only being detained until they finish their investigation. At that time, Plaintiff was not at any liberty to leave, was handcuffed with both hands behind his back, was being patted down and/or searched, and was being physically held by the Officer Blenton.

After their unreasonable search and seizure, Officer Barbar and Officer Blanton took

34

Plaintiff down the building elevator, and put Plaintiff in their police vehicle.

While in the elevator, Plaintiff told Officer Barbar and Blanton to just call HYS's unit or have the concierge staff call her to confirm that Plaintiff had consent to be in the building. Officer Blenton responded that the concierge staff had called them and stated to them that (a) Plaintiff was criminally trespassing, (b) that he had told Plaintiff to leave the building earlier in the night, and (c) that Damiola took pictures of Plaintiff while Plaintiff was asleep. Officer Blenton then mumbled that there are issues with homeless people in the building.

While in the back of the police vehicle, Plaintiff kept telling the two officers to call HYS or knock on her unit, and she would confirm that she invited Plaintiff. They refused stating that it was the concierge staff that called, that there had been an issue before and that he concierge staff had told Plaintiff to leave. Plaintiff responded that Plaintiff left at his own volition; that the concierge staff never asked Plaintiff to leave; that Plaintiff was almost home when he was called by the tenant HYS to return to the building; and that Plaintiff had her assure him – i.e. Plaintiff – that it was ok to return to the building; that Plaintiff even texted such assurance to Plaintiff and that it was in Plaintiff's phone; and that Plaintiff even had her tell the concierge staff that it was ok for Plaintiff to return to the building.

The officers did not care to investigate Plaintiff's phone or contact HYS to confirm. They simply kept the arrest as it stood, while Officer Barbar called the district attorney to inform him of their arrest.

During the call with the district attorney, Plaintiff heard them say to the district attorney that the police were called earlier but Plaintiff was not present; that the manager stated that he told Plaintiff to leave the building before; and that thereafter Plaintiff returned to the building. Officer Barbar did tell the district attorney that Plaintiff states that the manager did not tell Plaintiff

to leave the building; that Plaintiff stated/holds that he left before on his own; and that Plaintiff states that he returned because the unit tenant called Plaintiff back to the unit much later.

After their call with the district attorney, Officer Barbar stated that the district attorney advised them that the charge would be criminal trespassing because the concierge staff had told Plaintiff to leave.  At that time, the officers had not yet charged Plaintiff.  ADA Nelson was acting in an advisory role to the officers.

Nobody went to ask HYS.  Nobody investigated Plaintiff's telephone to confirm Plaintiff's allegations.

Plaintiff considered the sequence of what had occurred based on all the new information he just heard. (1) Plaintiff left on his own, (2) they called the police and the police arrived while Plaintiff was gone, (3) HYS called Plaintiff and begged him back to the building, and made all the assurances of his safety and well-being; yet (4) when Plaintiff returned, per her request, he still gets arrested, and Damiola makes false statements with the intent to frame Plaintiff and have him wrongfully arrested.  It became clear to Plaintiff that he was set up.

Plaintiff informed this to the two officers – i.e. that he was being set up and arrested. Plaintiff tried to plead with them to just investigate.  They refused.  They were more excited to arrest Plaintiff.  Office Blanton especially, seemed to/had a smirk or smile on her face from the moment Plaintiff heard "we got him," immediately after feeling the handcuff on his wrist.  Ever since then, she kept her smirk and her demeaning tone and attitude towards Plaintiff as she patted him down – except for when she abruptly gave her false response that Plaintiff was being detained and not arrested; as she and Barbar transported Plaintiff through the building hallway and elevator, as she made the homeless people comment in the elevator; and as she and Barbar transported Plaintiff through downstairs lobby, and outside to the police vehicle – all while in handcuffs.  Her

36

demeaning tone and attitude, continued as she put her camera on Plaintiff in the police vehicle, and as she refused to properly investigate – including knocking on HYS's unit, or at least letting Plaintiff show the phone text messages from HYS as proof that he was a guest in the building.

Plaintiff was taken to Mykawa Jail where he was booked and processed.  At the magistrate at Mykawa, Plaintiff was not allowed to respond to the charges.  Plaintiff made bail, and was released.

Plaintiff emailed HYS a questionnaire to answer on the matter, have notarized, and sent back to Plaintiff.  HYS provided Plaintiff with Exhibit 4.  At the first court appearance days later, which HYS accompanied Plaintiff on her own volition, Plaintiff provided the case's district attorney with Exhibit 4, informed the case ADA that HYS called Plaintiff back to the building, and showed HYS's text in Plaintiff's phone.  The ADA immediately dismissed the case for "no probable cause." (Exhibit 5).

## CAUSES OF ACTIONS FOR INCIDENT 3:

### False Imprisonment - Damiola Akinfolarin

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

Damiola Akinfolarin, intended to and did cause the willful and wrongful detention or confinement of Plaintiff on June 17, 2018.  Damiola Akinsolain also requested, directed, or caused the willful detention or confinement of Plaintiff on June 17, 2018.  At all relevant times, Plaintiff never consented to the detention.  At all relevant times, Damiola Akinfolarin had no authority of law for the wrongful detention/confinement or to cause the wrongful detention.  Factually, Damiola Akinfolarin actually had knowledge of Plaintiff's position as a guest on the property on

June 17, 2018, yet requested, directed, or caused the wrongful detention/confinement of Plaintiff.

Damiola's actions done with intent to confine Plaintiff, he was conscious of Plaintiff's detention or confinement and that it would result from knowingly, intentionally, and/or fraudulently, giving false information to law enforcement to wrongfully detain or confine Plaintiff, and he was aware that Plaintiff did not consent to such detention or confinement, nor was his direction, request, or cause of the wrongful detention or confinement of Plaintiff privileged.

Plaintiff incurred injuries actually or proximately caused by the intentional, knowing, and malicious actions of Damiola Akinfolarin.  The injuries include mental anguish, emotional harm, pain and suffering, reputational injury, property damage, and financial injuries including loss of income and loss of income opportunities.

Plaintiff prays for all damages allowed by law and equity including exemplary/punitive damages.

<u>False Arrest and False Imprisonment Section 1983 – HPD, Officer Barbar, Officer Blanton, & ADA Nelson.</u>

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

At all relevant times, ADA Nelson, Officers Barbar and Blanton were all acting under the color of law as necessary and applicable for a 42 U.S.C. Section 1983 claim.

The false arrest and false imprisonment claims are applicable for a §1983 claim as Plaintiff has a 14th and 4th Amendment U.S. Constitutional equal protection right against unreasonable search and seizures.  *Wolf v. Colorado*, 338 U.S. 25 (1949).  Furthermore, U.S. Supreme Court has held that false arrest and false imprisonment civil rights claims are actionable under §1983. *Wallace v. Kato*, 549 U.S. 384 (2007)

ADA Nelson, Officers Barbar and Blanton, intended to and did cause the willful, purposeful, wrongful, wanton, malicious, unreasonable, and fraudulent search, seizure, and/or detention/confinement of Plaintiff on June 17, 2018.  Their actions were also with deliberate indifference to Plaintiff's constitutional rights, health, and safety, as well as with deliberate indifferent to the inevitable resulting harm on Plaintiff.  At all relevant times, Plaintiff never consented to the unlawful detention/confinement, nor the unreasonable search and seizure.  They had no authority of law for the unreasonable search and seizure of Plaintiff, no authority of law for the wrongful detention/confinement, and no authority of law to effectuate it.

Factually, starting from the moment the Officers put Plaintiff in handcuffs to wake him up, they actually had knowledge of Plaintiff's position as a guest on the property on June 17, 2018. Plaintiff told them that he was a guest, and that they should simply knock on the door to verify that he was a guest and invited back to the property.  They also had reasonable opportunity to verify that Plaintiff was a guest on the property by knocking on HYS's unit or checking Plaintiff telephone to see the text she sent inviting him back to the property.  Rather, Officers Barbar and Blanton unreasonably searched and seized Plaintiff, without a warrant, and without any probable cause per Exhibit 5.

Furthermore, Officer Barbar informed ADA Nelson that Plaintiff disclosed that (a) the tenant, HYS, called him and invited him back to the building, and (b) Plaintiff maintains that he left before via his own volition and that the staff never asked him to leave the building.  Hence ADA Nelson possessed knowledge that Plaintiff was a guest in the building.  Therefore, Plaintiff would not be a criminal trespasser.  Yet, he advised the officers to press, and that he will accept charges for criminal trespassing based on the false allegation that the property staff told Plaintiff to leave the building before Plaintiff returned.  ADA Nelson never advised the Officers to knock

at HYS's unit to confirm that she invited Plaintiff back to the building.  ADA Nelson never advised the Officers to investigate with the tenant, HYS.

At all relevant times, ADA Nelson, and Officers Barbar and Blanton's actions executed with deliberate indifference to Plaintiff's constitutional rights, health, and safety, deliberate indifference to the resulting harm on Plaintiff, maliciously, intentionally, knowingly, and wantonly to wrongfully and unreasonably search, seize, detain and/or confine Plaintiff.  At all relevant times, they were conscious of Plaintiff's wrongful and unreasonable search and seizure and/or detention or confinement, or its inevitable result, and were aware that Plaintiff did not consent to such wrongful unreasonable search and seizure, detention or confinement.  At all relevant times, they were unjustified in the unreasonable search and seizure, detention or confinement of Plaintiff, nor were their actions privileged.

Plaintiff incurred injuries actually and/or proximately caused by the deliberate indifference, intentional, knowing, fraudulent, wanton, and malicious actions of ADA Nelson, and Officers Barbar and Blanton.  The injuries include mental anguish, emotional harm, pain and suffering, reputational injury, property damage, and financial injuries including loss of income and loss of income opportunities.

Plaintiff prays for all damages allowed by law and equity including exemplary/punitive damages.

<u>Conspiracy to Commit False Arrest and False Imprisonment Section 1983 – HPD, Officer Barbar, Officer Blanton, & ADA Nelson.</u>

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

At all relevant times, ADA Nelson, and Officers Barbar and Blanton had an object to be

accomplished – to willfully, purposefully, wrongfully, wantonly, maliciously, unreasonably, fraudulently, and with deliberate indifference to Plaintiff's constitutional rights, health, and safety and the resulting harm on Plaintiff, search, seize, detain and/or confine Plaintiff, without his consent, without justification, and without authority.  They agreed on their objective or course of action upon, amongst others, when ADA Nelson advised them to press charges for criminal trespassing based on the false allegations of M5250 staff Damiola.

The meeting of the minds between Damiola, and/or Barbar and/or Blanton was evident, amongst others, the moment the arrested Plaintiff in front of HYS's unit.

Amongst others, the unlawful search, seizure, and detention or confinement of Plaintiff in front of HYS's unit; Officers Barbar and Blanton's failure to knock on HYS's unit to investigate and confirm that Plaintiff was a guest; Officer Blanton's seizure of Plaintiff phone which contained evidence that Plaintiff was an invited guest onto the property; and the failure of Officers Barbar and Blanton to at least allow Plaintiff to access to his phone to show them the communication evidence that Plaintiff was a guest unto the property; are some of the many wrongful, malicious, knowing, intentional, fraudulent, and/or wanton overt unlawful acts done with intent to wantonly, wrongfully, malicious, knowing, intentional, and/or unreasonably search, seize, detain and/or confine Plaintiff – including in Mykawa Jail, against his will and consent and without legal authority.  At all relevant times, they were unjustified in the detention or confinement of Plaintiff, nor were their actions privileged.

Plaintiff incurred injuries actually and/or proximately caused by the the deliberate indifference, intentional, knowing, fraudulent, wanton, and malicious actions of ADA Nelson, and Officers Barbar and Blanton.  Plaintiff's injuries include mental anguish, emotional harm, pain and suffering, reputational injury, property damage, and financial injuries including loss of income

and loss of income opportunities; all for which ADA Nelson, and Officers Barbar and Blanton are jointly and severally liable.

Plaintiff prays for all damages allowed by law and equity including exemplary/punitive damages.

<u>Failure to Train and Supervise Section 1983 – HPD</u>

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

Again, the clear lack of probable cause at the time of the unreasonable search and seizure, detention, and/or confinement, resulting 14th amendment equal protection and due process violation and resulting harm on Plaintiff, are Exhibits 4 & 5, and the facts pled.

Plaintiff also clearly has a claim for failure to train or adequately train, and failure to supervise or adequately supervise claim against the HPD, and against the supervising officers of Officers Barbar and Blanton.

The fact that Officer Blanton and Barbar clearly searched, seized, detained and/or confined Plaintiff from the moment the put handcuffs on him, unreasonably searched him and seized his phone that contained clear evidence of his guest position, transported him to the police vehicle, refused to knock on HYS's unit or investigate his guest position per his telephone, and more, and while Plaintiff was telling them over and over that Plaintiff was a guest on the property, shows that there is also a failure to train or adequately train Officers Barbar and Blanton on applicable laws and procedures necessary to carry out their duties; laws including duty to reasonably investigate, The U.S. and Texas Constitution, 42 U.S.C. §1983 and §1985, and Texas Penal Code §30.05 (f-2)(D).

The fact that they also relied on the wrongful and false advice of ADA Nelson, clearly

show that there are not trained.  Their actions and this incident also support an intentional, knowing, fraudulent, malicious, deliberate indifference, and wanton conspiracy by the officers, and/or within HPD and its applicable decision makers to subject or cause Plaintiff to be deprived of his equal protection and due process rights, and cause Plaintiff harm.

These reasons above also support that there is a failure to supervise or adequately supervise Officers Blanton or Barbar, which subjected or caused Plaintiff to be deprived of his constitutional rights, and caused the resulting harm on Plaintiff.  The facts show that the officers are incapable of carrying out their legal obligations as required by the laws, and require supervision or adequate supervision; which did not occur.  The failure to supervise or adequately supervise also support action(s) or conspiracy and action in furtherance of such wrongful agreement by the officers, and/or within HPD and its applicable decision makers, to subject or cause Plaintiff to be deprived of his equal protection and due process rights, and cause Plaintiff harm.

Alternatively, it is clear that (a) their supervisors and applicable decision makers with HPD and District Attorney's Office authority, and/or those up the chain of command within HPD and District Attorney's Office (e.g. John Doe 3 and John Doe 4, *etc.*), acquiesced to, adopted, participated, and/or supported their actions; and (b) there is a custom or practice of clear failure to train or adequately train, and failure to supervise or adequately supervise officers/these officers within HPD that is/was adopted, acquiesced to, supported, and/or is prevalent within HPD and its applicable chain of command/decision makers.  The failure to supervise or adequately supervise, or sending out such unsupervised officers, also support intentional, knowing, fraudulent, malicious, deliberate indifference, and wanton action(s) or conspiracy and action in furtherance of such wrongful agreement by the officers, and/or within HPD and its applicable decision makers, and its applicable decision makers to subject or cause Plaintiff to be deprived of his equal

protection and due process rights, and cause Plaintiff harm.

Alternatively, it is clear that there is also a failure to screen or adequately screen issue within HPD and its applicable chain of command/decision makers.  Such officers, capable of such actions with such culpable mental states pled and total disregard for the laws applicable to their law enforcement obligations, should not have been put or kept in the line of duty.  Proper original and/or continuous screening would have precluded against such.  The failure to screen or adequately screen, or sending out such unscreened bad *mens rae* officers, also support intentional, knowing, fraudulent, malicious, deliberate indifference, and wanton action(s) or conspiracy and action in furtherance of such wrongful agreement by the officers, and/or within HPD and its applicable decision makers, to subject or cause Plaintiff to be deprived of his equal protection and due process rights, and cause Plaintiff harm.

The failure to train or adequately train, the failure to supervise or adequately supervise, and/or the failure to screen or adequately screen officers/these officers, in this case constitutes, amongst others, a deliberate indifference to the constitutional rights, health and safety of Plaintiff and other citizens such officers/the officers interact with; and therefore, makes HPD liable for Plaintiff's applicable damages.

Furthermore, the magistrate should have allowed Plaintiff to respond at the probable cause hearing for fair due process.  Such is clear evidence of, amongst others, deliberate indifference to Plaintiff's constitutional rights and harm to Plaintiff; further evidence of vindictiveness with intent or purpose to harm Plaintiff or target and harm Plaintiff, or harm such class of vulnerable individuals – i.e., person in custody before the magistrate; and the conspiracy to target Plaintiff and/or his various class of individuals and his/their equal protection rights and due process rights, and cause them substantial harm.

44

Plaintiff incurred injuries actually and/or proximately caused by the wrongful actions of Officers Blanton and Barbar, HPD, and the magistrate and/or Harris County, and as a result their wrongful actions, and/or as a result of their failure to train or adequately train, failure to screen or adequately screen, and failure to supervise or adequately supervise custom, practice, written or unwritten policy and procedure, and supporting, adopting, or acquiescing to such wrongful actions of their subordinates/employees.  They are each liable to Plaintiff for all the various resulting damages.

In regards to the conspiracy based liabilities, Officers Blanton and Barbar, Harris County, HPD, ADA Nelson, and arguably the Harris County District Attorney's Office, are jointly and severally liable for all of Plaintiff's resulting injuries based on, amongst others, an arguable deliberate indifference standard, of the tortfeasors, and the decision makers or supervisors; and based on, amongst others, their superiors or entities' adoption, acquiescence to, participation in, and/or support of the wrongful actions of ADA Nelson, Officer Barbar, and Officer Nelson.

Plaintiff's injuries include mental anguish, emotional harm, pain and suffering, reputational injury, property damage, and financial injuries including loss of income and loss of income opportunities.

Plaintiff prays for all damages allowed by law and equity, including exemplary/punitive damages.

<u>Conspiracy to Commit False Imprisonment – Damiola & HYS.</u>

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

HYS and Damiola, at various times entered into various agreement to intentionally, purposefully, willfully, maliciously, wantonly, fraudulently, and wrongfully searched, seized, detained, and/or confine, or have Plaintiff wrongfully searched, seized, detained and/or confined,

without Plaintiff's consent, and without lawful authority Plaintiff on 06/16/2018.

HYS and Damiola acted in furtherance of their various agreements to intentionally, purposefully, willfully, maliciously, wantonly, fraudulently, have Plaintiff searched, seized, detained and/or confined, without Plaintiff's consent, and without lawful authority Plaintiff on 06/16/2018.

Their actions include, amongst others, calling Plaintiff back to the building with what is now clear deception, with the intent to have Plaintiff arrested. Damiola clearly knew that Plaintiff was to return to the building as a guest of HYS. Damiola never told Plaintiff to leave the building. Evidence – e.g. camera evidence from the M5250 building – will support such because he did not walk Plaintiff out of the building before HYS called Plaintiff to return. Plaintiff left on his own volition, and was called back.

Even though Plaintiff was finally provided spoliated/manipulated and edited evidence on the 06/16/2018 incident, the spoliated/manipulated and edited evidence admissible against HPD *et al*, the spoliated evidence will show that Damiola looked either (a) intoxicated, or (b) just awaking from sleep, while he claims to be the one who called the police to the officers. The spoliated evidence also edited out the "we got him" comment from Officer Blanton upon putting the first handcuff on Plaintiff, which Plaintiff clearly remembers like no tomorrow. It also edited the arrest of Plaintiff to a more rapid state that it really occurred.

Looking back now, considering that Damiola was missing from the desk when Plaintiff originally entered to find HYS and giver her her purse, then was found with HYS and the short Hispanic guy in the lobby, then stayed back with HYS and the short Hispanic guy, then was missing from the desk when Plaintiff was called back to the building, then looked intoxicated or

just waking up in the HPD's bodycam video evidence[3], then HPD immediately handcuffed Plaintiff and seized his cell phone – disallowing him to produce evidence that he was a guest, and that HPD refused to knock on HYS's door to confirm that Plaintiff was an invited guest on the property, there is clearly enough evidence to support that Damiola, HYS, and her HPD cohorts/co-conspirators acted in furtherance of a wrongful conspiracy/agreement to intentionally, willfully, purposefully, maliciously, wantonly, and/or fraudulently searched, seized, detained and/or confine, or have Plaintiff wrongfully searched, seized, detained and/or confined, without Plaintiff's consent, and without lawful authority Plaintiff on 06/16/2018.

Plaintiff will show that Damiola and HYS acted fraudulently, maliciously, wantonly, knowingly, and with intention to detain or confine Plaintiff or have Plaintiff wrongfully detained or confined, they were conscious of Plaintiff's detention or confinement, or the reasonable result of their actions in furtherance of their agreement; and they were aware that Plaintiff did not consent to such detention or confinement, nor was their act in support of/instigating the detention or confinement of Plaintiff privileged.

Plaintiff sustained damages as a proximate result. Plaintiff's damages include mental anguish, personal injury, reputational injury, bodily injury, pain and suffering, emotional harm, and financial injuries including loss of income and loss of income opportunities.  HYS and Damiola are individually, and/or jointly and severally liable Plaintiff's damages.

Plaintiff prays for all damages including exemplary/punitive damages.

Conspiracy to Commit False Arrest and False Imprisonment Section §1985 equal protection – HYS, Damiola, ADA Nelson, HPD Officers, District Attorney's Office, and HPD.

Plaintiff herein incorporates all applicable facts and allegations in all sections above and

---

[3] A District Attorney finally gave Plaintiff the police reports and body camera video footages for the 06/17/2018, 07/08/2018, and 07/16/2018 incidents in the last week of May 2019.

below.

The facts and allegations pled above and below clearly show that there was a conspiracy or various agreements between HYS, Damiola, ADA Nelson, Offices Barbar and Blanton, HPD, District Attorney's office, and/or more within HPD and the District Attorney's Office, for the intent or purpose of depriving Plaintiff of 14th Amendment U.S. Constitution equal protection of the laws including (a) U.S. Constitutional laws against unreasonable search and seizure, and due process rights against the deprivation of liberty and property without due process of law, and (b) Texas Constitutional equal protection, unreasonable search and seizure, and due course of law rights.

The facts and allegations pled show that there is intentional and/or purposeful discrimination against Plaintiff. The history of facts pled also show that this was not just deliberate abuse of power. There is ill will here. Plaintiff is a target by the authorities and HYS and her co-conspirators, and is singled out for vindictive treatment. Plaintiff is clearly a subject of selective enforcement or prosecution, and is continuously harmed by such.

As a party and counsel in the civil rights and whistleblower (*qui tam*) action, Plaintiff is a member of vulnerable group, and consequently intentionally and purposefully targeted by authorities. The actions of the HPD officers, ADA Nelson, and HPD against Plaintiff and even against his family, and others pled throughout various sections of this pleading, including while acting with, leveraging, and/covering for HYS, Damiola, and their co-conspirators/cohorts' in their wrongful actions, clearly show that their enforcement of the laws has a discriminatory purpose and discriminatory effect; and that Plaintiff, and his family, are singled out for malicious and bad faith law enforcement, done capriciously or based on their whims, and done with an intent to injure Plaintiff, his property, his business, and his family and their properties.

Furthermore, the facts and allegations pled show that compared with others similarly situated, Plaintiff is selectively treated based on (a) wrongful/impermissible considerations – e.g. Plaintiff's race, origin, involvement in the civil rights and *qui tam* case, and more; and/or (b) with malicious or bad faith intent to injure Plaintiff including his rights, his person, his business, and his property.  There is clearly a maliciously orchestrated campaign that caused and continues to cause Plaintiff substantial harm, including harm to his constitutionally equal protected rights, his person, his reputation, his business, his income and income opportunities, and more.

Plaintiff is/has being/been clearly singled out for vindictive treatment by government officials because the state and local officials harbor a malignant animosity towards Plaintiff.  They acted spitefully and out of an illegitimate desire to get and harm Plaintiff's rights, his person, his business, his property, and his family for reasons unrelated to any legitimate state interest.  They are spiteful, vindictive, and out to get Plaintiff because of, amongst others, (a) Plaintiff's lawful actions including (i) carrying out or attempting to carry out his contractual obligations in the civil rights and *qui tam* case, and more; and/or (ii) exercising or attempting to his rights and protect his plaintiff and realtor interests in the cases; (b) protect himself against the purposeful or vindictive deprivation of his right against unreasonable seizure, and unjust confinement or detention; (c) their vindictive agreement and efforts establish a false/wrongful criminal record for Plaintiff for subsequent further malicious and vindictive use, purpose, and/or harm – including harm to Plaintiff's image and credibility necessary for his profession, the civil rights and *qui tam* case, and his current or future income and income opportunities; and (d) because Plaintiff is a black male, an attorney, and of Nigerian origin, with knowledge of many wrongful state actor and their criminal co-conspirator actions, and fearless to zealously contest such wrongful actions/injustice.

The facts and allegations pled also show that all or various times applicable, amongst

others, HYS, Damiola, ADA Nelson, Officers Barbar and Blanton, acted purposefully and intentionally to harm to Plaintiff's rights, health, and safety; acted purposefully, intentionally, fraudulently, wantonly, and/or maliciously, in furtherance of said wrongful conspiracy or their various wrongful agreements to deprive Plaintiffs of his equally protected U.S. Constitutional rights – e.g., the unreasonable search and seizure and wrongful detention or confinement of Plaintiff; and cause the resulting injuries to Plaintiff as mentioned.

The facts and allegations pled in this pleading, also show that Plaintiff, a person within a vulnerable class, is also a target within the District Attorney's Office as well as within HPD and Harris County.  Also, the 06/18/2018 incident occurred at M5250 building.  No incident pled in this case occurred at HPD headquarters or at the District Attorney's office.

The applicable government official and entity defendants knew or reasonably should have known that their actions were violating Plaintiff's clearly established constitutional rights.

Plaintiff sustained damages as an actual and/or proximate result of their wrongful actions. Plaintiff's damages include mental anguish, personal injury, reputational injury, bodily injury, pain and suffering, emotional harm, and financial injuries including loss of income and loss of income opportunities.  Harris County, the magistrate, HYS, Damiola, ADA Nelson, Officers Barbar and Blanton, District Attorney's Office, and HPD are liable individually, and/or jointly and severally liable Plaintiff's damages.

Plaintiff prays for all damages allowed by law and equity, including exemplary/punitive damages.

<u>FACTS FOR INCIDENT 4</u>

On 07/08/2018, HYS invited Plaintiff back to her unit at M5250.  After discussing the business, and while Plaintiff trying to teach her financial concepts of time value of money and its

calculations, HYS got argumentative.  Plaintiff did not want any trouble, so Plaintiff decided to leave.

As Plaintiff left the building, HYS texted Plaintiff showing that Plaintiff left his wallet/debt card in her unit. Plaintiff informed her that he was going to come back upstairs to grab them.

At this time, Plaintiff did not know Damiola by name.  Hence Plaintiff did not know that the person he saw behind the desk, was the one who instituted the criminal trespass charge.[4]

As Plaintiff entered the building lobby, Plaintiff saw Damiola behind the concierge desk attending to other guests and tenants of the property.  As Plaintiff approached the concierge desk, Damiola saw Plaintiff, got up from his seat, and began to verbally assault Plaintiff, claiming that he was going to call the police on Plaintiff again and have Plaintiff arrested again for criminal trespassing.

That moment was when Plaintiff realized the truth, that the person behind the desk was Damiola.

Plaintiff responded, "that was you?  Are you kidding me?  I was a guest.  You knew that I was allowed in the building.  She even let you know that I was allowed in the building. For gosh sakes we came from the same country.  Why would you do that?"

---

[4] On an occasion after 06/16/2018, when HYS invited Plaintiff to the building, another M5250 concierge staff/manager – who is with Damiola in the elevator speaking to Officers Barbar and Blanton on the body camera evidence provided Plaintiff in May 2019 on this issue, while Damiola mentions that he took pictures of Plaintiff – told Plaintiff that *he* was the one that called the police.  Plaintiff was always friendly to the guy whenever they interacted, hence thought it odd, but disregarded the statement. Also, while Plaintiff was ignorant of Damiola's name identity, activities and personal relationship with HYS, Plaintiff was also always friendly to him.
Interestingly, days after the 06/16/2016 incident, HYS informed Plaintiff that the person, Damiola, in the criminal trespassing charging instrument, was her friend and supposedly *liked* Plaintiff; that Damiola knew that Plaintiff was an attorney; and that Damiola has wife and kids.  Hence, Plaintiff always thought that Damiola was the other manager/concierge person that claimed that *he* called the police on 06/18/2016 for the criminal trespassing charge.
On another subsequent occasion after 06/16/2018, which HYS invited Plaintiff to the building, Plaintiff met a leasing or corporate manager, a person named Michael, in the elevator.  Plaintiff inquired if Plaintiff was disallowed in the building.  The manager responded no that Plaintiff was not disallowed in the building, just that HYS or a tenant has to either (a) call down to the desk to let the concierge staff know that Plaintiff or other building guests are coming, or (b) come down themselves to take the guest up to their unit.

Damiola claimed that he was calling the cops again immediately, and that Plaintiff was going to go to jail for criminal trespassing.  Plaintiff responded that Damiola can call whomever he wants, but Plaintiff is allowed on the property per HYS, and that Plaintiff was there to pick up his belongings he left upstairs.  He picked up the phone immediately and started dialing whomever, while stating to Plaintiff that he was going to see that Plaintiff goes to jail that day.

At that time, HYS rang Plaintiff's phone.  Plaintiff informed HYS of what was going on and told her to come downstairs and let Plaintiff up to pick up his things, or bring them downstairs.  HYS responded that she would come downstairs and grab Plaintiff and bring him upstairs.

After Plaintiff hung up with HYS, Damiola was still on the phone making his alleged call to the police.  Plaintiff responded – so that the police dispatcher could hear – that Plaintiff was a guest and has his property upstairs.

Damiola hung up the phone and stated that he would see to it that Plaintiff goes to jail.  Plaintiff responded, "good luck with that, and your last attempt got thrown out of court at the first court appearance, that's why you are going to be working behind this desk for the rest of life in America, meanwhile I have cases bigger than your little mind on my plate."

The last statement made Damiola to lose it.  He swiftly got up from behind his concierge desk – as if he was going to hit Plaintiff – came to the other side of the desk where Plaintiff was standing with other guests and tenants, and got in Plaintiff's face about a few inches away, if any; and continued screaming to Plaintiff that he would have Plaintiff arrested that day.

Other tenants and guests in the concierge lobby that Damiola was attending to before Plaintiff walked in, and was still supposed to be attending to, saw everything transpiring.  They got out of Damiola's way as/when he came around the desk, approached, and faced Plaintiff on the other side of the concierge desk, while screaming.

One male tenant who was listened to everything and watching everything transpiring, came and took Plaintiff by the arm, and told Plaintiff, "He's not worth it man.  You're an attorney.  He's only trying to screw you. Come with me.  I'll let you in."

At that time, Plaintiff saw that HYS had arrived at the lobby.  The rest of what occurred is attached as Exhibit 6, hereby incorporated by reference.

As Plaintiff defended himself from Damiola's assault and battery, after being chased down by Damiola as Plaintiff left and was outside the building, a male in blue shorts came and separated Damiola from Plaintiff.  He asked Plaintiff to stay here he was as the authorities have been called. Plaintiff responded to the person that Plaintiff was not going to leave, that he was just chased down outside, assaulted, and battered by Damiola; that he – i.e. Plaintiff – wanted to wait until the authorities came; and that Plaintiff wanted to press charges for assault and battery on Damiola.

The male officer then turned to Damiola and told Damiola that he – i.e. the male officer that lived in the building – was going to tell the police when they arrived that he saw Plaintiff hit Damiola.  Damiola went back around the building from the location of his outside assault, and went back inside; and Plaintiff remained outside by the parking lot waiting for the authorities to arrive to speak to them.

When the police arrived, Plaintiff tried to tell them all that occurred.  Rather, the officer Reyes tried to blame Plaintiff without even listening to Plaintiff.  Officer Reyes first stated that Plaintiff would be a criminal trespasser if the concierge staff tells him to leave, regardless of if a tenant in the building wants Plaintiff in the building.  He then told Plaintiff to leave the property.

Plaintiff responded that such was not true; that he – i.e. Plaintiff – knew the applicable law; that such was not criminal trespassing; that Plaintiff was a guest in the building; that Plaintiff had his property upstairs, simply wanted, and was allowed to retrieve his property; that Damiola

53

assaulted and battered Plaintiff multiple times, including when he left his desk, and outside after Plaintiff left the building and Damiola chased him down from behind; and that Plaintiff waited for the officer to arrive and wanted to press charges against Damiola for assault and battery.

Officer Reyes immediately put handcuffs on Plaintiff, searched and seized Plaintiff, and put Plaintiff in the HPD vehicle.  Plaintiff asked if he was being arrested.  Officer Reyes claimed that Plaintiff was only being detained, for further investigation.  Plaintiff was clearly arrested and in custody of the state, unable to leave, with his liberty deprived.

Officer Reyes tried coerce HYS to incriminate Plaintiff for criminal trespassing, by continuously stating that Plaintiff was not allowed in the building regardless of if HYS invites him.

Officer Reyes then went into the building and spoke to Damiola and the man in the blue shorts, who were talking to each other.  They both tried to blame Plaintiff and make Damiola seem the victim.  The guy in the blue shorts first approached Officer Reyes and disclosed that he was a police officer that lived in the building, and blamed Plaintiff. Damiola, who was clearly lying, wanted to add credibility to their plotted-out version of the story, and asked to show Officer Reyes officer the video camera footage of the incident accessible on the concierge desk.  However, he withdrew his efforts immediately after saying so, and Officer Reyes never made any effort to see the video camera footage.  Officer Reyes just went with Damiola and the blue shorts guy's story.

Plaintiff never knew he was an officer.  He never stated so to Plaintiff.  At the time of the incident, Plaintiff just saw him as random liar person (a) who was trying to cover for Damiola and blame Plaintiff, (b) who appeared out of nowhere as Plaintiff was defending himself from the third battery from Damiola that occurred that evening, (b) who did not see everything that transpired as the tenants and guests did in the lobby and elevator, and (c) who was trying to cover for Damiola per his statement to Damiola – in front of Plaintiff before the police arrived – of what he was going

to tell the police that he saw.

Officer Reyes later arrived at the vehicle where Plaintiff was arrested, and made a call.  At this time, other officers were around.  Plaintiff then overheard Officer Reyes tell the other officers, that the district attorney said, "*if he can get someone to say that* they saw [Plaintiff] hit [Damiola] first, he will accept the charges for assault."

This did not sit well with Plaintiff as he heard Officer Reyes disclose this to other officers. Plaintiff knew that his rights, health, and safety were in danger again, and he was about to be further harmed **again** after being assaulted and battered this time by Damiola, multiple times, even after he left the building.

Plaintiff was ultimately taken to Mykawa jail and booked in.  Plaintiff made bail after being in front of a magistrate, again precluded from responding to the charge in front of the magistrate.

Plaintiff while the case was in court, Plaintiff originally represented himself *pro se*. Plaintiff subpoena'd M5250 for all surveillance footage on the property that day.

M5250, via their Counsel, delayed provision of the surveillance footage.  They eventually provided evidence in response to the subpoena for the 07/08/2018 event, jointly with the subpoenaed evidence for the 07/16/2018 event below.

When M5250 via their Counsel finally provided Plaintiff surveillance footage per the subpoena request, the footage M5250 provided were manipulated/edited/spoilated surveillance footage.  Just as all police camera evidence provided Plaintiff, they too contained no time or date stamp.

Plaintiff informed M5250's counsel that the evidence the provided Plaintiff was deficient. The counsel responded that what was provided was all that his client, M5250, was going to provide.

M5250's counsel, Patrick Drake, knew that the video footages were inauthentic, edited and manipulated to frame Plaintiff and misrepresent the events that occurred on 07/08/2018.  Yet he still responded that what was provided was all that his client, M5250, was going to provide.  He also provided all the evidence for both the 07/08/2018 and the 07/16/2018 events on the shared-file link, to the State.

M5250's footage of the 07/08/2018 incident, was edited and manipulated to seem as if Plaintiff was the original and continuous aggressor.  They provided an edited elevator lobby camera video footage that showed Plaintiff and Damiola exchanging words in the elevator lobby area, after an enraged and violent Damiola tried to physically block HYS, Plaintiff, and the tenant who said "he's not worth it," from going through the door to the elevator lobby section of the building.

M5250 edited out/excluded the portion of the footage where an enraged Damiola blocked the tenants from entering the elevator lobby section.  Yet, it shows the footage of after everyone went through the door into the elevator lobby, Damiola is still screaming, insulting and threatening Plaintiff, Plaintiff is then responding back to him, Plaintiff moves towards Damiola and says to him that Plaintiff is still going to get on the elevator, go upstairs, and get his property move on to greater things while Damiola is stuck on his desk job for life.  It then shows Damiola get further enraged at what Plaintiff was saying, pushes Plaintiff, and Plaintiff falls.

M5250 footages excluded the concierge lobby footage that showed Damiola leave his desk, go around the concierge desk, and get in Plaintiff's face; placing Plaintiff in fear of imminent injury in front of tenants and other guests.  They excluded the footage where Damiola charged after and struck Plaintiff multiple times inside the elevator, as other tenants and guests watched. They excluded the part of surveillance footage in which the Damiola ran after Plaintiff outside

while Plaintiff was about 30 yards away, charged at Plaintiff from behind to strike Plaintiff, and Plaintiff had to defend himself.

M5250 also altered the timing and sequence of the camera footage they provided. that showed Plaintiff leave the building after Damiola assaulted and battered Plaintiff inside the elevator.  They edited the video footage they provided to make it seem that Plaintiff left the building and Damiola walked out immediately behind him.  It did not show the time difference that Plaintiff left the building and was already down the corner about 30 yards away in the parking lot, when Damiola came running around the corner to charge at and hit Plaintiff.  It contained no time or date stamp.  Again, their video evidence also excluded everything that occurred outside the property within the property's camera boundaries.

Without evidence to defend himself from the charges, and being bled of financial resources and opportunities, Plaintiff had to investigate himself.  Plaintiff found evidence showing that there are cameras in the lobby that face the concierge desk that should have captured what occurred.  Plaintiff also went on the adjacent property, a Walgreen store, and took zoom photos of the M5250 property with Plaintiff's phone, and captured their cameras outside the property that should have captured all that occurred outside.

Ultimately, the State knew they had no case on the assault with bodily injury charge, refused to take their case to trial, and simply sought resets.  Plaintiff sought to press charges against Damiola, but neither the district attorney nor HPD would listen.  They refused.

One day in the month of August 2018, while Plaintiff was a guest at HYS's new apartment, the district attorney called HYS.  HYS put him on speaker phone.  The district attorney sought to inquire as to HYS's statements to the police.  As he read what the officer wrote was her version of the story, Plaintiff noticed that it was clearly false.  Plaintiff left HYS's new apartment.  HYS

called Plaintiff many times to return.  Plaintiff refused to return, and told her just to tell the truth.

Otherwise, she is helping M5250 and her HPD and district attorney friends to unjustly screw

Plaintiff; and Plaintiff was not going to allow such obstruction of justice, or be around her to be

blamed for any obstruction of justice witness intimidation.

Thereafter, HYS volitionally created and emailed the district attorney with the attached

Exhibit 6, and cc'd Plaintiff. That was all Plaintiff had for defense.  Everything else were

spoliated/edited evidence used to frame Plaintiff; yet the State refused to dismiss the case, and

simply sought resets.

Afterwards, the court clerk in the case suggested a counsel to Plaintiff.  Plaintiff did not

know the counsel but retained him.  The counsel stated to Plaintiff that the State intends to drag

the case out unless Plaintiff takes a plea deal and do anger management class.  Plaintiff wanted the

matter to go to trial, but the counsel disclosed to Plaintiff that **he** – i.e. Plaintiff – **is the target**, that

his spouse works is a District Attorney so he knows and is well informed, and that the authorities

including the district attorney's felony and misdemeanor's department, as well as some judges, are

out to get Plaintiff.  The counsel informed Plaintiff that he could just do an online course and

provide it to Plaintiff.

Considering (1) the harm to an innocent yet framed Plaintiff, an attorney in a major civil

rights and *qui tam* case in Federal Court against the county and a major state agency; and (2) the

harm caused by the ongoing/extension of outstanding case at that time, the State's refusal to set it

for speedy trial, the frame-job spoliated/manipulated/edited evidence from M5250 to cover for

Damiola, and another pending false robbery charge HYS, HPD, and their cohorts cooked up to

further harm Plaintiff, Plaintiff only agreed to take the so-called "anger management" class, but

informed the counsel to communicate to the State that (a) the case must be dismissed; (b) Plaintiff

was NOT pleading guilty nor should there be any indication of guilt or culpability; and (c) Plaintiff was just doing the anger management class to just end the case.

Defendant understood that such was agreed.  Defendant took a brief course/survey online and submitted proof of its completion to the counsel, who submitted it to the State, and the case was dismissed. Plaintiff later saw the order of dismissal, Exhibit 7, online.

Note: One day in early August 2018, while Plaintiff was a guest at HYS's new apartment, HYS disclosed to Plaintiff that she had met with M5250 Counsel, Patrick Drake, and they had a few words and became friends.  Patrick Drake is a partner at the law firm that represented M5250, and at that time, worked out of their Denver, CO office.  HYS is originally from Denver, CO.

Interestingly, all of the evidence – including the spoliated video footages – from M5250 and the 07/08/2018 incident, have *magically* disappeared from Plaintiff's files.  M5250's counsel's share-file link where he uploaded the files for Plaintiff, have *magically* disappeared.  All the flash drives that Plaintiff downloaded and stored the evidence provided, *magically* disappeared from Plaintiff's custody and control, including from Plaintiffs home after various unauthorized intrusions.  The flash drives were destroyed and later returned to Plaintiff either in damages and/or non-functioning condition, starting during in the fall and winter of 2018, while HYS would invite Plaintiff to her new apartment and keep him there and the events pled in FACTS FOR INCIDENT 2 would occur at her apartment and at Plaintiff's home.

<u>CAUSES OF ACTIONS FOR INCIDENT 4:</u>

<u>Assault</u>

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

At various times on 07/08/2018, Damiola Akinfolarin, intentionally attempted to inflict

injury on Plaintiff, had the apparent ability to cause injury on Plaintiff, and did create a reasonable apprehension of bodily harm or offensive contact on Plaintiff.

The edited/manipulated/spoliated video evidence is a violation of Texas Penal Code §32.47(a), because under §32.47(b)(1), "For purposes of this section, writing includes: … any other method of recording information."  Those surveillance footages are clearly means to record information.

The subpoena was made out to the custodia of records or management of M5250.  Clearly, some decision maker with M5250, with authority to retain counsel to represent the company, and with authority to provide the fraudulently altered, removed, concealed, destroyed, substituted, and/or manipulated surveillance evidence to their counsel, was committing a criminal act as an employee of M5250.  Such also includes Patrick Drake in knowingly providing said fraudulent evidence to Plaintiff, and stating that such evidence was all that his clients were to provide.

The fact that M5250 provided Plaintiff with edited/manipulated/spoliated evidence to cover-up for Damiola per the subpoena request, shows that the necessary authorities at M5250, or M5250 itself, clearly (a) ratified or approved the wrongful actions of their employee/agent, Damiola, (b) authorized the doing and manner of Damiola's wrongful acts.  Damiola was an employee of M5250 at that time, acting within the scope of his employment as a concierge/desk and/or property manager when the committed the wrongful act.

The facts and evidence are clear that Damiola was unfit, and M5250 and its decision makers/principals maliciously employed or retained him.  Damiola was not terminated after the first June 2018 incident, nor was he terminated after the July incident.

The edited/manipulated/spoliated video evidence provided also shows that M5250 is liable because they provided the fraudulently edited/manipulated/spoliated evidence with intent to

defraud or harm Plaintiff and his defense against the charges.

Hence while acting with the kind of culpability required for Damiola's offense – i.e. intent, M5250 via its corporate decision makers causes or aids their video staff or counsel to fraudulently alter, remove, conceal, destroy, or substitute the subpoenaed video recording with inauthentic video evidence in violation of Texas Penal Code §32.47(a).

Furthermore, while acting with intent to promote or assist the violation of Texas Penal Code §32.47(a) in regards to the surveillance video recordings provided, and while acting with intent to defraud or harm Plaintiff, M5250 and/or their counsel solicited, encouraged, directed, aided, or attempted to aid their staff, video staff, custodian of record, contractors, and/or counsel to violate Texas Penal Code §32.47(a) with intent to defraud or harm Plaintiff and his defense to the charges.

Furthermore, M5250 and/or their counsel had a legal duty to prevent the violation of Texas Penal Code §32.47(a) with intent to defraud or harm Plaintiff and his defense against the charges, but clearly acted with intent to promote or assist the commission of the crime – i.e. violation of Texas Penal Code §32.47(a) in regards to the surveillance video recordings provided, and acted with intent to defraud or harm Plaintiff and his defense against the charges.  M5250 and/or their counsel had a legal duty to make reasonable effort to prevent violation of their staff, video staff, custodian of record, contractors, and/or counsel's violation of Texas Penal Code §32.47(a), done with intent to defraud or harm Plaintiff and his defense against the charges.

Therefore, M5250 is liable under the doctrine of respondeat superior.  M5250 counsel and its firm are also liable, because M5250's counsel was a partner at the law firm, acting within the scope of his partner role at the firm, and acting with legal representation authority to bind M5250, its Principals, and its staff.

Plaintiff sustained damages as an actual or proximate result. Plaintiff's damages include mental anguish, bodily injury, emotional harm, pain and suffering, reputational injury, property damage, and financial injuries including loss of income and loss of income opportunities.

Plaintiff prays for all damages allowed by law and equity including exemplary/punitive damages.

<u>Battery</u>

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

At various times on 07/08/2018, Damiola Akinfolarin, intended to and did cause the intentional touching of, or application of force to Plaintiff's body; in a harmful and offensive manner, and without Plaintiff's consent.

For the reasons stated above, including in the Assault section above for the 07/08/2018 incident, M5250 is liable under the doctrine of respondeat superior.  M5250 counsel and its firm are also liable, because M5250's counsel was a partner at the law firm, acting within the scope of his partner role at the firm, and acting with legal representation authority to bind M5250, its Principals, and its staff.

Plaintiff sustained damages as an actual or proximate result. Plaintiff's damages include mental anguish, bodily injury, emotional harm, pain and suffering, reputational injury, property damage, and financial injuries including loss of income and loss of income opportunities.

Plaintiff prays for all damages allowed by law and equity including exemplary/punitive damages.

<u>False Arrest & False Imprisonment §1983 and Conspiracy, & §1985</u>

Plaintiff herein incorporates all applicable facts and allegations in all sections above and

below.

At all relevant times, Officer Reyes and ADA Denholm were all acting under the color of law as necessary and applicable for a 42 U.S.C. Section §1983 and §1985 claims.

The false arrest and false imprisonment claims are applicable for a §1983 and also the 1985 claim as Plaintiff has a 14th and 4th Amendment U.S. Constitutional equal protection and due process, right against unreasonable search and seizures, and unjust detention and/or confinement.

Amongst others, Officer Reyes intended to and did cause the willful, purposeful and wrongful, wanton, malicious, unreasonable, and fraudulent search, seizure, and/or detention of Plaintiff on June 17, 2018. His were also with deliberate indifference to Plaintiff's constitutional rights, health, and safety; and/or with, amongst others, malice, discriminatory intent and purpose to deprive Plaintiff of his equally protected constitutional rights, and to cause substantial harm to Plaintiff. At all relevant times, Plaintiff never consented to the unlawful detention or confinement, nor the unreasonable search and seizure. At all relevant times, Officer Reyes had no authority of law for the unreasonable search and seizure of Plaintiff, no authority of law for the wrongful/unlawful detention or confinement, and no authority of law to effectuate the wrongful/unlawful detention.

Amongst others, Officer Reyes was called and clearly arrived on the scene with a criminal trespassing wrongful allegation in mind. Per the 911 recording, the police call was for criminal trespassing. He tried to allege that Plaintiff was criminally trespassing; and tried wrongfully evict/remove Plaintiff from a property where he was a guest and where he had authority to be including to retrieve his property. When Plaintiff stated that Plaintiff knew the law, and that Plaintiff was a guest, Officer Reyes immediately arrested/unreasonably seized Plaintiff. Plaintiff was not able to leave nor at liberty to leave. Plaintiff was clearly seized, detained, and/or confined

in his police car for an unjust reason; because Plaintiff did not leave the property immediately per his allegation that Plaintiff was a criminal trespasser.  After the wrongful search, seizure, and detention/confinement of Plaintiff, he then went to find an alternate yet false reason to further charge and confine Plaintiff.  Plaintiff was never a flight risk.  Plaintiff stayed to speak to the authorities on the assault and battery that just occurred against him.

Evidence of the willful, malice, ill will, wanton, fraudulent, vindictive, and discriminatory intent or purpose including to target and harm Plaintiff, and the conspiracy to harm Plaintiff and his rights, are evident in the spoliated video evidence.  The fact they bear no time or date stamp supports such.  Based on Plaintiff's personal knowledge, Officer Reyes spoke to an ADA J. Denholm, whom according to Officer Reyes, was instructed that "*if he can get someone to say…*" Such is clearly not an objective or good faith investigation of allegations, but a subjective, ill will, vindictive, and malicious or purposeful intent to harm Plaintiff approach.  Authorities are not supposed to "***get someone to say***" anything in order to make their decision or charge a crime; especially under the circumstances when there is an objective surveillance video camera footage, easily accessible at the concierge desk, and even mentioned and offered to be shown to officer.

Evidence of the willful, malice, ill will, wanton, fraudulent, vindictive, and discriminatory intent or purpose including to target and harm Plaintiff and his rights, and the conspiracy/agreement of such, and acts in furtherance of such wrongful agreement, exist in his false police report statements.  Contrary to the evidence, which shows that he was called and arrived per Damiola's wrongful allegation of criminal trespassing against Plaintiff, he writes in his police report that he was dispatched to an assault, just occurred, no injury matter.  He then goes on to falsify the statements of the few witnesses he spoke with.

Evidence of the willful, malice, wanton, fraudulent, ill will, vindictive, and discriminatory

intent or purpose including to target and harm Plaintiff and his rights, and the conspiracy/agreement of such, and acts in furtherance of such wrongful agreement, are the false statements Officer Reyes wrote in the police report, in which he claims that he forwarded to ADA J. Denholm, and then the ADA accepted the charges. In the report, he states that HYS stated that she saw Plaintiff strike Damiola first, and do so many times in various locations. Such is contrary to HYS's affidavit, and contrary to what actually occurred.

These authorities clearly had a vindictive motive in mind, sought and executed another selective enforcement, purposefully and intentionally acted with ill will, malice, fraud, and deceit to deprive Plaintiff of his equal protection rights and further cause Plaintiff harm. Looking back, they were clearly acting in furtherance of their long-standing agreement to harm Plaintiff and his rights, and cause Plaintiff perpetual and substantial harm; including harm to his reputation, his person, his property, the whistleblower and civil rights claims in Federal Court. A malicious or ill will Officer Reyes and the ADA took a subjective approach with the discriminatory purpose and intent to harm Plaintiff, which had discriminatory effect. The torfeasor, Damiola, evaded justice, and Plaintiff's rights were deprived again, and Plaintiff harmed. Plaintiff once again was singled out.

The evidence shows that Officer Reyes had no legitimate reason to arrest and detain Plaintiff when he did. He was vindictive because, amongst others, Plaintiff as an assault and battery victim but who is supposed to be blamed for criminal trespassing, corrected him on his false legal allegation of criminal trespassing; and refused to leave (1) without his property that was still in the building – to which Plaintiff had a right to retrieve, and (2) being a guest in the property with authority to be there and retrieve his property. His report even excludes the fact that Plaintiff sought to press charges against Damiola.

Amongst others, this incident coupled with others facts pled, clearly show that there is a conspiracy/agreement within/between the HPD and/or the District Attorney's Office; based on a discriminatory custom or practice of selective enforcement in regards to Plaintiff; executed maliciously, vindictively, and with a discriminatory purpose and intent to target Plaintiff, deprive him of his U.S. Constitutional equal protection rights – including right to due process and rights against unreasonable searches, seizures, detention and/or confinement, hinder, deter or impede due course of justice in Plaintiff's civil rights and *qui tam* action, and cause Plaintiff substantial harm.

HPD, or those that act of the behalf of HPD, and applicable supervisors are also liable for failure to train and failure to supervise such officers as Reyes.  Also, under the circumstances, the actions of Reyes, coupled his statements from ADA Denholmn to "get someone to say that…" are actions in furtherance of an agreement to vindictively target Plaintiff, and actions in furtherance of the malicious discriminatory purpose and intent custom, practice, or unwritten/adopted policy within HPD and the District Attorney's Office, to vindictively target Plaintiff, with discriminatory intent or purpose to deprive him of his equally protected rights, and cause Plaintiff substantial harm.  HPD, District Attorney's Office, and/or their various decision makers acting on or authorized to act on the District Attorney's Office and HPD's behalf, acquiesce to, support, participate, or aid in the wrongful vindictive or discriminatory agreements and/or actions discriminatory actions in furtherance of said wrongful, ill will, and vindictive agreements done against Plaintiff.  They also acquiesce to, support, participate, or aid in the intended wrongful, malicious, vindictive, discriminatory purpose, and the actual and foreseeable results.

Furthermore, the magistrate should have allowed Plaintiff to respond at the probable cause hearing for fair due process.  Such is clear evidence of, amongst others, deliberate indifference to Plaintiff's constitutional rights and harm to Plaintiff; further evidence of vindictiveness with intent

or purpose to harm Plaintiff or target and harm Plaintiff, or harm such class of vulnerable individuals – i.e., person in custody before the magistrate; and the conspiracy to target Plaintiff and/or his various class of individuals and his/their equal protection rights and due process rights, and cause them substantial harm.

Plaintiff incurred injuries actually and/or proximately caused by the wrongful actions of Officer Reyes, ADA Denholm, the magistrate acting on behalf of Harris County, District Attorney's Office, HPD, and Damiola's wrongful actions and wrongful conspiracies.  In regards to the conspiracies, they are, including Harris County, are jointly and severally liable for Plaintiff's resulting injuries.  The injuries include mental anguish, emotional harm, pain and suffering, reputational injury, property damage, and financial injuries including loss of income and loss of income opportunities.

Plaintiff prays for all damages allowed by law and equity including exemplary/punitive damages.

<u>FACTS FOR INCIDENT 5</u>

On 07/16/2018, Plaintiff met with HYS at a social venue to discuss the online business, her alleged graduate school progress, etc. During these meetings, HYS would normally disclose facts and information to Plaintiff.  Towards the end of the night, HYS stated that she was going to go and make some "shmoney."  Again, this did not make Plaintiff happy.  Plaintiff told her to pay her own bill including for her alochol, and had the bill allocated accordingly. The meeting ended in another argument, and Plaintiff immediately left her at the venue.

~ 3 hours later, after Plaintiff got home and went to sleep, Plaintiff was awakened by banging on his home door.  Plaintiff walked out to see over 10 HPD officers, including Officer Tallant and Meyer, standing outside his family home's door, and over 7 HPD vehicles.

They questioned a barely awake Plaintiff about his earlier whereabouts and the interaction with HYS, to which Plaintiff informed them.  They immediately handcuffed Plaintiff.  Plaintiff asked why he was being arrested.  They responded that Plaintiff was just being detained.  Plaintiff was arrested – seized and search – and immediately put in their police vehicle.  HYS and Walker then arrived at Plaintiff's home and spoke to the authorities.

Per an uninvestigated and flagrant story, and without any warrant as necessary under the circumstances for Plaintiff's arrest, Plaintiff was again driven to Mykawa jail.  Plaintiff was charged Plaintiff with robbery with bodily injury of HYS, that allegedly occurred at HYS's apartment complex. Amongst others, Plaintiff was never at HYS's apartment, nor had he been there since the last Damiola incident.  Plaintiff even informed such to the officers at his home.

Plaintiff was again not allowed to respond to the allegation/charge in front of the magistrate, was given a high bond, was thereafter transported to Harris County Jail, eventually made bail, and was released.

Plaintiff had to deal with HYS for a while.  She blamed Jarrod Walker and HPD for Plaintiff's arrest.  She also used her complainant position, the economic ruin of Plaintiff, and her threats of HPD and District Attorney influence, as leverage to exercise control over Plaintiff, to coerce or force Plaintiff into joining her illegal activity syndicate, to incriminate or frame Plaintiff, and to amongst others, threaten, intimidate, harass, and continuously and further harm Plaintiff – especially when Plaintiff evaded her harassments, or just wanted her to pay his investment returns.

Plaintiff subpoenad M5250 for surveillance footage of their property on the alleged night to show that Plaintiff was not even present on the property.  M5250 counsel provided a joint response to Plaintiff's subpoenas for this incident and the 07/08/2018 incident, and also gave them to the State. Plaintiff also subpoenad HYS for evidence of the allegations, and subpoenaed the

68

local government authorities for evidence on HYS, that Plaintiff had personal knowledge was in their custody, of HYS's illegal activities that was being covered up.  HYS and the authorities refused to comply with the subpoenas.

Plaintiff was allowed, and submitted a packet to contest any grand jury indictment. The grand jury dismissed the case for no probable cause in October 2018.  Exhibit 8.

CAUSES OF ACTION FOR INCIDENT 5

False Arrest & False Imprisonment §1983 and Conspiracy, & §1985

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

At all relevant times, Officers Tallant and Officer Meyer were all acting under the color of law as necessary and applicable for a 42 U.S.C. Section §1983 and §1985 claims.

The false arrest and false imprisonment claims are applicable for a §1983 and the based 1985 claims as Plaintiff has a 14th and 4th Amendment U.S. Constitutional equal protection and due process, right against unreasonable search and seizures, and unjust detention and/or confinement.

Amongst others, Officer Meyer and Tallant, intended to and did cause the willful, purposeful and wrongful, wanton, malicious, unreasonable, and fraudulent search, seizure, and/or detention/confinement of Plaintiff on July 16, 2018.  Their actions were also with deliberate indifference to Plaintiff's constitutional rights, health, and safety; and/or with, amongst others, malice, discriminatory intent and purpose to deprive Plaintiff of his equally protected constitutional rights, to cause substantial harm to Plaintiff.  At all relevant times, Plaintiff never consented to the unlawful detention or confinement, nor the unreasonable search and seizure.  At all relevant times, Officer Reyes had no authority of law for the unreasonable search and seizure

69

of Plaintiff, no authority of law for the wrongful detention or confinement, and no authority of law to effectuate the wrongful detention or confinement.

These officers had no reasonable basis arrest or confine/detain Plaintiff.  Plaintiff was at home and not a flight risk. Exhibit 8, and the fact that they had no warrant as required under the circumstances, is more than enough facts in support.  They also could have investigated M5250's cameras to see that Plaintiff was never on M5250 where the alleged event occurred.  There were over 10 police officers and 7 HPD vehicles to come and blind-sight Plaintiff at him home, ***again***, and execute on the long-standing or ongoing agreement, custom, unwritten/adopted policy, and/or practice, entered into and executed with malicious and discriminatory intent and purpose, to deprive Plaintiff of his U.S. Constitutional equal protection and due process rights, and maliciously, discriminatorily, intentionally, and purposefully cause Plaintiff substantial harm.

At the time of the 07/17/2019 wrongful false arrest and false imprisonment, Jarrod Walker was a probation officer II for Texas Department of corrections.  There was an agreement, unwritten/adopted policy, custom, or practice within HPD to vindictively and malicious target Plaintiff via ill will amongst others; executed with amongst others, vindictive and malicious discriminatory purpose and intent to deprive Plaintiff of his equal protection rights, and with vindictive discriminatory purpose and intent to cause Plaintiff substantial harm.  Walker and the HPD officers, acting in furtherance of the conspiracy, agreed to, acquiesced to, participated in, and/or carried out the wrongful actions in furtherance of the conspiracy on 07/17/2019.  Walker was not present at the West End social venue with HYS and Plaintiff.  His actions in participation of the wrongful false arrest and false imprisonment, evidence his discriminatory vindictiveness and ill will against Plaintiff, and evidence of malicious intent and purposeful intent to target and harm Plaintiff.  Hence intracorporate doctrine is inapplicable defense for HPD and the officers.

Furthermore, the magistrate should have (a) allowed Plaintiff to respond at the probable cause hearing, and (b) noted that there was no warrant for Plaintiff's arrest.  Such is clear of, amongst others, deliberate indifference to Plaintiff's constitutional rights and harm to Plaintiff; further evidence of vindictiveness with intent or purpose to harm Plaintiff or target and harm Plaintiff; and the conspiracy to target Plaintiff's and his equal protection rights, and cause substantial harm. Plaintiff was entitled to a due process fair hearing, which includes opportunity to respond to the charges, in front of the magistrate while at Mykawa Jail.  Plaintiff was denied said fair hearing opportunity, and incurred harm as a result – including harm to due process rights.

The arguments made for the failure to supervise or adequately, failure to screen or adequately screen, and failure to train or adequately train, made in sections above, are also applicable to this section; based on the deliberate indifference standard arguable for the customs, practice, polices -written or unwritten, and procedures of HPD; and the arguable deliberate indifference standard arguable for Officers Tallant, Meyer, and other officers/supervisors/decision makers involved.

Plaintiff incurred injuries actually and/or proximately caused by the wrongful actions of Officers Tallant, Meyer, Harris County per the wrongful and/or deliberate indifferent actions of the magistrate, and HPD, and as a result of their conspiracy actions.  They are liable to Plaintiff for the resulting damages.  In regards to the conspiracies, they are jointly and severally liable for Plaintiff's resulting injuries.  The injuries include mental anguish, emotional harm, pain and suffering, reputational injury, property damage, and financial injuries including loss of income and loss of income opportunities.

Plaintiff prays for all damages allowed by law and equity including exemplary/punitive damages.

<u>FACTS FOR INCIDENT 6</u>

On or about early March 2019, after months of staying clear of HYS and her constant harm on Plaintiff since 02/09/2019, and while focused on other case matters and the diamonds and gold deals that HYS knew Plaintiff was working on but Plaintiff did not allow her privy to the details or clients, and after HYS refused to pay Plaintiff his returns or denied owing him anything, a jealous HYS vindictively went to her District Attorney cohorts and made a flagrantly false report alleging that Plaintiff committed aggravated assault on her on 01/12/2019.

Without proper investigation, and armed with a flagrantly discriminatory investigation, HYS and her District Attorney co-conspirators opened up a protective order proceeding against Plaintiff; even after HYS had volitionally picked up and taken Plaintiff to her apartment many times after the alleged 01/12/2019, including the subsequent day after the alleged 01/12/2019.

Plaintiff was never served with notice of the proceeding or any documents regarding the proceeding. A Harris County Constable, Officer Shoenvogel, contacted Plaintiff to meet at Plaintiff's office mid-March 2019, but never stated his reason.  Plaintiff followed up by calling the cell number the constable used to call, which Plaintiff saved in his phone, around March 26, 2019. During the follow-up, the person/officer that answered claimed or feigned ignorance.

Plaintiff finally found out about the proceeding, on or about 04/17/2019 when another Harris County Constable, Officer C. APonte, appeared at his home and gave Plaintiff's mother a post card with his name and telephone number, and Plaintiff's mother later informed Plaintiff that day.  Plaintiff contacted the constable, and asked him to return to Plaintiff's property and serve Plaintiff.  The constable refused to return, but provided Plaintiff with the case number.

Plaintiff contacted the courts and the District Attorney's office to speak to the Assistant District Attorney advising them over the telephone on the case.  The District Attorney team staff

on the case claimed that Plaintiff was not supposed to be served, because the hearing already occurred.   A concerned and harmed Plaintiff suspected fraud, deceit, and more – including a conspiracy to target and his rights, and cause him serious harm including on the diamond and gold deals. The court staff responded that Plaintiff was not a party to the case and was not allowed the documents.  Plaintiff called everyone he could, including another ADA Cornelia Hartman that was supposedly on the case.  The District Attorney feigned ignorance in regards to the case/matter.

Plaintiff, ignorant of the allegations in the protective order petition and without any copy of any documents or allegations regarding the proceeding, filed a motion to vacate the two ex-parte orders that were already entered against him, and that were causing serious him harm. Plaintiff filed the motion to vacate on or about 04/22/2019 and an amended version on or about 04/23/2019.  During these two days were when Plaintiff saw HYS's cohort, Eric Keller, in his neighborhood and home.

On 04/25/2019, after the deadline for any hearing on the protective order had lapsed by statute, a District Attorney emailed Plaintiff with a notice of hearing on the protective order. Plaintiff made all efforts to get served with the documents regarding the proceeding, including email correspondence with one the District Attorney team staff, ADA Elizabeth Barron, informing her that Plaintiff was never served with the application.  Plaintiff said informed her that Plaintiff was entitled to due process.  She falsely claimed that Plaintiff's filing of the motion to vacate constituted a response to the suit.

Plaintiff was never given or served any documents in regarding the protective order except for the 04/25/2019 notice of hearing.

Plaintiff went to the 05/14/2019 thinking that the hearing would be on his statutory and constitutionally entitled motion to vacate the ex-parte orders. Upon arrival on 05/14/2019, Plaintiff

was *blind-sighted again* with a *same day* hearing on the protective order proceeding.  Plaintiff was just given the application – not the statutory and constitutionally entitled NOTICE OF THE APPLICATION – on said 05/14/2019, after he entered his name on record.  The court refused to reset the protective order hearing.

Prior to the hearing, ADA Barron met and spoke with Plaintiff outside the courtroom. Based on her statements, she knew of HYS's vice/illegal activities.  She also knew that Plaintiff was not served with any documents.  Yet she tried to get Plaintiff to sign her drafted order for the court on the case.  Plaintiff had never seen her alleged order, nor did she present one to Plaintiff. She simply tried to intimidate and coerce Plaintiff into agreeing to sign her drafted protective order, without even presenting the order, the application, or any document she filed to Plaintiff.

The hearing was a vindictive, malicious, and discriminatory one-sided hearing, during which, amongst others, Plaintiff was subject to coercion, harassment, and intimidation from the court, listened to HYS's flagrant false testimony, dealt with blind-sights from the District Attorney, the court, and HYS, and was denied a fair hearing or proceeding.  The court thereafter entered a flagrantly vindictive protective order against Plaintiff, and required Plaintiff – via intimidation, fraud, deceit, and coercion, to sign a compliance order, and pay attorney's fees and costs – including service of process costs, to the District Attorney, for a fraudulent proceeding, their fraudulent activities, and for a bad faith, ill will, and fraudulent service of process; service of process that was never done as required by law.

The protective order was made public the following day.  Plaintiff when Plaintiff finally got access to the records, while the case was on appeal, Plaintiff finally learned that the motion to vacate were actually denied on the same day as filed, without the statutory/constitutionally required hearing.

CAUSES OF ACTION FOR INCIDENT 6

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

At all relevant times, Officers Chad Schoenvogel and Officer Carmelo Aponte, and ADA Elizabeth Barron, Cornelia A. Hartman, and Eva G. Flores were all acting under the color of law as necessary and applicable for 42 U.S.C. Section §1983 and §1985 claims.

Plaintiff had an equal protection right to due process of law – i.e. service of process on the protective order application. The constables had a constitutional/statutory and legal obligation to serve Plaintiff with the notice of the protective order application and all documents required.

The facts and evidence show that the constables intentionally, maliciously, fraudulently, and/or with deliberate indifference refused to serve process on Plaintiff. The facts and evidence also show that the constables conspired (i.e. agreed and acted in furtherance of their wrongful agreement) with HYS's District Attorney team on the matter, and probably even HPD, in order to vindictively, maliciously, willfully, wantonly, and fraudulently, deny Plaintiff of his due process right to service of the notice of the proceeding.

Amongst others, this incident coupled with others facts pled, clearly show that there is a conspiracy/agreement within/between the HPD and/or the District Attorney's Office; based on a discriminatory custom or practice of selective enforcement in regards to Plaintiff; executed maliciously, vindictively, and with a discriminatory purpose and intent to target Plaintiff, deprive him of his U.S. Constitutional equal protection rights – including right to due process and rights against unreasonable searches, seizures, detention and/or confinement, deter, hinder or impede due course of justice in Plaintiff's civil rights and *qui tam* action, and cause Plaintiff substantial harm.

Evidence of the willful, malice, ill will, wanton, fraudulent, vindictive, and discriminatory

intent or purpose including to target and harm Plaintiff, and the discriminatory conspiracy to vindictively target and harm Plaintiff and his rights, are evident.  They are clear as water.

The constables had no reasonable or justified basis not to serve process on Plaintiff with the notice of the application, and any required documents.  The fact that Officer Schoenvogel asked Plaintiff to meet him at Plaintiff's office shows the willful, malice, ill will, wanton, fraudulent, vindictive, and discriminatory intent or purpose including to target and harm Plaintiff, and the discriminatory and vindictive conspiracy to target and harm Plaintiff and his rights.  The fact that Officer Aponte refused to return and serve an awaiting Plaintiff at his home, but merely texted Plaintiff a case number, evidences the willful, malice, ill will, wanton, fraudulent, vindictive, and malicious discriminatory intent or purpose including to target and harm Plaintiff, and the discriminatory and vindictive conspiracy to target and harm Plaintiff and his rights.

The fact that the ADA on the phone with Plaintiff, stated to Plaintiff that he was not supposed to be served because the hearing already occurred, evidences the willful, malice, ill will, wanton, fraudulent, vindictive, and malicious discriminatory intent or purpose including to target and harm Plaintiff, and the discriminatory and vindictive conspiracy to target and harm Plaintiff and his rights.  The fact that ADA Barron was even on written notice of the lack of service of process, yet refused to have Plaintiff served, evidences the willful, malice, ill will, wanton, fraudulent, vindictive, and malicious discriminatory intent or purpose including to target and harm Plaintiff, and the discriminatory and vindictive conspiracy to target and harm Plaintiff and his rights.  The fact that the court's docket even states HPD and no service, and that the Harris County District Clerk system states no service, shows that there was no due process, and further supports the willful, malice, ill will, wanton, fraudulent, vindictive, and discriminatory intent or purpose including to target and harm Plaintiff, and the discriminatory and vindictive conspiracy to target

76

and harm Plaintiff and his rights; all agreed upon and carried out by HPD, the District Attorney's Office, Harris County Constables Office, and even within the courts, and their various staff and decision makers or authorized personnel.

At the least, had Officers Schoenvogel and/or Aponte complied with the law/their duties and served Plaintiff process at his home, Plaintiff would have been on fair notice, and had a fair opportunity to protect his equally protected rights. Plaintiff was clearly within a vulnerable group, including the statutory defined group; "respondents" to protective order proceedings, and the whistleblower and civil rights group. Although Plaintiff is a U.S. citizen, Plaintiff is also a foreign-born person (alienage) and hence within a protected class. Plaintiff had statutory/constitutional rights that were with deliberate indifference or willfully, maliciously, wantonly, fraudulently, vindictively and with ill will, deprived of him; done with the deliberate indifference to his constitutional rights, or with discriminatory intent or purpose to target and harm him and his rights, and/or per the discriminatory and vindictive conspiracy to with malicious purpose or intent to cause Plaintiff the resulting harm, or with deliberate indifference to the resulting harm on Plaintiff.

HYS knew that Plaintiff was an attorney. She knew Plaintiff's home. Plaintiff also caught her roaming his neighborhood on the night of 03/29/2019 while the first ex-parte protective order was on file, and before the second ex-parte protective order. She and her cohorts had been calling Plaintiff's phone before and even while the ex-parte order was on file. She also knew about Plaintiff's work including the diamond and gold clients.

The District Attorneys and the constables, knew of Plaintiff's profession as an attorney. They knew of the substantial harm that their vindictive and discriminatory agreements, and/or actions in furtherance of such agreement, would cause Plaintiff if he was denied the required due process. They tried to keep Plaintiff out of court, without the required fair notice of the proceeding,

and impede, deter, and hinder due course of justice in regards to the proceeding, and deny Plaintiff his equally protected right to fair notice and fair hearing, and due process. The deliberate indifference; or really, the malicious and discriminatory purpose and intent to cause substantial harm on Plaintiff, including his rights, are clear as water. Had Plaintiff not shown up on 05/14/2019 for the motion to vacate, lord knows what the fraudulently obtained and created protective order would have said. Likely that Plaintiff was duly cited and served, and the court vindictively find whatever the vindictive ADAs write in the order; and Plaintiff would have been ignorant of the suit, and unable to collaterally attack order with extrinsic evidence considering its flagrantly false recitals. These folks knew what they were doing, with malice, intent, and purpose to discriminate and harm Plaintiff.

Plaintiff also has evidence that what occurred against Plaintiff, is a vindictive and discriminatory custom or practice within Harris County District Attorney's Office, executed with intent and purpose to harm vulnerable individuals. In the case of an Oscar Lazar Suarez, the same ADA's involved in HYS's protective order case, i.e. Hartman, Flores, and Barron, actually had Mr. Suarez served while he was in State custody in Harris County Jail. He remained there without bond, and on the day of the protective order hearing against him, the ADA's involved never requested or acted to have him brough to court for the protective order hearing. He was kept out of court through vindictive, ill will, and trickery of the ADAs (i.e. extrinsic fraud), denied his fair hearing (i.e. due process) and right to counsel (i.e. equal protection) opportunity. They had a default order entered against him, and later used it to indict him on a criminal charge based on the same facts. Talk about a scheme.

Again, Plaintiff is/has being/been clearly singled out for vindictive treatment by government officials because the state and local officials harbor a malignant animosity towards

Plaintiff.  They acted spitefully and out of an illegitimate desire to get and harm Plaintiff's rights, his person, his business, his property, and his family for reasons unrelated to any legitimate state interest.  They are spiteful, vindictive, and out to get Plaintiff because of, amongst others, (a) Plaintiff's lawful actions including (i) carrying out or attempting to carry out his contractual obligations in the civil rights and *qui tam* case, and/or (ii) exercising or attempting to protect his rights and protect his plaintiff and realtor interests in the cases, and/or (iii) protect his business interests including in the diamond and gold deals, the relationship with the clients, and the business profits with HYS; (b) protect himself against the purposeful or vindictive deprivation of his right against unreasonable seizure, and unjust confinement or detention; (c) their vindictive agreement and efforts establish a false/wrongful criminal record for Plaintiff for subsequent further malicious and vindictive use, purpose, and/or harm – including harm to Plaintiff's image and credibility necessary for his profession, the civil rights and *qui tam* case, and his current or future income and income opportunities; and (d) because Plaintiff is a black male, an attorney, and of Nigerian origin, with knowledge of many wrongful state actor and their criminal co-conspirator actions, and fearless to zealously contest such wrongful actions/injustice.

Furthermore, the facts and allegations pled show that compared with others similarly situated, Plaintiff is selectively treated based on (a) wrongful/impermissible considerations – e.g. Plaintiff's race, origin, involvement in the civil rights and *qui tam* case, and more; and/or (b) with malicious or bad faith intent to injure Plaintiff including his rights, his person, his business, and his property.  There is clearly a maliciously orchestrated campaign that caused and continues to cause Plaintiff substantial harm, including harm to his constitutionally equal protected rights, his person, his reputation, his business, his income and income opportunities, and more.  Even Suarez was served with notice of the application.  Plaintiff had to constantly ask to be served, and was

denied said service, and ended up subject to a fraudulent and false court order to pay for the non-service.

Also, the arguments made for the failure to supervise or adequately, failure to screen or adequately screen, and failure to train or adequately train, made in sections above, are also applicable to this section; based on the deliberate indifference standard arguable for the customs, practice, polices -written or unwritten, and procedures of Harris County Constable's Office and Harris County; and the arguable deliberate indifference of Officers Schoenvogel & Aponte, and other officers/supervisors/decision makers involved.

Plaintiff incurred injuries actually and/or proximately caused by the wrongful actions of Officers Schoenvogel & Aponte, Harris County Constable's Office and/or Harris County, Harris County District Attorney's Office, and HPD as a result of the wrongful conspiracy actions. They are each liable to Plaintiff for all the various resulting damages. In regards to the conspiracies, they are jointly and severally liable for all of Plaintiff's resulting injuries. The injuries include mental anguish, emotional harm, pain and suffering, reputational injury, property damage, and financial injuries including loss of income and loss of income opportunities.

Plaintiff prays for all damages allowed by law and equity including exemplary/punitive damages.

<u>FACTS FOR INCIDENT 7</u>

On or about 10/2/2019, HYS and her HPD and District Attorney cohorts/co-conspirators decided to capitalize on their vindictiveness. This time, an Officer D.R. Daniel III, as well as about 6 other police officers, arrived at Plaintiff's home again in the dark on night/early morning; around 6:25am.

Plaintiff, who was outside his home taking a break from a long work grind, saw a flashlight

in the dark of night, approaching him from his home/family home's front lawn.  Long story short, Plaintiff identified himself, the police officer with the flashlight walked up to and immediately seized Plaintiff.

The other officers tried to go towards Plaintiff's home as if they were going to enter the home.  Plaintiff immediately called out to them as to where they were going.  They stopped.

The officer that seized and was searching Plaintiff, stated to Plaintiff that they wanted and were going to take Plaintiff's cell phone, and that Plaintiff was charged with sexual assault. Plaintiff was allowed to call his mother to come outside and take all the items from Plaintiff's pocket, but they were going to take Plaintiff's cell phone.

Amongst others, Plaintiff asked for a warrant, and officer Daniel appeared out of nowhere, and identified himself; as Plaintiff was being searched and seized by another officer.  Plaintiff asked what this was about.  Officer Daniel tried to approach a seized and non-violent Plaintiff in a hostile manner, and alleged that Plaintiff was being arrested for ***aggravated sexual assault*** on the 01/12/2019 alleged incident.  He stated to Plaintiff that he was working with Cornelia Hartman on the matter – the same Cornelia Hartman in the protective order matter.

Plaintiff, hinting on the shoddiness going on, told Daniel that he had not even seen or talked to HYS since February 9, 2019, and amongst others, asked for a warrant.  In the dark of night/early morning, Officer Daniel handed Plaintiff paper that was not a warrant.  Plaintiff barely got to finish reading before Officer Daniel snatched it out of Plaintiff's hands, and the officer that seized Plaintiff put the other handcuffs on Plaintiff.

Plaintiff had no choice.  Plaintiff was searched, seized, and in their custody.  Plaintiff called his mother who came outside and was shocked to see what was going on, took Plaintiff's pocket items, e.g. keys and wallet, and watched sadly as they took Plaintiff to one of the officer's vehicle,

sat him there, talked amongst each other, and drove away to Harris County Jail.

None of the officers had a body camera.  Plaintiff did not see a body camera on any of them.  None of the officers also were in uniform.  Just plain clothes, jeans and t-shirt, and protective vests.  Even the guy that identified himself as Officer Daniel, was in plain clothes – a shirt and dress pants.  Plaintiff thought it was an odd, and a very crooked operation.  Hence Plaintiff decided to ask the officer driving him to Harris County Jail his name, why the needed his cell phone without a warrant for it, where his cell phone was being taken, and who were all the other officers.

The officer stated his name as Officer Maruer, and stated that he knew nothing else about the other officers or Daniel, and he was just doing what was told.  He stated that he did not know which one of the had Plaintiff's cell phone, and stated that he did not know their names.

The cell phone contains Plaintiff's contacts on the diamond and gold deals, confidential attorney-client privileged and confidential information, attorney work-product privileged and confidential information, and evidence Plaintiff needs for these claims, and more.  The officers had no warrant for the cell phone, and took the cell phone.

Plaintiff was taken to and booked into Harris County Jail, where he eventually saw a magistrate on the charge.  Amongst others, Plaintiff was again disallowed to respond to the charges in front of the magistrate and in front of the District Court Judge in the case when brought before him.  Plaintiff remained in Harris County Jail for over a week, and eventually made bail on 10/9/2019.

Plaintiff later realized that Plaintiff was arrested with a ***capias*** issued by a magistrate and based on clearly false and unreasonable allegations.  The capias was not issued by the District Court Judge.  They also did not have any warrant for the seizure of Plaintiff's cell phone or anything.

The 10/02/2019 and still continued seizure of Plaintiff's cell phone causes Plaintiff serious harm including loss of income and income opportunities, loss of property, mental anguish, and more.  Plaintiff prays for such damages including exemplary and punitive damages allowed by law and equity.

<u>CAUSES OF ACTION FOR INCIDENT 7</u>

<u>False Arrest & False Imprisonment §1983 and Conspiracy, & §1985</u>

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

At all relevant times, HPD Officers D.R. Daniel III and all, were all acting under the color of law as necessary and applicable for 42 U.S.C. Section §1983 and §1985 claims.

Amongst others, Officer D.R. Daniel III and his HPD crew, intended to and did cause the willful, purposeful and wrongful, wanton, malicious, unreasonable, and fraudulent search, seizure, and/or detention/confinement of Plaintiff on 10/2/2018.  Their actions were also with deliberate indifference to Plaintiff's constitutional rights, health, and safety; and/or with, amongst others, malice, discriminatory intent and purpose to deprive Plaintiff of his equally protected constitutional rights, to cause substantial harm to Plaintiff.  At all relevant times, Plaintiff never consented to the unlawful detention or confinement, nor the unreasonable search and seizure.  At all relevant times, Officer D.R. Daniel III and his HPD crew, had no authority of law for the unreasonable search and seizure of Plaintiff, no authority of law for the wrongful detention or confinement, and no authority of law to effectuate the wrongful detention or confinement.

Without even touching the flagrantly false and vindictive allegations in their complaint, Officer D.R. Daniel III and all the other officers, had no reasonable basis arrest or confine/detain Plaintiff.  Simply put, a magistrate has no authority/jurisdiction to issue capias in Texas, especially

on a felony charge – even though a false and flagrant felony in this case.  The capias must be issued by the District Court Judge with jurisdiction over the case, or by a clerk at the direction of the District Court Judge with jurisdiction over the case.  See, e.g. *Texas Code of Criminal Procedure Art. 23.01(1)*.

The fact that D.R. Daniel III, stated that he was working with ADA Hartman prior to Plaintiff's false arrest and false imprisonment, shows that ADA Hartman was working in an advisory/investigatory role… just like the other ADA's subject to liability in this suit.  Hence absolute immunity does not apply to then in Plaintiff's 42 U.S.C. Section §1983 and §1985 claims.

Furthermore, Plaintiff was entitled to a due process fair hearing, which includes opportunity to respond to the charges, in front of the magistrate while in Harris County Jail.  Plaintiff was denied said fair hearing opportunity, and incurred harm as a result – including harm to his due process rights.

The facts already pled in this pleading show that the 10/2/2019 incident was merely another one of the malicious and discriminatory intent or purpose to vindictively harm Plaintiff's rights; executed as part of the agreements between HPD and the District Attorney's office, or as part of the discriminatory and vindictive custom, practice, written or unwritten policy, and procedure, to target and substantially harm Plaintiff and his rights – e.g. equal protection and due process rights, via ill will, malice, and more.  There is clearly an agreement within the authorities to discriminate against Plaintiff, target and harm Plaintiff, and execute selective prosecution or enforcement against him. Plaintiff's counsel in INCIDENT 4 & 5 even stated to Plaintiff that Plaintiff is a target by the authorities.  The fact that the magistrate even signed the capias without authority, shows how far the vindictiveness and discrimination extends into the system.  Harris County becomes liable for the actions of the magistrate.

Again, Plaintiff is/has being/been clearly singled out for vindictive treatment by government officials because the state and local officials harbor a malignant animosity towards Plaintiff. They acted spitefully and out of an illegitimate desire to get and harm Plaintiff's rights, his person, his business, his property, and his family for reasons unrelated to any legitimate state interest. They are spiteful, vindictive, and out to get Plaintiff because of, amongst others, (a) Plaintiff's lawful actions including (i) carrying out or attempting to carry out his contractual obligations in the civil rights and *qui tam* case, and/or (ii) exercising or attempting to protect his rights and protect his plaintiff and realtor interests in the cases, and/or (iii) protect his business interests including in the diamond and gold deals, the relationship with the clients, and the business profits with HYS; (b) protect himself against the purposeful or vindictive deprivation of his right against unreasonable seizure, and unjust confinement or detention; (c) their vindictive agreement and efforts establish a false/wrongful criminal record for Plaintiff for subsequent further malicious and vindictive use, purpose, and/or harm – including harm to Plaintiff's image and credibility necessary for his profession, the civil rights and *qui tam* case, and his current or future income and income opportunities; and (d) because Plaintiff is a black male, an attorney, and of Nigerian origin, with knowledge of many wrongful state actor and their criminal co-conspirator actions, and fearless to zealously contest such wrongful actions/injustice.

The facts and allegations pled also show that compared with others similarly situated, Plaintiff is selectively treated based on (a) wrongful/impermissible considerations – e.g. Plaintiff's race, origin, involvement in the civil rights and *qui tam* case, and more; and/or (b) with malicious or bad faith intent to injure Plaintiff including his rights, his person, his business, and his property, including business profits. There is clearly a maliciously orchestrated campaign that caused and continues to cause Plaintiff substantial harm, including harm to his constitutionally equal protected

rights, his person, his reputation, his business, his income and income opportunities, and more.

Also, the arguments made for the failure to supervise or adequately, failure to screen or adequately screen, and failure to train or adequately train, made in sections above, are also applicable to this section; based on, amongst others, the deliberate indifference standard arguable for the customs, practice, polices – written or unwritten, and procedures of HPD, Harris County, and Harris County District Attorney's Office; and the arguable, amongst others, deliberate indifference actions of Officers D.R. Daniel III and the other HPD officers, the magistrate, ADA Hartman, and other officers/supervisors/decision makers involved.

Plaintiff incurred injuries actually and/or proximately caused by the wrongful actions of Officers Schoenvogel & Aponte, Harris County Constable's Office, Harris County District Attorney's Office, HPD, and Harris County per the magistrate's actions, as a result of the wrongful conspiracy actions.  They are each liable to Plaintiff for all the various resulting damages.  In regards to the conspiracies, they are jointly and severally liable for all of Plaintiff's resulting injuries.  The injuries include mental anguish, emotional harm, pain and suffering, reputational injury, property damage, and financial injuries including loss of income and loss of income opportunities.

Plaintiff prays for all damages allowed by law and equity including exemplary/punitive damages.

<u>FACTS FOR INCIDENT 8</u>

On 11/14/2018, HPD officers Wang and Terran, wrongfully arrested Plaintiff on a misdemeanor DWI charge.  No officer saw Plaintiff commit any DWI offense.  Amongst others, Plaintiff was never mirandized pre or post arrest, and was subjected to interrogation on the scene. When the officers sought to take Plaintiff to Mykawa jail, Plaintiff continuously inquired as to

their basis. They alleged that they were arresting Plaintiff for "suspicion" of DWI.  They did not

say that Plaintiff was being arrested for DWI; just "suspicion" of DWI.  Plaintiff asked to speak to

the District Attorney who communicated with them over the telephone.  They refused and stated

that they will add an interference charge – i.e. interference with public duties.  Plaintiff was

thereafter forcefully roughed up, and taken to Mykawa Jail in the HPD vehicle.

At Mykawa Jail, Plaintiff was never asked, in compliance with required Texas

Transportation Code 724.012, to provide any blood or breath specimen.

Plaintiff was strapped down to a chair, and about 4 or 5 HPD officers, including officer

Wang, drew Plaintiff's blood without proper consent or authority.  During the blood draw, they

used unreasonable force on Plaintiff during which Plaintiff sustained multiple injuries, as a result

of the unreasonable force used by the HPD officers during the blood draw.

Plaintiff had bruises on his arm from the location where they made multiple and painful

needle insertions.  The state actor who drew the blood, made the multiple painful attempts because

he claimed that he could not locate Plaintiff's vein.  Plaintiff never saw a magistrate nor had an

examining trial.

After Plaintiff made bail, Plaintiff took photos of the physical injuries Plaintiff sustained

in his arm, due to the unconstitutional blood draw.

While the case was pending in trial county court, and while HYS and her state actor

cohorts/co-conspirators broke into Plaintiff's home and electronic files – including iPhone and

iCloud, the intruders accessed and deleted the photos of the injuries from the unconstitutional

blood draw, from Plaintiff's iPhone and iCloud account.

Also, after Plaintiff made bail, Plaintiff realized that the state actors – e.g. officer Wang –

took Plaintiff's license.   After leaving Mykawa jail, on 11/16/2019, Plaintiff immediately

requested an ALR hearing to contest the license taking, as a precautionary measure (Exhibit 9).  In the ALR request, Plaintiff made it clear that Plaintiff was never asked to give consent to the blood draw.  Plaintiff sought to also make this clear at the ALR hearing.

Plaintiff was never granted an ALR hearing.  Rather, Plaintiff was blind-sighted with a 01/14/2019 dated Order of Suspension in the mail (Exhibit 10), stating that Plaintiff's driving privilege was suspended from 12/24/2018 through 06/21/2019 because of refusal to provide a specimen of blood or breath following the arrest.

Plaintiff made various efforts to get an ALR hearing, but one was never given to Plaintiff.  Upon calling the Texas Department of Public Safety office in Austin, after receiving the 12/24/2018 order, Plaintiff understood that the license was suspended because the arresting officer, officer Wang, claimed/reported that Plaintiff refused to consent to a specimen draw; and that such refusal precluded any ALR hearing.  Plaintiff made it clear that the officer did not seek consent as required by statute, and Plaintiff still requested a hearing.

Plaintiff's driving privilege was still justly deprived, per the suspension, without the required due process including the ALR hearing.

## FACTS SPECIFICALLY FOR DEFEDANT MCGRAW

On 11/14/2018, HPD officers Wang and Terran, wrongfully arrested Plaintiff on a suspicion of misdemeanor Driving While Intoxicated ("DWI") charge.  The merits of the arrest or charge are irrelevant for this motion.

At no time pre or post arrest, and prior to requesting Plaintiff to provide any blood or breath specimen, did any Houston Police Department (HPD) officer ever inform Plaintiff of the following: "if the officer determines that the person is a resident without a license to operate a motor vehicle in this state, the department will deny to the person the issuance of a license, whether

or not the person is subsequently prosecuted as a result of the arrest, under the same conditions and for the same periods that would have applied to a revocation of the person's driver's license if the person had held a driver's license issued by this state."

HPD and its officers use Texas Department of Public Safety's ("TxDPS") promulgated DIC-24 Statutory Warning document and its contents, as their means of providing the required Texas Transportation Code Section 724.015's enumerated oral and written notice and warnings. (Exhibit 1.6)  This DIC-24 form is used throughout Texas by law enforcement officers in situations required under Texas Transportation Code Chapter 724 and its various sections, including before requesting a person to submit to the taking of a breath or blood specimen.

Amongst others, Plaintiff was rather subjected to the current DIC-24 statutory warning document. (Doc. 2, pg. 176 of 352)

Director McGraw is the Director of Texas Department of Public Safety (Doc. 2, pgs. 341 – 348 of 352).

This DIC-24 statutory warning sheet is promulgated by Texas Department of Public Safety (TxDPS).  The agency, acting under the authority of Director McGraw, drafts, enforces, and also makes the DIC-24 document available via their official TxDPS website with the weblink: https://www.dps.texas.gov/Internetforms/FormDetail.aspx?Id=236&FormNumber=DIC-24.pdf The actual document is available for download in TxDPS official website listed above, and via the following separate weblink:  https://www.dps.texas.gov/Internetforms/getForm.ashx?id=DIC-24.pdf

After Plaintiff made bail, Plaintiff realized that the state actors – e.g. officer Wang – took Plaintiff's driver's license.

On 11/16/2019, Plaintiff immediately requested an Administrative License Revocation

("ALR") hearing to contest the license taking, as a precautionary measure (Doc. 2, pg. 174 of 352) by inputting information into the following TxDPS official website: https://www.dps.texas.gov/DriverLicense/customer_service/alr.aspx

In the ALR hearing request, Plaintiff made it clear that Plaintiff was never legally requested to give consent to the blood draw by entering the, "Not Requested to Submit" option. (Exhibit 1.6) Plaintiff sought to also make this clear at the ALR hearing.

Plaintiff was never legally notice of, nor granted an ALR hearing.

Plaintiff was sent a 01/14/2019 dated Order of Suspension in the mail, stating that Plaintiff's driving privilege was suspended from 12/24/2018 through 06/21/2019 because of refusal to provide a specimen of blood or breath following the arrest. (Doc. 2, pg. 175 of 352, pg. 345 of 352)

Upon calling the Texas Department of Public Safety office in Austin, after receiving the 12/24/2018 order, Plaintiff understood that the license was suspended because the arresting officer, officer Wang, claimed/reported that Plaintiff refused to consent to a specimen draw; and that such refusal precluded any ALR hearing. Plaintiff made it clear that the officer did not seek consent as required by statute, and Plaintiff still requested a hearing (Doc. 2, pgs. 349 – 351).

Plaintiff's driving privilege was still justly deprived, per the suspension, without the required notice or ALR hearing. Plaintiff is subject to the $125 ALR reinstatement fee.

Defendant responded to the suit in State Court, with Defendant's Exhibits A – E (Doc. 2 pgs. 345 – 352 of 352), and its defenses.

Plaintiff never received Defendant's Exhibit B (Doc. 2, pg. 347 of 352). It is worth noting that said Exhibits B was clearly not addressed to Plaintiff, as they do not bear Plaintiff's name, nor Plaintiffs' address shown by the records of TxDPS or address in officer Wang's report in

Defendants' Exhibit E (Doc. 2, pg. 352 of 352) and Plaintiff's Exhibit 11 (Doc. 2, pg. 176 of 352).

Attached as Exhibit 1.1 is a screenshot of the following TxDPS website address contents:

https://www.dps.texas.gov/Internetforms/FormDetail.aspx?Id=236&FormNumber=DIC-24.pdf

Attached as Exhibit 1.2 is a screenshot of the following TxDPS website address contents:

https://www.dps.texas.gov/DriverLicense/customer_service/alr.aspx

Attached as Exhibit 1.3 is a copy of the DIC-24 form downloaded from the following

website on 12/5/2020: https://www.dps.texas.gov/Internetforms/getForm.ashx?id=DIC-24.pdf

Exhibits 1.1 and 1.2 shows that the website bears/contains the official seal of Texas

Department of Public Safety; as necessary per Federal Rules of Evidence authentication purpose.

Plaintiff accessed the websites and took the screenshot of said websites on 12/05/2020 around

5:08pm.

Exhibit 1.2 contains the same website where Plaintiff entered information on 11/16/2018

to request the ALR hearing.  There have been no changes, at least from Plaintiff's perspective or

recollection, to the website in Exhibit 1.2 and its contents.  Exhibit 1.2 is a good representation of

the same website Plaintiff accessed on 11/16/2018, and entered the ALR hearing request

information in Exhibit 1.4.  After entry of the information, Plaintiff received the email system

confirmation response in Exhibit 1.4 and Exhibit 1.4's contents.

Plaintiff accessed the website and weblink containing Exhibit 1.3 on 12/05/2020 around

5:40pm, and obtained the attached Exhibit 1.3.

Plaintiff also hereby attaches and submits another legible copy of Doc. 2, pgs. 174 – 176

of 353, as Exhibits 1.4, 1.5, & 1.6.


CAUSES OF ACTION FOR INCIDENT 8

<u>42 U.S.C. §1983 & §1985 against HPD officers, HPD, & Harris County</u>

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

False Arrest/False Imprisonment Sec. 1983 claim

Amongst others, Officers Wang, Terran, and others, intended to and did cause the willful, purposeful and wrongful, wanton, malicious, unreasonable, and fraudulent search, seizure, and/or detention/confinement of Plaintiff on 11/14/2018.   Their actions were also with deliberate indifference to Plaintiff's constitutional rights, health, and safety; and/or with, amongst others, malice, discriminatory intent and purpose to deprive Plaintiff of his equally protected constitutional rights, to cause substantial harm to Plaintiff.  At all relevant times, Plaintiff never consented to the unlawful detention or confinement, nor the unreasonable search and seizure.  At all relevant times, the officers had no authority of law for the unreasonable search and seizure of Plaintiff, no authority of law for the wrongful detention or confinement, and/or no authority of law to effectuate the wrongful detention or confinement.

Under the circumstances, they had no authority for a warrantless arrest per Texas Code of Criminal Procedure Ch. 14.  They arrested Plaintiff based on "suspicion."

Plaintiff incurred damages as a result the (actual and proximately caused by) the willful, purposeful and wrongful, wanton, malicious, unreasonable, and fraudulent search, seizure, and/or detention/confinement of Plaintiff on 11/14/2018, and the deprivation of rights including due process rights, including pain and suffering, mental anguish, reputational harm, loss of income, loss of income opportunities, and more.  Plaintiff prays for all damages sustained including exemplary and punitive damages allowed by law and equity.

Plaintiff also prays for all damages resulting from HPD's failure to train or adequately train

and/or failure to supervise or adequately supervise their staff, including Officers Wang and Terran. Arrests are not made on "suspicion" but based on probable cause. The officers lacked probable cause at the time of the arrest. The fact that they stated "suspicion of DWI" as their basis for the false arrest is enough admission to support lack of probable cause. No crime was committed before the any officer. They lacked the authority to make a warrantless arrest, and lacked probable cause.

Plaintiff prays for all damages sustained that were actually and proximately caused by HPD's failure to train or adequately train its officers, as allowed by law and equity.

<u>Excessive Force Sec. 1983 claim</u>

Amongst others, Officers Wang, Terran, John Doe 7 and John Doe 8 exerted wrongful and unreasonable force on Plaintiff on two occasions, (a) upon their arrest of Plaintiff based on their "suspicion" of DWI on 11/14/2018, and (b) upon the wrongful blood draw from Plaintiff at Mykawa Jail on 11/14/2018.

Their actions and force exerted on Plaintiff were beyond the bounds of force that a reasonable officer would use under the circumstances. They had no basis to even arrest Plaintiff based on "suspicion" as they stated/admitted. They had no probable cause at the time of the false arrest. Officer Wang could have easily executed proper statutory warning procedures, obtained consent from Plaintiff for a breath sample, or simply just sought and obtained a warrant if they could. Neither he nor any other officer did such. Rather, they sought to deprive Plaintiff of his equal protection and due process rights, and wrongfully seize and confine Plaintiff with unreasonable force if he resisted in any manner.

While at Mykawa Jail, upon the wrongful blood draw, Plaintiff was already strapped down to their chair with multiple restraining devices, and with various officers holding each of Plaintiff's arm. There was no need for all such officers to forcefully restrain Plaintiff, including the ones that

forcefully restrained Plaintiff's head for the unconstitutional blood draw.  The force used was unreasonable.

The officer/state actor who unconstitutionally drew the blood, used unreasonable, unnecessary, and unwarranted force to draw the blood in his use of the needle.  He also was not properly trained or qualified to execute the unconstitutional blood draw.  He could not find Plaintiff's vein, and stuck Plaintiff with the needle multiple times in order to unconstitutionally draw Plaintiff's blood.  Plaintiff sustained various injuries as a result of (i.e. actually and proximately caused by) the unreasonable, unnecessary and unwarranted force exerted upon the unconstitutional arrest of Plaintiff for "suspicion" of DWI, and the unreasonable, unwarranted and unnecessary force used during the unconstitutional blood draw at Mykawa Jail.  Plaintiff's injuries include but are not limited to physical injuries to Plaintiff's arm, pain and suffering, mental anguish, and reputational harm.  No reasonable prudent officer in their position would have applied the force they used at all relevant times against Plaintiff – i.e. for the arrest and for the unconstitutional blood draw.

Plaintiff prays for all damages resulting from the excessive force of the state actors, John Doe 5, John Doe 6, John Doe 7 and John Doe 8, Officers Wang and Terran; including any exemplary/punitive damages allowed by law and equity.

Plaintiff also prays for all damages resulting from HPD's failure to train or adequately train and/or failure to supervise or adequately supervise their staff, including Officers Wang and Terran, John Doe 5, John Doe 6, John Doe 7 and John Doe 8.  HPD should be able to train their staff in regards to proper and reasonable force necessary to Such failure to train or adequately train, and/or failure to supervise and adequately supervise, constitutes a deliberate indifference to the constitutional rights, health, and safety of Plaintiff to which HPD is therefore liable under §1983.

Section 1985(2) and 1985(3) claims

In regards to §1985 claims, there is clearly evidence of a conspiracy to obstruct justice, and deprive Plaintiff his equally protected right against excessive force, petition rights, Texas open courts rights, and due course of law rights.  The access to Plaintiff's iPhone and iCloud account, and the deletion of the evidence of Plaintiff's injuries from the wrongful blood draw is material evidence of such.  That is clearly obstruction of justice via unauthorized access to Plaintiff's iPhone and iCloud account, and destruction of evidence of excessive force that occurred on said 11/14/2019.

The unauthorized access and deletion of the evidence also supports that there was clearly an agreement – including the long-standing agreement – within HPD and its officers, and their cohorts/co-conspirators, to vindictively target and harm Plaintiff. It also supports that there was an intentional act, or multiple intentional acts, by the co-conspirators, to vindictively target Plaintiff and impede, deter, or hinder the due course of justice, so to deprive Plaintiff of his – amongst others – equal protected U.S. Constitutional right to petition the government for proper redress of grievance, and cause Plaintiff harm.  It also supports that the decision makers within HPD intentionally, or with deliberate indifference to Plaintiff's constitutional equal protection rights, health, and safety, fail to supervise or adequately supervise their subordinated and staff.  It also supports that the decision makers within HPD acquiesce to or participate in the wrongful actions of their subordinates, or authorize their subordinates to act to vindictively target and harm Plaintiff. It also supports that there is a custom, practice, and unwritten policy within HPD and Harris County District Attorney's office, and Harris County, to vindictively target Plaintiff, with intent to cause Plaintiff harm including via deprivation of Plaintiff's equal protection rights.  Such action is not the act of a rogue bystander because the evidence deleted is evidence against a bunch of HPD and

Harris County actors – i.e. State actors, and such evidence was destroyed with an intent to evade impede, deter, or hinder justice, and to deprive Plaintiff of his mentioned U.S. Constitution equally protected rights, and harm Plaintiff.

These HPD officers, HPD, and other state actors, acting with HYS and her cohorts, clearly acted to, amongst others, break into Plaintiff's phone and iCloud, without authority or consent, and destroy evidence of damages of the excessive force, and cause Plaintiff various substantial harm.

The main to access and destroy the evidence is by unauthorized access to Plaintiff's home, iPhone, and/or iCloud, via HYS and her cohorts/co-conspirators who continuously work with and/or on behalf of HPD and other state actors and her cohorts/co-conspirators, to further target and harm Plaintiff, including as described in sections above.  All their actions are clearly spiteful, vindictive, and done to get Plaintiff because of, amongst others, (a) because Plaintiff is a black male, an attorney, and of Nigerian origin, with knowledge of many wrongful state actor and their criminal co-conspirator actions, and fearless to zealously contest such wrongful actions/injustice; and (b) Plaintiff's lawful actions including (i) carrying out or attempting to carry out his contractual obligations in the civil rights and *qui tam* case, and/or (ii) exercising or attempting to protect his rights and protect his plaintiff and realtor interests in the cases, (iii) protect his business interests including in the diamond and gold deals, the relationship with the clients, and the business profits with HYS, (iv) petition the court for redress of grievance for their excessive force actions, and more.  These Defendants, including HYS, the State actors, and their cohorts/co-conspirators, seek to make sure that Plaintiff is financially ruined, reputationally ruined, and wrongfully convicted and incarcerated.

Plaintiff incurred damages as a result the (actual and proximately caused by) the conspiracy

including deprivation of rights, pain and suffering, mental anguish, loss of reputation, loss of income, loss of income opportunities, reputational injury, and more.  Plaintiff prays for all damages sustained including exemplary and punitive damages allowed by law and equity.

§1983 Declaratory & Injunctive Relief

Plaintiff seeks   §1983 allowed declaratory relief and/or injunction against Steven C. McGraw as Director of TxDPS, against any of his and state agency's (i.e. TxDPS') recognition or enforcement of the current DIC-24 statutory warning sheet, or any proceedings, notices, or orders resulting from the current DIC-24 statutory warning document; on the grounds that the DIC-24 document is unconstitutional – i.e. in violation of Texas Transportation Code 724.015, thereby subjecting or causing Plaintiff and similarly situated individuals to be deprived of U.S. and Texas Constitutional equal protection and due process right to proper Section 724.015 statutory warning notice; and subjecting or causing Plaintiff and similarly situated individuals to be deprived of their U.S. Constitutional due process and due course of law rights.  The §1983 injunction is allowed against state officials who purport to officially act on behalf of, or as agent of the State and/or State agencies.  *See e.g.*, *Ex Parte Young*, 209 U.S. 123 (1908).  Also, an act against a state official in his official capacity, is an act against the State.  *Id.* at 203.  Eleventh Amendment of U.S. Constitution does not apply since the State, acting though its official agent, consented to the suit by removing the case to federal court. *Lapides v. Board of Regents of University System of Georgia*, 535 U.S. 613 (2002). *See also*, *Meyers Benzing v. Texas*, 410 F.3d 236 (5th Circ. 2005).

Since Plaintiff is subject to a $125.00 reinstatement fee resulting from the use of the DIC-24 document, the continuous resulting subjection to or deprivation of Plaintiff's U.S. and Texas Constitutional equal protection, due process, and due course of law rights, and the revocations or suspension orders, and reinstatement fee requirement(s), constitute irreparable harm.

Such is because the DIC-24 document must be in compliance with Texas Transportation Code 724.015, a procedural statute with substantive due process rights protections. Otherwise, Plaintiff and individuals subjected to the statute, must forego their equally protected and due process right to notice in compliance with Section 724.015 in order to avoid (a) immediate deprivation of their right to consent or refuse consent to the invasion of their bodily integrity, or (b) having their driver's license or driving privilege immediately deprived or infringed upon per Section 724.032(2); all and before an ALR hearing. *See, e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 463 n.12 (1974) ("[A] showing of irreparable injury might be made in a case where . . . an individual demonstrates that he will be required to forgo constitutionally protected activity in order to avoid arrest.").

### The DIC-24 statutory warning sheet is unconstitutional on its face and as applied.

This DIC-24 statutory warning sheet is promulgated by Texas Department of Public Safety (TxDPS). *Texas Transportation Code Sections 724.001(7) & 724.003. See also, Texas Transportation Code Sections 724.032(b) & 724.032(d) if applicable.*

As a mandatory statutory procedural statute, the DIC-24 document is required to be in strict compliance with Texas Transportation Code 724.015, and all its subsections required to be read to applicable persons before an officer requests any consent to collect a breath or blood sample. *Texas Transportation Code Sections 724.015* ("…the officer **shall** inform…") (bold emphasis added)

Thereafter, if the person refuses to provide a breath or blood sample, then the officer can execute required measures including taking the driver's license of the person, and instituting ALR proceedings. *Texas Transportation Code Sections 724.015(7); 724.032; 724.034*

Since the DIC-24 document is unconstitutional on its face, i.e. is not in strict compliance with mandated and enumerated requirement of Texas Transportation Code 724.015, neither

Plaintiff nor any persons subjected to the DIC-24 document, is fairly noticed as required by Texas Transportation Code 724.015.  *See e.g., Schultz v. Performance Lighting, Inc*., 999 N.E.2d 331, 335-336 (2013) (discussing statutory construction with statutory words as "shall" interpreted as mandatory statutory requirement and requiring strict compliance.); *See also, Pierce v. Underwood*, 487 U.S. 552, 569 – 570 (1988) (discussing mandatory language implications in statutes where "shall" is enumerated); *Maine Community Health Options v. United States,* 140 S.Ct. 1308, 1320 (2020) ("The first sign that the statute imposed an obligation is its mandatory language: `shall'"); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 35 (1998) (recognizing that "`shall' [n]ormally creates an obligation").

Also, since the DIC-24 document is clearly missing Texas Transportation Code Section 724.015(6), it is not in strict compliance with Texas Transportation Code 724.015, and is thereby null and void for being unconstitutional on its face for deprivation of Plaintiff's 14th Amendment equal protection and due process rights.  *U.S. v. Stanley*, 109 U.S. 3, 11 (1883) (discussing nullity and void of state law that is contrary to 14th Amendment).  *See also, Shelby County, Ala. v. Holder*, 133 S.Ct. 2612, 2648 (2103) (citing *United States v. Raines,* 362 U.S., at 23, 80 S.Ct. 519 (a statute capable of some constitutional applications may nonetheless be susceptible to a facial challenge only in "*that rarest of cases where this Court can justifiably think itself able confidently to discern that Congress would not have desired its legislation to stand at all unless it could validly stand in its every application*")") (Italics added); *See also, Bostock v. Clayton County, Gerogia*, 140 S.Ct. 1731, 1737 (2020) ("…When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit.")

Texas Legislature's intent is clear on the face of Section 724.015.  It requires that all of the

subsections 724.015(1) through 724.015(7) are informed Plaintiff orally and in writing.  It clearly

uses the word "and" as the last word in 724.015(6).  Hence, Texas Legislature clearly would not

have desired for any oral or written information not in strict compliance with 724.015, to stand.

724.015 shows their unambiguous intent.  Hence the DIC-24 document is facially unconstitutional.

Therefore, the unconstitutional DIC-24 document subjects or caused **Plaintiff** to be

subjected to the deprivation of his 14th Amendment equally protection and due process right to

oral and written notice in strict compliance with Texas Transportation Code 724.015.   Since

Director McGraw of TxDPS is in charge of promulgating and enforcing the document, Plaintiff is

entitled to an injunction against Director McGraw of TxDPS and TxDPS' use, enforcement, and

recognition of the unconstitutional DIC-24 document.

Since the DIC-24 document is facially unconstitutional, it is also unconstitutional as

applied to Plaintiff.

**The ALR hearing and any orders resulting from the DIC-24 document are unconstitutional.**

Plaintiff was also deprived of his due process right to fair notice and ALR hearing

opportunity. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An

elementary and fundamental requirement of due process in any proceeding which is to be accorded

finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of

the pendency of the action and afford them an opportunity to present their objections.").

The ALR hearing document (Doc. 2, pg. 347 of 352) was not reasonably structured to

assure that Plaintiff received it.  Rather, it was drafted for "ASIMORA LAW FIRM" not Plaintiff,

and drafted on a date that assures that it is not timely received by law.  Hence, it was clearly

unreasonably structured to assure that Plaintiff does **not** receive it.  Such is contrary to U.S.

Supreme Court rulings. *Armstrong v. Manzo*, 380 U.S. 545, 550 - 552 (1965); *Robinson v.*

*Hanrahan*, 409 U.S. 38 (1974).

Plaintiff was never provided fair notice of the ALR hearing as required by Texas Transportation Code including its Section 724.033.  The document in Doc. 2, pg. 347 of 352 was clearly not addressed to Plaintiff in compliance with Section 724.033.  There is also no evidence that it was ever sent to Plaintiff in compliance with 724.033(a), nor timely received pursuant to 724.033(b).  Aside of the lack of evidence of being sent, the document shows that it was drafted on 11/26/2018.  Per Section 724.033(b), it is deemed received – if it was ever sent – as of 12/1/2018.  The 15-day deadline after 11/14/2018 falls on 11/29/2018 or 11/30/2018 at the latest.  Therefore, by statute, Plaintiff never received said document in Doc. 2, pg. 347 of 352.

Since the document in Doc. 2, pg. 347 of 352 contains a statement that "if the 15-day time period has already lapsed, then this letter is notification of your denial for a hearing, as your request is untimely…," and Plaintiff never received said by law, yet already made the request per Doc. 2, pg. 174 of 352.  TxDPS clearly received the request submitted and evidenced in Doc. 2, pg. 174 of 352, per the acknowledgement in Doc. 2, pg. 347 of 352: "We have received your request for an administrative hearing regarding the Notice of Suspension…."

Therefore, since TxDPS' response per Doc. 2, pg. 347 of 352, was drafted on a date that Plaintiff would be unable to receive it by law – i.e., 11/30/2018, Plaintiff was clearly also denied his due process right to fair notice and ALR hearing opportunity.

Therefore, any ALR proceeding or orders resulting from lack of an ALR proceeding, is null and void.  *Bass v. Hoagland*, 172 F.2d. 205, 209 (5th Circ. 1949), cert denied, 338 U.S. 816 (1949) ("We believe that a judgment, whether in a civil or criminal case, reached without due process of law is without jurisdiction and void, and attackable collaterally by habeas corpus if for crime, or by resistance to its enforcement if a civil judgment for money, because the United States

is forbidden by the fundamental law to take either life, liberty or property without due process of law, and its courts are included in this prohibition.")

Plaintiff is also subjected to the deprivation of 14th Amendment equal protection and due process right against deprivation of his already acquired driving privileges without the required 14th Amendment U.S. Constitutional due process or the required Texas Constitution due course of law. *U.S. Const. Amd. XIV; Tex. Const. Art. 1, Sec. 13*. TxDPS' use of the unconstitutional DIC-24 document can or does result in the deprivation of or infringement upon one's driving privileges – e.g. via the officer taking possession of the person's driver's license per *Texas Transportation Code Section 724.032(2)* – if the officer finds, after reading the unconstitutional DIC-24 document, that the person refused to consent to the taking of a breath or blood specimen. See *Robinson v. State of Florida,* 378 U.S. 153, 156 (1964) ("[S]tate action, of a kind that falls within the prescription of the Equal Protection Clause of the Fourteenth Amendment, may be brought about through the state's administrative and regulatory agencies just as through the legislature."); *See also, Mahone v. Addicks Utility Dist. of Harris County*, 836 F.2d. 921, 929 (1988) (explaining 14th Amendment due process claims with U.S. Supreme Court holding that "the fourteenth amendment's due process safeguards also extend to the 'interests that a person has already acquired in specific benefits.'")

The void DIC-24 document is an absolute nullity from the start as it lacks force or effect. It cannot form the basis for any legal right or proceeding. *Norton v. Shelby County*, 118 U.S. 425, 442 (1886) ("An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed.") Therefore, the use of the void DIC-24 document is equivalent to never asking as all as required by Texas Transportation Code 724.015, and even equivalent to the State,

officer, or TxDPS' failure to provide the constitutionally required notice. If one was never asked a required or mandated question, there is no obligation to respond; nor can one legally ever found to have refused something that was never asked as mandated by law. Had the DIC-24 included the red lettered proposal as Plaintiff proposed (Doc. 2, pg. 311 of 352), it would have provided the statutory required notice and warning, and would be constitutional.

Most importantly, since Section 724.015 affects individuals' fundamental due process right to privacy and notice, one is never put on the constitutional and statutorily required fair notice of the repercussions of their rights, actions, or inactions. *U.S. v. Davis*, 139 S. Ct. 2319, 2333 (2019) ("And much like the vagueness doctrine, it is founded on "the tenderness of the law for the rights of individuals" to fair notice of the law "and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department.") Defendant McGraw, TxDPS, or State of Texas will have to provide that the DIC-24 is narrowly tailored to achieve a compelling interest, via the least restrictive means; which it/they cannot do because Section 724.015 is a mandatory enumerated requirement by Texas Legislature, on point for the contemplated situation. *See e.g,  Washington v. Glucksberg*, 521 U.S. 1, 702, 720 - 721 (1973) (discussing heightened protection, "strict scrutiny," for deprivation of fundamental rights); *Schultz v. Performance Lighting, Inc*., *Pierce v. Underwood*, and *Maine Community Health Options v. United States, Supra,* pgs. 6-7.

Note that as determined by Texas Supreme Court's rules of Texas statutory construction, it is not within the court's jurisdiction to determine or intrude into Texas Legislature's policy intentions in the unambiguous enumeration of Texas Transportation Code Section 724.015's complete requirements. *Smith v. Davis*, 426 S.W.2d 827, 831 (Tex. 1968) ("In passing upon the constitutionality of a statute, we begin with a presumption of validity. It is to be presumed that the Legislature has not acted unreasonably or arbitrarily; and a mere difference of opinion, where

reasonable minds could differ, is not a sufficient basis for striking down legislation as arbitrary or unreasonable… The wisdom or expediency of the law is the Legislature's prerogative, not ours… 'There is a strong presumption that a Legislature understands and correctly appreciates the needs of its own people, that its laws are directed to problems made manifest by experience, and that its discriminations are based upon adequate grounds.'")

As discussed already, the continuous resulting subjection to or deprivation of Plaintiff's U.S. and Texas Constitutional equal protection, due process, and due course of law rights, and the revocations or suspension orders, and reinstatement fee requirement(s), constitute irreparable harm because Plaintiff and individuals subjected to the statute, must forego their equally protected and due process right to notice in compliance with Section 724.015, by accepting TxDPS' unconstitutional DIC-24 warning version, in order to avoid deprivation of their due process and equal protection right. *Supra, pg. 6.* Hence, per *Steffel v. Thompson*, Plaintiff and citizens subject to the DIC-24 document continuously incur irreparable harm. Such warrants an injunction against the use, recognition, and enforcement of the DIC-24 document.

Any resulting revocations, ALR proceedings, or TxDPS orders, that result from the use of the DIC-24 document, is also therefore unconstitutional and unenforceable. *See e.g., American Power Co., v. S.E.C.*, 329 U.S. 90, 108 (1946), ("Wherever possible, statutes must be interpreted in accordance with constitutional principles… But should the Commission neglect to follow the necessary procedure in a particular case, such failure would at most justify an objection to the administrative determination rather than to the statute itself…")  Plaintiff is not contesting or objecting to Texas Transportation Code Section 724.  Rather, Plaintiff contents the commissioned agency's (i.e. TxDPS's) administrative determination based on its unconstitutional DIC-24 document and TxDPS ALR proceedings.  Plaintiff also contests any TxDPS orders or

reinstatement fee requirements resulting from TxDPS' unconstitutional DIC-24 document, unconstitutional ALR proceedings, and unconstitutional orders.

Since Plaintiff was denied of fair ALR notice and hearing opportunity, the resulting order of suspension and license revocation is therefore unconstitutionally void for being issued in violation of Plaintiff's 14th Amendment due process right. *Bass v. Hoagland*, 172 F.2d. at 209.

The resulting $125 reinstatement fee order or requirement resulting from the use of the unconstitutional DIC-24 document, and the unconstitutional order of suspension, is also a void requirement or order. *Id*.

Since the DIC-24 document subject or causes Plaintiff and similarly situated citizens to be subjected to an ALR proceeding, the ALR proceeding and any orders resulting from the DIC-24 document, including order to pay a reinstatement fee, must be deemed as void.  But for the unconstitutional DIC-24 document, Plaintiff and similarly situated citizens would not be subjected to an ALR proceeding.  Such is clear because Texas Transportation Code Subchapter D and its Section 724.041 governs the ALR hearing. *Texas Transportation Code Subchapter D, §724.041.* Per Section 724.041(a), notice of suspension or denial under Section 724.032(a) triggers the ALR hearing. *Texas Transportation Code §724.041(a).*  The notice of suspension or denial is triggered by a persons' refusal to submit to taking of specimen. *Texas Transportation Code §724.032(a) & §724.033.*  And as already established, one cannot legally refuse what was never legally asked in compliance with the statute.

Therefore, any ALR proceeding, hearing, orders, or reinstatement fee requirement resulting from the use of the unconstitutional DIC-24 document, is rendered void.  The ALR proceeding is not a constitutionally recognized mitigating factor against (a) the irreparable harm that results from the already existing deprivation of 14th Amendment U.S. Constitutional substantive and procedural

due process rights, and (b) the burden placed on Plaintiff and similarly situated citizens to prove, at the ALR hearing, that there was no notice as required by Section 724.015, or there was no refusal as they were never legally asked in compliance with the statute.  There is no way to wipe the slate clean before the ALR hearing because the unconstitutional DIC-24 already leads to the civil rights deprivation without the proper mandated notice.  *See e.g.*, *Armstrong v. Manzo*, 380 U.S. 545, 550-552 (1965) (holding that a subsequent hearing is no remedy for the deprivation of Constitutionally mandated notice and due process).

Additional Section 1983 claims

Plaintiff also has and asserts a claim under Section 1983 against Officer Wang, for violation of the equal protection and due process rights of Plaintiff, resulting in the suspension of Plaintiff's driving privileges; per his claim/report that Plaintiff refused to consent to blood draw.  Plaintiff was clearly never asked for consent as required by Texas Transportation Code 724.015.  Hence, Plaintiff did not have to consent to anything until he was asked in compliance with Section 724.015.  The code is a procedural code that has strict requirements enumerated by Texas legislature, and is in regards to a substantive due process fundamental right to privacy and bodily integrity.  A violation of said narrowly tailored and required statutory procedure, is a violation of a U.S. Constitutional due process and equal protection right.

The fact that Officer Wang then reported that Plaintiff refused to provide consent, was then clearly wrongful.  He never requested in compliance with required statute.  The resulting 01/14/2019 order of suspension, which was an actual and proximate cause of officer Wang's wrongful and deliberate indifferent actions in his non-compliance with Section 724.015, is then clearly a deprivation of Plaintiff's equal protection and due process right because supposedly, the report from Officer Wang that Plaintiff refused consent, precluded any ALR hearing (see Section

724.015(2))… which really makes no sense to Plaintiff because it therefore means that Plaintiff and citizens still don't get a fair hearing before unjust deprivation of constitutionally entitled privileges, even when the actions of the State is clearly wrong/unconstitutional.

Officer Wang reporting that Plaintiff refused, when he did not comply with statute, was clearly spiteful, vindictive, and done to get Plaintiff because of, amongst others, Plaintiff's lawful actions not to have his equal protection and due process rights deprived. These guys – e.g. Officer Wang – knew Plaintiff was an attorney, and they knew that simply saying that Plaintiff refused to consent, results in an automatic suspension of the driver's license without any ALR hearing. Hence, Plaintiff's driving privilege guaranteed him under the 14th Amendment privileges and immunities clause, is thereby harmed; and Plaintiff would incur resulting expenses and damages including loss of income, reputational injury, loss of income opportunity, and more. Officer Wang simply used his police authority to harm Plaintiff.

Plaintiff also has a claim against HPD for failure to train Officer Wang in regards to obtaining informed consent in strict compliance with required Section 724.015. The fact that the DIC-24 document, a document created by a state agency, is not in compliance with state statute, does not preclude HPD from its responsibility to comply with state statutory law – i.e. Section 724.015, and ensure that its staff and subordinates comply with state statutory law. This is clearly established law. Clear as water. HPD has an Office of Legal Services department with general counsel services to ensure that statutory warnings comply with a clearly enumerated state statute. Harris County has its District Attorney and County Attorney's offices to provide them with legal counsel services, to ensure that statutory warnings comply with clearly enumerated state statute.

The fact that the unconstitutional DIC-24 has existed and has been wrongfully used since 2011, and has not been amended to comply with clearly established law, is further evidence of the

using entities' (e.g. HPD) and persons' (e.g. Officer Wang, etc.) deliberate indifference to the constitutional rights, health, and safety of Texas citizens subjected to the DIC-24 by failure to train them to comply with required State and Federal laws in their operations when applicable to the governing situation with citizens – including Plaintiff.

Plaintiff sustained injuries actually and proximately caused by HPD's deliberate indifference in their failure to train or adequately train officer Wang in proper compliance with Section 724.015, and sustained injuries actually and proximately caused by officer Wang's deliberate indifference in complying with clearly established Texas statute – i.e. 724.015.

Plaintiff incurred damages as a result the (actual and proximately caused by) the conspiracy including deprivation of rights, pain and suffering, mental anguish, loss of reputation, loss of income, loss of income opportunities, reputational injury, and more.  Plaintiff prays for all damages sustained including exemplary and punitive damages allowed by law and equity.

## ADDITIONAL CAUSES OF ACTION

### 42 U.S.C. §1983 & §1985 against HPD & Harris County with Class Action

Plaintiff herein incorporates all applicable facts and allegations in all sections above and below.

Plaintiff was never allowed to respond to the charges upon arrest and presentation in front of the magistrates (aka "criminal hearing officers"), or county or district court judges, who were acting under color of law.  Such is a clear violation of Plaintiff's U.S. Constitutional rights; due process and equal protection of the laws. Such supports that there is clearly a custom, written or unwritten policy, practice, or procedure that allows for such wrongful action/deprivation of due process rights.  These magistrates or county judges act on behalf of Harris County, with statutory authority conferred upon them.  U.S. Supreme Court has held that pre-trial detainees are allowed

to respond at such hearings.

Harris County/the magistrate's failure to ensure fair hearing to Plaintiff and other vulnerable class of individuals – i.e. pretrial detainees before the magistrate, is clearly, amongst others, a deliberate indifference to the constitutional rights, health, and safety of such individuals including Plaintiff. The proceedings are discriminatory against Plaintiff and his class of individuals, and discriminates in favor of the State or District Attorneys. People similarly situated in the proceeding – i.e. adversaries in the proceeding, are treated differently. One side (i.e. the State or person with government authority bringing the charge) is allowed to speak, and the other side (i.e. the vulnerable person charged with a crime) must keep quiet, is silenced, or deprived a fair opportunity to respond to the charge. Thereafter, the magistrate acting on behalf of the City or County, sets the bond amount, and the person is hauled off to jail. They must pay the bond, if given one, or stay in jail until resolution of their matter, which can take years based on the allegation. And just as in Plaintiff's situation, the allegations are flagrantly false or without merit.

HPD and its officers are aware of this. Hence, they take it upon themselves to charge individuals, including targeted individuals like Plaintiff, sometimes with the maximum possible charge, or any charge, even if there is no evidence or probable cause to support it. It becomes a harmful or vindictive money maker for the county, the state, and the city because the person charged, including Plaintiff, are not allowed to respond to the allegation at the probable cause hearing before the magistrate, the magistrate will likely set the bond based on the DA or State representative's recommendation, and the person must pay the amount to be release pre-trial, and is subject to pre-trial detention requirements. The person is subjected to and incurs property loss, financial loss, loss of liberty, and more injuries, without due process because they are deprived of their liberty upon being arrested or a pretrial detainee, and have to pay or incur financial obligations

with a bail bonding company… and that's a different story; and/or even pay a counsel to address the matter.

Furthermore, the person, including Plaintiff, incurs other harm including income or income opportunity losses as the case is dragged out in the courts; all because Plaintiff and such similar individuals were subjected to and/or deprived of their equally protected right to fair hearing from the start.

Simply, after reading the person his statutory warnings under Texas Penal Code 15.17, he can easily ask, "would you like to respond to the charges against you before I issue my findings in regards to probable cause?" Such an opportunity should be given to all persons including Plaintiff.

The various equal protection and due process rights deprivation in Plaintiff's cases, clearly subjected or caused harm to Plaintiff and similarly situated persons within the class. Harris County and HPD or City of Houston are jointly and severally liable for Plaintiff's damages, as well as the damages of similarly situated putative individuals within the class.

Plaintiff and other class member's injuries include mental anguish, emotional harm, pain and suffering, reputational injury, property damage, and financial injuries including loss of income and loss of income opportunities.

Plaintiff and similarly situated class members, are/were amongst others, continuously deprived of their U.S. Constitutional rights, including right to fair hearing in probable cause proceedings in Harris County and Houston, TX. This has resulted in deprivation of fundamental liberty and property rights, and has caused substantial harm to Plaintiff and countless others.

In one situation, e.g., on 10/3/2019, after watching about 8 – 10 other individuals be denied the right to be heard on probable cause at Harris County Jail, Plaintiff asked for the opportunity to rebut or respond to the District Attorney's statements or allegations on probable cause before he

issues his finding of probable cause, and was outright denied said right by the magistrate/hearing officer.  Also, on 10/07/2019, when brought before the District Court Judge on a matter, Plaintiff also asked to respond to the District Attorney's statements or allegations on probable cause before the judge issued his finding on probable cause, and was again denied said right by the District Court judge.  In other occasions, the District Court judge precluded any response from Plaintiff in regards to probable cause – e.g., on or around late July 2018; however, Plaintiff was no-billed by the grand jury.  In another occasion, in June 2018, upon appearance at the County Court at Law, case was dismissed the matter for lack of probable cause, which would have been precluded without deprivation of rights.

Plaintiff observed, on 10/03/2019, that the custom or practice of denying individual the right to contest or be heard on probable cause in their initial appearance before a criminal hearing officer/magistrate/judge, that it even occurs when the individual has counsel present.  The counsel provided individuals at Harris County Jail, therefore, simply just focuses on the bond hearing aspect.  When Plaintiff observed this, Plaintiff chose to represent himself thinking it would be difference.  It was not.  Plaintiff asked the judge if Plaintiff could to respond to the probable cause allegation, and the judge refused, and this was totally fine with the State counsel.  Just like in the other situations, the judge/hearing officer listens to the counsel for the state, e.g., the District Attorney counsel, makes his determination on probable cause without allowing rebuttal, he finds probable cause, and then the proceeding moves on to the bail/bond determination aspect.  Such is when the individual or their counsel is then allowed to rebut the State's allegations or position.

A key fact, just remembered, is that at the probable cause determination in District Court 182 after the 07/17/2018 arrest, Plaintiff also asked and was denied the opportunity to contest the statements or allegations of the District Attorney on probable cause at the appearance before the

interim judge behind the bench via rebuttal or response to the State's allegations.  This was upon

Plaintiff's first court appearance days after Plaintiff made bail.  The case as eventually no billed

by the grand jury after Plaintiff submitted a grand jury packet to contest probable cause.

Hence, there is clearly a custom or practice, policy or procedure, of denying Plaintiff and

similarly situated pre-trial detainees of their right to fair and impartial hearing on probable cause

in Harris County.

This U.S. Constitutional right to fair and impartial hearing on probable cause occurs in the

Harris County Court at Law, and in the Harris County District Courts.

Plaintiff was never allowed to respond to the charges upon arrest and presentation in front

of the magistrates who were acting under color of law.[5]  Such is a clear violation of Plaintiff's U.S.

Constitutional rights; due process and equal protection of the laws.[6]

There is clearly a custom, written or unwritten police, practice, or procedure that allows

for such wrongful action.  These magistrates act on behalf of Harris County, with statutory

authority conferred upon them.  U.S. Supreme Court has held that pre-trial detainees are allowed

to respond at such hearings.

<u>CLASS ACTION CERTIFICATION AGAINST HARRIS COUNTY, HPD, & HARRIS
COUNTY DISTRICT ATTORNEY'S OFFICE</u>

**<u>Numerosity</u>**:  Harris County/the magistrate's failure to ensure fair hearing to Plaintiff and other

---

[5] These magistrates are employees of Harris County, and compensated by county funds.  See Tex, Code of Criminal Procedure Art. 2.09, Tex. Govt. Code Sec. 54.854(c), and Tex. Local Govt. Code Chapter 81.

[6] Amongst others, such due process violation effectively labels individuals pre-trial detainees without an opportunity or rebuttal, similar to that deemed unconstitutional by U.S. Supreme Court in *Wisconsin v. Constantineau,* 400 U.S. 433 (1971).  Therefore, SCOTUS recognizes that a hearing, or fair hearing, requires an opportunity for one to rebut to allegations made against him or her.  Such ensures the abstract fair play to the individual whose rights or liberty are affected or being deprived, ensures that the hearing is done in a meaningful manner, ensures the constitutionally necessary and required fair process of decision making by an impartial tribunal, and precludes arbitrary encroachment of the such fundamental rights.  See *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Fuentes v. Shevin*, 407 U.S. 67, 80–81 (1972) See also "Right to Bail Hearings" attachment in Exhibit 30 (contains applicable U.S. Supreme Court cases on adversarial nature of the "initial appearance" i.e. the probable cause hearing.)

vulnerable class of individuals – i.e. pretrial detainees before the magistrate/criminal hearing officer or Harris County District Court Judges, is clearly, amongst others, a deliberate indifference to the constitutional rights, health, and safety of such individuals including Plaintiff. The proceedings are discriminatory against Plaintiff and his class of individuals, and discriminates in favor of the State or District Attorneys. People similarly situated in the proceeding – i.e. adversaries in the proceeding, are treated differently.  One side (i.e. the State or person with government authority bringing the charge) is allowed to speak, and the other side (i.e. the vulnerable person charged with a crime) must keep quiet, is silenced, or deprived a fair opportunity to respond to the charge.  Thereafter, the magistrate acting on behalf of the City or County, or the Judges acting on behalf of the County, sets the bond amount, and the person is hauled off to jail or deprived of their liberty.  They must pay the bond, if given one, or stay in jail, or have their liberty deprived, until resolution of their matter, which can take years based on the allegation.  And just as in Plaintiff's situation, the allegations are flagrantly false or without merit.

This continuously occurs daily, at least in Harris County.  Plaintiff has observed and experienced over 10 situations of its occurrence, and upon over 30 individuals.  That such U.S. Constitutional right to fair and impartial hearing on probable cause occurs in the Harris County Court at Law, and in the Harris County District Courts supports that there is clear evidence that this is a custom or practice, or a policy or procedure within Harris County jurisdiction

The class persons – i.e., those who were and are subjected or caused the deprivation of their equal protection and due process rights to a fair hearing, including opportunity to respond to the charges while in front of the magistrate, District Court Judge, and Harris County Court at Law Judge during probable cause component of the initial appearance hearings – are so numerous that joinder of all members is impracticable.  The class should also include those who incurred harm

as a result of the subjection or deprivation of the equal protection and due process rights of individual like Plaintiff.  Because the harm does not only end with the detained or the confined. Others like their immediate family members incur harm as a result.  Some of the detained/confined also die/get killed in custody, which could have been precluded by a fair probable cause hearing.

Therefore, the numerosity element of the class action is met for a §1983 and §1985 claim.[7]

**Commonality**:  There is a common question of fact and law that applicable to Plaintiff, that also governs all proposed Class Members – i.e. whether the individual was subjected to an adversarial probable cause initial appearance proceeding before a Harris County magistrate, District Court judges, and Harris County Court at Law judges, during probable cause proceedings that involved or resulted in the deprivation of their U.S. Constitutional equal protection and due process right to a fair and impartial tribunal, fair hearing, and arbitrary encroachment of fundamental rights including liberty rights.

**Typicality**:   The common claim and defense of Plaintiff and the class is that the probable cause/initial appearance proceeding before Harris County magistrates, District Court judges, and Harris County Court at Law judges are unconstitutional for lack proper notice and fair opportunity to respond to allegations made against the Defendant, lack of the abstract of fair play to the class member, lack of fair process of decision making by an impartial tribunal, and lack of arbitrary encroachment on fundamental rights.

---

[7] HPD and its officers, and the District Attorney staff are aware of this.  The District Attorneys are the counter-party or adverse party in the adversarial proceeding.  Hence, they take it upon themselves to charge individuals, including targeted individuals like Plaintiff, sometimes with the maximum possible charge, or any charge, even if there is no evidence or probable cause to support it.  It becomes a vindictive money maker for the county, the state, and the city because the person charged, including Plaintiff, are not allowed to respond to the allegation at the probable cause hearing before the magistrate, the magistrate will likely set the bond based on the DA or State representative's recommendation, and the person must pay the amount to be release pre-trial, and is subject to pre-trial detention requirements.  The person is subjected to and incurs property loss, financial loss, without due process because they have to pay or incur financial obligations with a bail bonding company… and that's a different story; or even pay a counsel to address the matter.

Simplified, or additionally, the common questions of fact and law within the members which include: (a) "Whether Plaintiff and other class members were denied their U.S. Constitutional equal protection and due process fair hearing opportunity – e.g. given fair opportunity to respond to their charges at the probable cause hearing before the magistrate;" (b) "Whether there is a conspiracy to deprive Plaintiff or his class of person of their equal protection and due process rights – including right to property, right against unreasonable search and seizure, detention or confinement – by subjecting or causing them the denial of a fair hearing/probable cause hearing;" and (c) "Whether there is a custom, practice, policy – written or unwritten, or procedure, that exists within HPD, City of Houston, and/or Harris County, that allows for such subjection or causation of the deprivation of Plaintiff and class member's equal protection and due process rights.

Another common claim of Plaintiff and class members is that the Harris County District Attorneys, HPD and its officers, and other Harris County law enforcement officers, are aware of these constitutional violations, and leverage such to their benefit and/or to subject or cause Plaintiff and other class members to be deprived of their equal protection and due process rights, and cause Plaintiff and other class members resulting harm.

**Adequacy**:  Plaintiff, as Class Representative, will fairly and adequately protect the interests of the class on equal protection and due process false arrest and/or false imprisonment claims, as well as the due process and equal protection claims for the subjection or cause of deprivation of liberty and property without due process; and any resulting conspiracy claims under §1983 and §1985 for deprivation of equal protection and due process rights.

Plaintiff as class counsel can also represent the interests of all Class Members himself. Plaintiff is a duly licensed attorney by the State Bar of Texas, and has always been and remains in

good standing.

Plaintiff has obviously done the necessary research, has the litigation background to adequately carry out this class action, and can vigorously prosecute the class claims as class representative and class counsel.

There is no conflict or antagonism between the interests of Plaintiff and Class Members. All interests are aligned as to the issues sought in the class certification, and in regards to the relief sought – damages resulting from the civil rights/U.S. Constitutional rights deprivations and conspiracy deprivations.

This project/class action is easily manageable because the main entities to work with to ascertain the class members are Harris County District Attorney's Office, Harris County District Clerk, Harris County Clerk, the various detention centers throughout Harris County.  The main entities to work with to ascertain the baseline of damages caused the class members are Harris County District Attorney's Office, Harris County District Clerk, Harris County Clerk, the various detention centers throughout Harris County and the various Bonding Companies throughout Harris County or Texas.

Harris County and the various local government entities also cause or subject Plaintiff and similarly situated persons, to the various length of pre-trial confinement or detention, i.e., the deprivation of the loss of liberty and property/financial costs for bond and/or counsel, etc., as well as their status as pre-trial detainees, all resulting from the unconstitutional initial appearance.

Once the class members are ascertained and noticed, they would then have the opportunity to provide proof of additional damages they sustained aside of any bail or bail bond damages incurred – e.g. loss of property/money, loss of income, loss of income opportunities, injury to reputation, emotional harm or distress, mental anguish, pain and suffering, and more.  Even though

judges are absolutely immune from suit, the damage claims for the civil rights deprivations that occur before the magistrate and county court judges, are claim for damages against Harris County as their employer under the **custom or practice**, and arguably the policy or procedure, aspects of §1983 and §1985 claims.  For the sake of §1985 claims, the intercorporate doctrine is inapplicable since HPD, Harris County District Attorneys, and other non-Harris County entities/persons/individuals, are also participants in the conspiracy.

Plaintiff and class members are also entitled to a §1983 injunction against any probable cause order for any pending or outstanding/unadjudicated matters that resulted from unfair and partial adversarial probable cause proceeding in any tribunal before Harris County as mentioned in this motion.

In regards to financing the class action, that is relatively complex yet simple for Plaintiff. It shall go according to the following **<u>Proposed Plan</u>**:

1. Once the class action certified, and Plaintiff appointed as Class Representative and Class Counsel, Plaintiff-Counsel intends to begin by requesting/exchanging discovery from/with Harris County District Attorney's Office, Harris County District Clerk, Harris County Clerk, the various detention centers throughout Harris County and the various Bonding Companies throughout Harris County or Texas, to ascertain all the actual Class Members, and for the sake of future calculation of the aggregate baseline of damages.

2. There will be a hearing, and/or trial if necessary, in regards to Plaintiff's case situation, with evidence presented for other class members' situations.  This will be to adjudicate the existence of the alleged civil rights violations, the applicability to other class members, and adjudicate the scope of the injunction against any applicable and pending probable cause order determinations.

3. If to be settled without trial, Plaintiff-Counsel shall work with Harris County to enter into a settlement agreement in regards to proposed modifications on their policies and procedures in Harris County District Courts, Harris County Courts at Law, and initial appearance proceedings, in regards to probable cause.[8]  Plaintiff-Counsel shall also work with Harris County, HPD, and Harris County District Attorney's Office to exchange discovery and enter into a settlement in regards to Plaintiff's damages on the civil rights deprivations; otherwise a hearing or trial will be executed as necessary on damages.

4. If settled, without trial on damages, there will be a hearing to this Court's approval of the settlement in regards to Plaintiff's damages on the civil rights deprivations.

5. Within 5 business days of this Court's approval of the settlement terms in the preceding paragraph, Harris County, HPD, and Harris County District Attorney's Office shall then compensate Plaintiff for Plaintiffs' damages to Plaintiff's designated account.

6. Upon receipt of the payment for the preceding paragraph, Plaintiff as Class Representative and Class Counsel, shall then send out a class notice to all Class Members.  Notice shall be sent via mail to the address provided Plaintiff by Defendant(s), and shall also be posted in various newspapers throughout Harris County.

7. All other Class Members shall have an opportunity to (a) opt-out, or (b) provide Plaintiff with additional evidence of their damages.

8. Plaintiff as Class Representative and Class Counsel shall with Harris County and District Attorney's Office and any other necessary entities to then enter into a settlement with Harris County, HPD, and Harris County District Attorney's Office as to the remaining Class

---

[8] In reality, it's just the requirement that in any probable cause proceeding, the arbitrator/criminal law hearing officer/magistrate/county judge/district court judge must ask a Defendant/alleged Defendant, "would you like to respond to the charges against you before I issue my findings in regards to probable cause?"  Such an opportunity should be given to all persons including Plaintiff.

Members' damages, and any applicable injunction orders for Class Members.

9.  The Final Settlement Hearing shall occur on or before July 1, 2022, and shall be in regards to any objections on the settlement terms including Class Counsel attorney's fees and costs, and administration of class settlement funds.

10. Within 10 business days of the Final Settlement Hearing, Harris County, HPD, and Harris County District Attorney's Office shall remit 61% of the agreed damages settlement funds into this Court's registry, remit 39% of the gross amount of the damages' settlement for the remaining Class Members (i.e., exclusive of damages paid to Plaintiff) to Plaintiff's designated account as Class Counsel compensation.  1% of the gross amount of the damages' settlement for the remaining Class Members, shall be remitted to Plaintiff's designated account as Class Counsel compensation on a pro-rata basis as each Class Member's damages are distributed to the Class Member upon submission of the Class Member's elected means of damages payment.

11. After 2years, any uncollected or undistributed settlement damages shall be shared equally and distributed to the whole class on a per-stripes basis.

Per the above, Plaintiff will adequately represent the interests of all Class Members in the injunction sought against enforcement of any unconstitutional probable cause orders DIC-24, and for any resulting §1983 and §1985 equal protection and due process rights deprivation claim for damages.  Plaintiff should also be able to finance this class action – subject to this Court's orders.

Plaintiff will fairly and adequately protect the interests of the class on equal protection and due process false arrest and/or false imprisonment claims, as well as the due process and equal protection claims for the subjection or cause of deprivation of property without due process.

<u>CLASS ACTION AGAINST DEFENDANT MCGRAW & TxDPS</u>

**<u>Numerosity</u>**:  Plaintiff's equal protection and due process rights were also deprived as a result of

the unconstitutional Statutory Warning (i.e. the current DIC-24 document).  This statutory warning is applied state-wide per Texas Department of Public Safety's state-wide jurisdiction.  Per the attached truncated report from Texas Department of Public Safety ("TxDPS"), (Doc. 2, pgs. 307 – 310 of 352), there were 88,163 DWI charges in 2016, 90376 DWI charges in 2017, and 97,660 DWI charges in 2018 in all Texas Counties.  Hence there is a total of **at least** 276,199 different individuals that were subjected to Texas Transportation Code ("TTC") §724.015 informed consent requirement, and the current DIC-24 statutory warning sheet.  Such is sufficient enough basis to meet the class numerosity requirement for class certification.

**Commonality**:  There is a common question of fact and law that applicable to Plaintiff, that also governs all proposed Class Members – i.e. whether the individual was subjected to the DIC-24 statutory warning in an alleged situation as enumerated in TTC §724.011 and/or TTC §724.015, on or after 11/14/2016.

**Typicality**:  The common claim and defense of Plaintiff and the class is whether the DIC-24 document is unconstitutional for non-compliance with TTC §724.015 enumerated requirements. If not in compliance, then Plaintiff and Class Members were clearly subjected to and/or caused the deprivation of their U.S. and Texas Constitutional equal protection and due process rights of the Class Members were clearly deprived.  Furthermore, the common question of fact and law applicable to Plaintiff and all Class Members is in regards to damages.  All Class Members are subjected to and/or caused damages including the $125.00 reinstatement fee exposure or charge. This reinstatement fee is required to be paid to TxDPS for renewal or issuance of driver's license; and applies in situations of TTC §724.015(2), §724.015(4), §724.015(5), and §724.015(6). Plaintiff and the Class Members are caused additional damages including mental anguish, loss of reputation, loss of income, loss of income opportunities, reputational injury.

If this Court finds that the DIC-24 document is unconstitutional, then a common defense against the effectiveness of the DIC-24 document is a §1983 injunction against its enforcement or applicability; with said defense common and applicable to all persons subjected to the DIC-24 document – since it is used throughout TxDPS jurisdiction (i.e. Texas).

**Adequacy**:  Plaintiff is a viable class representative for (a) a declaratory judgment action under Texas Civil Practice and Remedies Code Chapter 37; (b) an injunction against the use, recognition, and enforcement of the current DIC-24 under §1983; and (c) a §1983 injunction against any $125.00 reinstatement fee payment requirement consequent to any use of the DIC-24 in the State of Texas - as incurred or sustained by Plaintiff and Class Members.

Plaintiff is a counsel and can represent the interests of all Class Members himself.  Plaintiff has done the necessary research, has the litigation background to adequately carry out this class action, and can vigorously prosecute the class claims as class representative and class counsel.

There is no conflict or antagonism between the interests of Plaintiff and Class Members. All interests are aligned as the class certification sought is in regards to an injunction on the enforceability, effectiveness, or unconstitutionality of the DIC – 24 form.

This project/class action is easily manageable because the main entities to work with on the injunction to preclude or resolve the resulting $125.00 reinstatement fee damages, are Steven McGraw and TxDPS.  TxDPS has all information on all Class Members in their database, and Plaintiff-Counsel can request the information via discovery.

In regards to financing the class action, that is relatively complex yet simple for Plaintiff. It shall go according to the following **Proposed Plan**:

12. Once the DIC-24 is found unconstitutional, the class action certified, and Plaintiff appointed as Class Representative and Class Counsel, Plaintiff-Counsel intends to begin by requesting

the information from Steven McGraw and TxDPS, to ascertain all the actual Class Members, and calculate the aggregate $125.00 individual Class Member damages or damages exposure – which is partly clear per Doc. 2, pgs. 307 – 310 of 352.

13. Plaintiff-Counsel shall work with Steven McGraw of TxDPS and his staff, to enter into a settlement agreement in regards to the proposed modifications to the DIC – 24 form to meet Texas Legislature requirements (Doc. 2, pg. 311 of 352), and settlement terms of the injunction.  The settlement terms are as proposed in Doc. 2, pgs. 312 – 317 of 352, and shall include Plaintiff-ClassCounsel attorney's fees and costs paid in two tranches.

14. Within 5 business days of this Court's pre-approval of the settlement terms at a Preliminary Hearing, Steven McGraw and TxDPS shall then pay the first tranche of the settlement, applicable for the attorney's fees and costs for notice and administration of the settlement, to Plaintiff-ClassCounsel's designated account.

15. Upon receipt of the payment for the attorney's fees and costs for notice and administration of the settlement, Plaintiff-ClassCounsel shall then send out a class notice to all Class Members (see Doc. 2, pg. 318 of 352).

16. The Final Settlement Hearing shall occur on July 1, 20201, and shall be in regards to objections on the settlement terms.

17. On or before 07/06/2021, Steven McGraw shall release the remainder of the attorney's fees and costs due Plaintiff-ClassCounsel via a second tranche payment to Plaintiff-ClassCounsel at said Plaintiff-ClassCounsel's designated account.

18. Plaintiff shall then move to certify class for §1983 claims against other Defendants or putative Defendants – i.e. the various governmental entities throughout Texas – for the non-reinstatement fee damage claims incurred by putative Class Members.

19. Plaintiff shall present to this Court, a Proposed Plan for each class action sought to be certified for said non-reinstatement fee damages claims that are due the Class Members, against future class action Defendants.

Per the above, Plaintiff will adequately represent the interests of all Class Members in the injunction sought against enforcement of the DIC-24, and for any resulting §1983 equal protection and due process rights deprivation claim for damages.  Plaintiff will also be able to finance this class action.

Plaintiff is a duly licensed attorney by the State Bar of Texas, has always been and remains in good standing.

<u>RELIEF REQUESTED</u>

Plaintiff also prays for any and all relief allowed by law and equity including those requested in this pleading, and: (a) order that neither Director McGraw or TxDPS are entitled to sovereign immunity; (b) order, adjudge, and decree that the current TxDPS promulgated statutory warning sheet (i.e. the DIC-24 document in Exhibits 1.3 & 1.6) as used by law enforcement throughout Texas, are unconstitutional and void; (c) Steven C. McGraw as Director of TxDPS, and TxDPS, are enjoined against any (i) recognition or enforcement of the current DIC-24 statutory warning sheet in Exhibits 1.3 or 1.6, and (ii) any recognition or enforcement of any proceedings, notices, or orders resulting from the current DIC-24 statutory warning document with a sample in Exhibit 1.3 or as used in Exhibit 1.6, including any recognition of the 01/14/2019 order of suspension of Plaintiff's driver's license in Exhibit 1.5, and any of Plaintiff's requirement to pay any resulting fee (e.g. the $125.00 reinstatement fee as stated in Exhibit 1.5); (d) certify class as requested above in the McGraw class action; (e) grant Plaintiff and Class Members a 42 U.S.C. §1983 injunction against (i) any recognition of the 01/14/2019 order of suspension of Plaintiff's

driver's license, and (ii) any requirement to pay any fee (e.g. the $125.00 reinstatement fee); (f) order Plaintiff's as Class Representative; (g) order Plaintiff and Adimora Law Firm, PLLC and Class Counsel in the McGraw and TxDPS class action, with compensation for attorney's fees and costs fixed at the following formula:  40% of the greater of (i) 276,199 multiplied by $125.00, or (ii) $125.00 multiplied by the number of individual Class Members with the exclusion of Plaintiff; (h) certify class as requested above for the class action against Harris County, HPD, and Harris County District Attorney's Office, with the Class Members defined as "All individuals, family members of individuals, and persons subjected to or involved in adversarial probable cause initial appearance proceeding before a Harris County magistrate/criminal hearing officer, a Harris County Court at Law Judge, and a Harris County District Courts; which involved or resulted in the deprivation of U.S. Constitutional equal protection and due process right to a fair tribunal and/or fair hearing, and arbitrary encroachment of fundamental rights to liberty and property; and since 06/17/2016;" (i) Order Plaintiff, Ernest Adimora-Nweke, as Class Representative for the §1983 and §1985 Class Actions against Harris County, HPD, and Harris County District Attorney's Office; (j) Order Adimora Law Firm, PLLC and its legal representative(s), as Class Counsel for the class action against HPD, Harris County, and Harris County District Attorney's Office, with compensation for attorney's fees and costs fixed at the following formula:  40% of the gross amount of damages of the Class Members with the exclusion of Plaintiff's damages; and (k) Preliminarily approve the Proposed Plan for the Class Action Suits as proposed in this pleading or in the class action motion.

Any grammar, syntax, or spelling error in this pleading should kindly be excused.  This pleading should be construed to effectuate all the claims pled or intended to be pled, per the facts, including its embedded possible misappropriation of fiduciary property, additional fraud, and

124

tortious interference with contract claims.

Exhibits in Doc. 2, pg. 58 – 70 of 352, pg. 174 – 176 of 352, pg. 307 – 319 of 352, and pg. 323 – 324 of 352 are all hereby incorporated by reference. Exhibits 1.1, 1.2, 1.3, 1.4, 1.5, & 1.6, all on file in the cause number above, filed with Plaintiffs' partial summary judgment and injunction motion, and are all hereby incorporated by refence.

Respectfully Submitted,
 /s/ Ernest C. Adimora-Nweke, Jr
Ernest C. Adimora-Nweke, Jr
Texas State Bar Number: 24082602
c/o Adimora Law Firm
3050 Post Oak Blvd., Suite 510
Houston, TX 77056
281-940-5170 (Office)
ernest@adimoralaw.com
*Pro Se Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above petition has this day, December 8, 2020, been filed and shall be served or delivered to all necessary parties, in this case or to the various attorneys of such necessary parties, in due course as allowed by the Court and pursuant to Federal Rules of Civil Procedure.

Respectfully Submitted,
 /s/ Ernest C. Adimora-Nweke, Jr
Ernest C. Adimora-Nweke, Jr
Texas State Bar Number: 24082602
c/o Adimora Law Firm
3050 Post Oak Blvd., Suite 510
Houston, TX 77056
281-940-5170 (Office)
ernest@adimoralaw.com
*Pro Se Plaintiff*